**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MANIDHAR KUKKADAPU, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | No. 1:16-cv-06277 (RMB) |
| -against- | **JURY TRIAL DEMANDED** |
| EMBRAER S.A., FREDERICO PINHEIRO FLEURY CURADO, JOSÉ ANTONIO DE ALMEIDA FILIPPO, PAULO PENIDO PINTO MARQUES, LUIZ CARLOS SIQUEIRA AGUIAR, TERENA PENTEADO RODRIGUES, and FLAVIO RIMOLI, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE .......................................................... 8

III.   PARTIES ........................................................................................... 8

     1.    Lead Plaintiff ....................................................................... 8

     2.    Defendants ............................................................................ 8

     3.    Relevant Nonparties............................................................ 10

IV.   SUBSTANTIVE ALLEGATIONS ................................................... 15

    A.        Background ................................................................. 15

    B.        The Fraudulent Scheme ............................................. 17

     1.    Dominican Republic Bribery Scheme ............................... 19

     2.    Saudi Arabia Bribery Scheme ........................................... 31

     3.    Mozambique Bribery Scheme............................................ 35

     4.    India Bribery Scheme ........................................................ 38

     5.    Regulatory Action and Embraer's Admissions.......................... 42

        i.     U.S. Regulatory Actions ................................... 43

        ii.    Brazilian Regulatory Actions.................................... 47

        iii.   Indian Regulatory Actions ............................................ 48

        iv.    Embraer's FCPA Violations ......................................... 48

        v.     Embraer's Failure to Adhere to its Code of Ethics and Conduct ....................................................... 49

        vi.    Embraer's Woefully Inadequate Internal Controls ...................... 51

        vii.   Embraer's Failure to Record a Charge for Anticipated Regulatory Penalties ....................... 58

        viii.   Embraer's Violations of Management Discussion and Analysis............................................... 60

        ix.    Pre-Class Period False and Misleading Statements and Omissions.............................................. 61

    C.        False and Misleading Statements and Omissions During the Class Period .. 62

|  |  | 1. | 2012 Statements | 67 |
|  |  | 2. | 2013 Statements | 92 |
|  |  | 3. | 2014 Statements | 110 |
|  |  | 4. | 2015 Statements | 128 |
|  |  | 5. | 2016 Statements | 145 |
|  | D. | | The Truth Slowly Emerges | 153 |
|  | E. | | Additional scienter allegations | 163 |
|  |  | 1. | Defendant Curado's Knowledge | 167 |
|  | F. | | Defendants Aguiar's Knowledge | 170 |
|  | G. | | Defendant Rimoli's Knowledge | 172 |
|  | H. | | Defendant Rodriguez's Knowledge | 173 |
| V. | NO SAFE HARBOR | | | 174 |
| VI. | LOSS CAUSATION/ECONOMIC LOSS | | | 174 |
| VII. | RELIANCE PRESUMPTION | | | 175 |
| VIII. | CLASS ACTION ALLEGATIONS | | | 176 |
| IX. | CLAIMS FOR RELIEF | | | 179 |
|  | COUNT I | | | 179 |
|  | COUNT II | | | 182 |
| X. | PRAYER FOR RELIEF | | | 183 |
| XI. | DEMAND FOR TRIAL BY JURY | | | 184 |

Lead Plaintiff the Employees' Retirement System of the City of Providence ("Lead Plaintiff" or "Providence"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's Amended Class Action Complaint ("Complaint") against Defendants, alleges the following based upon (i) personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and (ii) information and belief as to all other matters from the investigation conducted by and through Lead Plaintiff's attorneys.  This investigation included a review of the following, without limitation: Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Embraer S.A. ("Embraer," "ERJ," or the "Company"); analysts' reports and advisories about the Company; documents from governmental and legal proceedings within the U.S. and abroad; information readily obtainable from public sources; and information learned from confidential sources.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a securities fraud class action ("Action") on behalf of a class ("Class") of all persons and entities who purchased or otherwise acquired Embraer securities during the period from January 11, 2012 through and including November 28, 2016 (the "Class Period").   This Action is brought under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      Embraer manufactures commercial, executive, and defense aircrafts and sells them to governmental and private customers throughout the world.  It is the world's largest manufacturer of mid-size commercial jets and a leading Brazilian exporter.

3.      For nearly a decade, Embraer has engaged in and covered up a brazen and sprawling bribery scheme.  Examples of this pervasive culture of bribery are the schemes that Embraer admitted to carrying out in the Dominican Republic, Saudi Arabia, Mozambique, and India.  The Company admitted that between 2007 and 2011, several of its high-level executives helped effectuate approximately $11.5 million[1] in bribes to secure contracts with government officials or agents in these four countries that in total were worth $463.1 million in revenue and $83 million in profits.  For purposes of comparison: (i) the $83 million in profits from the contracts executed through bribes represents about 7% of the Company's net income throughout the Class Period; (ii) the $304.4 million in revenue from the contracts executed through bribes within Embraer's Defense and Security business unit represents about 6% of this unit's revenue throughout the Class Period; and (iii) the $158.7 million in revenue from the contracts executed through bribes within Embraer's Commercial Aviation business unit within this unit's Other geographic operating region (including Mozambique and Saudi Arabia) represents about 20% of this unit's revenue within that geographic region throughout the Class Period.

4.      Specifically, Embraer admitted to paying bribes of the following: (1) $3.52 million to Carlos Piccini Nunez ("Piccini"), the General Manager of Programs and Special Projects to the Secretary of the Dominican Republic's Airforce or Fuerza Aerea de Republica Dominicana ("DRAF"), to obtain a contract for eight aircrafts valued at $96.4 million; (2) $1.5 million to Mazen Snobar, an employee of the public Saudi Arabian company Saudi Aramco, to obtain a contract for three aircrafts valued at $93 million; (3) $800,000 to at least one executive at Mozambique's state-owned and controlled airline, Linhas Aereas de Mocambique, S.A. ("LAM"), through a fraudulent commercial-representation agreement with Mozambican official Mateus Lisboa Gentil Zimba

---

[1] All figures herein are in U.S. dollars, unless stated otherwise; all figures herein are approximates.

("Zimba"), to obtain a contract for two aircrafts valued at $32.69 million per aircraft and a down payment of $312,000 for a third aircraft; and (4) $5.76 million to at least one Indian official with the Indian Air Force, through a fraudulent commercial-representation agreement with Vipin Khanna ("Khanna") (an alleged arms dealer), to obtain a contract for three aircrafts valued at $208 million.

5.      As a result, the Company has agreed to pay over $200 million, which is 16% of the Company's net income throughout the Class Period, to U.S. and Brazilian regulators for violations of the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA") and several other laws.  But the repercussions of Defendants' misconduct have not ended there.  Embraer faces continued investigation from U.S. and Brazilian regulators, where criminal prosecutors have opened criminal investigations under case numbers 0022500-03.2014.4.02.5101, 0041280-88.2014.4.02.5101, 0505412-21.2016.4.02.5101, and 0508034-73.2016.4.02.5101 (collectively, "Brazilian Criminal Actions"), and may face charges in India.  Moreover, these three countries have been cooperating in their parallel investigations with France, South Africa, Spain, Switzerland, and Uruguay.

6.      A deluge of Embraer admissions to regulators demonstrates the Company's culpability.  For example, in executing a deferred-prosecution agreement with the U.S. Department of Justice ("DOJ"), Embraer admitted to the following, without limitation:  "[A]n individual within *high-level personnel of the organization participat[ing] in, condon[ing], or was willfully ignorant of the offense*"[2]; the nature and seriousness of Embraer's offenses was "pervasive[] throughout each of the Company's three separate sales divisions and [had] involvement of high-level executives in each set of criminal conduct"; as of October 24, 2016, according to the DPA, Embraer had not disciplined a senior executive with oversight responsibility over the employees

---

[2] All emphasis is added herein, unless stated otherwise.

engaged in the illegal activity, even though the senior executive was at least aware of the bribery discussions in 2004, as reflected in emails; and many "*of the high-level executives who knew about the false nature of the agreements and the improper purpose of the payments had the authority and responsibility to ensure that EMBRAER devised and maintained an adequate system of internal accounting controls, knew that EMBRAER'S then-existing internal accounting controls failed to prevent EMBRAER from entering into false agency agreements and making improper payments, and knowingly and willfully failed to implement adequate internal accounting controls to address the known weaknesses, in part to permit EMBRAER to enter into false agency agreements and funnel bribes to foreign officials.*"[3]

7.      Brazilian regulators have already named as criminal defendants ten former Embraer senior executives, including former members of the Company's Board of Executive Officers ("Executive Board").  Two of those named criminal defendants are defendants in this Action, Luiz Carlos Siqueira Aguiar ("Aguiar") and Flavio Rimoli ("Rimoli").

8.      Defendant Frederico Pinheiro Fleury Curado ("Curado") was Embraer's Chief Executive Officer ("CEO") and President.  At least one former Embraer executive stated that Curado knew about the Dominican Republic bribery scheme.  Also, a commercial agent who worked with Embraer for decades testified to Brazilian regulators that Curado was aware of the Dominican Republic bribery scheme through circumstantial evidence, such as his relationship with Curado and Curado's required approval of the extremely atypical and fraudulent commercial-representation agreements used to effectuate the schemes.

9.      Defendant Aguiar has been an Embraer Executive Board member, the Executive vice president ("VP") of the Defense and Security business unit, and the Company's Chief

---

[3] All emphasis herein is added, unless stated otherwise.

Financial Officer ("CFO").  Facts revealed from the regulators' investigations demonstrate that Aguiar was aware of the Dominican Republic, Mozambique, and India bribery schemes.  For example, Aguiar was aware of Piccini's demands for bribes, Aguiar was aware of and interacted with the middleman used to effectuate the schemes, he executed the extremely atypical and fraudulent commercial-representation agreements used to effectuate the schemes, and even in one email to him concerning aircraft sales in Ecuador, an Embraer executive stated that "I am under attack since they said there is no contract for the Super Tucano due to a legal report. … We would make an international consulting contract to be paid in December after Legacy's submission without mentioning the plane and the country.  We would have them tied up to give us time to close the Super Tucano [contract] without surprises and to do the Legacy submission without fear. *This way, I avoid infringing the anti-corruption laws of the country and I keep them supporting us.*"

10.     Defendant Rimoli served as an Embraer Executive Board member, General Counsel, Executive VP of Corporate Services, and Secretary of Embraer's Board of Directors ("Board").  Facts revealed from the regulators' investigations demonstrate that Rimoli was aware of the Dominican Republic and Mozambique bribery schemes.  For example, Rimoli advised senior Embraer executives on how to effectuate the bribes to Piccini to hide their true purpose, and Rimoli executed the extremely atypical and fraudulent commercial-representation agreements used to effectuate the schemes.

11.     Defendant Terena Penteado Rodrigues ("Rodrigues") has been an Embraer Executive Board member and Executive VP-General Counsel.  Facts revealed from the regulators' investigations demonstrate that Rodrigues actively participated in the India bribery scheme.  For

example, Rodrigues hid the extremely fraudulent and atypical commercial-representation agreement with Khanna in a lockbox in London.

12.     Embraer's involvement in the bribery schemes was flagrant to the point that the Company used two of its subsidiaries to execute the fraudulent commercial-representation contracts with intermediaries and dole out the bribes.  A substantial function of Embraer Representations LLC was to transfer several bribes from its New York bank account to effectuate the Dominican Republic, Saudi Arabia, Mozambique, and India schemes.  Also, a substantial function of ECC Investment Switzerland AG was to pay bribes to effectuate the India scheme.

13.     Throughout the Class Period, in addition to Defendants' false certifications under the Sarbanes-Oxley Act of 2002 ("SOX"), Embraer disclosed materially false and misleading statements regarding the following, without limitation: revenue, income, and cost metrics in both Embraer's consolidated and business-segment financial reporting; the aircraft agreements with and deliveries to the Dominican Republic, Saudi Arabia, Mozambique, and India; the nature of Embraer's subsidiaries, a substantial function of which were to execute the extremely atypical and fraudulent commercial-representation contracts used to effectuate the schemes and to dole out the bribes; provisions for foreseeable and quantifiable liabilities; adherence to the Company's code of ethics and business practices; internal controls; and knowledge about the very bribery schemes at the heart of this Action.

14.     The Class suffered damages through several curative disclosures that slowly revealed the truth of the Dominican Republic, Saudi Arabia, Mozambique, and India bribery schemes.  These revelations of the fraud eviscerated at least $2.53 billion in ADR shareholder value.

15.     Embraer can find no solace in hiding behind its vague and weak warnings to investors since 2010.  Defendants muted the severity of the investigations and their foreseeable outcomes by disclosing only, in essence, that Embraer received a subpoena from the SEC in 2010 relating to possible violations of the FCPA, that the Company was fully cooperating with the SEC and DOJ in connection with the investigation, and that the Company was "unable to predict duration, scope or results of the investigation" and that "there [was] no basis for estimating reserves or quantifying any possible contingency."

16.     Even before the Class Period, Defendants launched a campaign to hide the severity of Embraer's endemic culture of bribery.  On November 4, 2011, Embraer hosted a conference call to discuss the Company's third quarter 2011 results.  In response to a question about the recently announced regulatory investigations into the bribery schemes, Defendant Curado said the following: "So I apologize, but this is exactly where we are.  And as I said, we remain with serenity, knowing the seriousness of what the process like that is, the serenity of a company that *has voluntarily adopted all the processes, the code ethics, adhere to the Global Compact of the United Nations with – following with follow-up* reports.  So we just have to wait and in an orderly way."

17.     Acknowledging Defendants' undeniable culpability, as it must in the face of these damning admissions, the Company's current President and CEO, Paulo Cesare de Souza e Silva, stated the following during an October 31, 2016 earnings call:  "So, let me elaborate a little bit on this because, of course, this is a high profile case for us.  I think this is over now.  We have to turn this page so the company unfortunately made that mistake years ago.  *The company is responsible for that*."

## II.   JURISDICTION AND VENUE

18.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.   This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.   Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  A substantial part of the conduct complained of herein, and the subsequent damages, occurred in this Judicial District, and the Company's American Depository Receipts ("ADRs") are traded on the New York Stock Exchange ("NYSE"), which is located in this Judicial District.

21.   In connection with the acts, conduct, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of a national securities market.

## III.   PARTIES

### 1.   Lead Plaintiff

22.   Lead Plaintiff Providence, as set forth in its previously filed certification on October 7, 2016, purchased Embraer securities during the Class Period on the NYSE and was damaged upon the revelation of the alleged curative disclosures.

### 2.   Defendants

23.   Defendant Embraer is incorporated under the laws of Brazil, with its principal executive offices located at Avenida Presidente Juscelino Kubitschek, 1909, São Paulo Corporate

Towers, 04543-907, São Paulo, Brazil.  In North America, Embraer maintains its regional office in Fort Lauderdale, Florida.

24.     Defendant Frederico Pinheiro Fleury Curado ("Curado") was Embraer's CEO and President from 2007 through his resignation effective July 2016.  He has worked at Embraer for more than 32 years, 22 years of which as an officer.  He was an Embraer Executive Board member during the Class Period.

25.     Defendant José Antonio de Almeida Filippo ("Filippo") was Embraer's Executive VP of Finance, its CFO, and its Chief Investor Relations Officer ("CIRO") since June 2012.  He was an Embraer Executive Board member during the Class Period.

26.     Defendant Paulo Penido Pinto Marques ("Marques") was Embraer's Executive VP of Finance, CFO, and CIRO between July 2011 and April 2012.  He was an Embraer Executive Board member during the Class Period.

27.     Defendant Luiz Carlos Siqueira Aguiar ("Aguiar") was Embraer's Executive VP of the Defense and Security business unit since January 2011.  He resigned in February 2014.  Before holding this position, between 2009 and 2010, he was Embraer's CFO.  Prior to that, between 2006 and 2008, he was Embraer's Executive VP of the defense market and governmental aviation products and systems divisions.  He was an Embraer Executive Board member during the Class Period.  Aguiar was named as a defendant in the Brazilian Criminal Actions.

28.     Defendant Terena Penteado Rodrigues ("Rodrigues") joined Embraer in 2004 as an Associate General Counsel for the Company's regulatory division and later for the sales and after-market divisions.  She became Embraer's Senior VP-General Counsel & Compliance in 2012 and since April 2013, she has been Embraer's Executive VP-General Counsel.  She was an Embraer Executive Board member during the Class Period.

29.     Defendant Flavio Rimoli ("Rimoli") began employment at Embraer in 1984, serving as Senior VP of the Commercial Aviation business unit between 2002 and 2005, as General Counsel between 2005 and 2012, and as Executive VP-Corporate Services between 2012 through 2013.  Between 2005 and 2012, Rimoli was also the Secretary of Embraer's Board.  Also, he has been an officer or member of the board of several of Embraer's subsidiaries.  He was an Embraer Executive Board member during the Class Period.  He was named as a defendant in the Brazilian Criminal Actions.

30.     The Defendants referenced above in ¶¶24-29 are sometimes collectively referred to herein as the "Individual Defendants."

### 3.     Relevant Nonparties

31.     Luis Carlos Affonso ("Affonso") has worked at Embraer since 1985.  Between 2005 and 2011, he was Embraer's Executive VP of the Executive Jets and Executive Aviation business units.  Prior to 2005, he held several positions at Embraer, including Senior VP of Engineering and New Product Development, having led the Embraer 170 and 190 aircraft programs since their inception.  He is currently Embraer's Senior VP of Operations and Chief Operating Officer of the Commercial Aviation business segment.  He was an Embraer Executive Board member during the fiscal year ending December 31, 2010.

32.     Silvia Araujo ("Araujo") has worked at Embraer since March 2000 and currently is a Proposals and Contracts Manager.

33.     Ricardo Araujo de Siqueira ("Siqueira") worked at Embraer from 1971 through 1974 and from 1978 through 2012, with his final position as Financial Processing and Control Manager in Singapore.  He was deposed by Brazilian regulators on November 11, 2013.

34.     Margarida Maria Bedeschi ("Bedeschi") worked at Embraer as Contract Administrator in the Indirect Purchasing & Supply Chain department between 2002 and 2012.

35.     Sergio Bellato Alves ("Alves") worked at Embraer as VP of Marketing and Sales in Asia and for the Defense and Government Market business unit.

36.     Ricardo Marcelo Bester ("Bester") worked at Embraer as Director of Marketing and Sales in the Defense and Government Market business unit in the Europe, Middle East, and Africa ("EMEA") regions.  Bester was named as a defendant in the Brazilian Criminal Actions.

37.     Rubens Mathias Bueno ("Bueno") worked at Embraer as a Contracts Negotiator in the Defense Market business unit between 2008 and 2012.

38.     Patrice Candaten ("Candaten") worked at Embraer as the Head of Sales for the Commercial Aviation business unit between 1998 and 2016.

39.     Remo Vinicius Casarsa de Souza ("Casarsa") works at Embraer as Director of Contracts in the Executive Jets business unit.

40.     Albert Phillip Close ("Close") worked at Embraer as a Senior Manager for Proposals and Contracts in the Defense Market business unit.  Close was named as a defendant in the Brazilian Criminal Actions.  He also signed a plea agreement and testified about the Dominican Republic bribery scheme.

41.     José Luis D'Avila Molina ("D'Avila") is currently Embraer's Senior Commercial VP of the Defense and Security business unit.  Before, he was Embraer's VP of the Airline department in EMEA and VP of Contracts for the Commercial Aviation business unit.

42.     Eduardo Augusto Fernandes Fagundes ("Fagundes") has worked at Embraer as a Manager and Contracts Negotiator for the Defense Market business unit.  He has been named as a defendant in the Brazilian Criminal Actions.

43.     Geraldo Ferreira ("Ferreira") worked at Embraer as VP of Customer Support in the Defense and Government Market business unit.

44.     Orlando Jose Ferreira Neto ("Orlando") worked at Embraer between 1998 and 2010.  He was Embraer's Executive VP of the Defense and Government Market business unit between 2009 and 2010 and an Executive Board member.  He was named as a defendant in the Brazilian Criminal Actions.

45.     Tony Fitzpatrick ("Fitzpatrick") worked at Embraer as a Regional Sales Director for the Middle East.

46.     Luiz Alberto Lage da Fonseca ("Fonseca") worked at Embraer as Senior Manager of Special Programs Contracts and as Contracts Negotiator for the Defense and Government Market business unit.  Fonseca was named as a defendant in the Brazilian Criminal Actions.

47.     Sergio Frias ("Frias") began working at Embraer in 1999 and became VP of Contracts for the Executive Jets business unit in October 2008.

48.     Luiz Fuchs ("Fuchs") serves as the President and Managing Director of Embraer Aviation Europe, SAS.

49.     Luiz Eduardo Zorzenon Fumagalli ("Fumagalli") has worked at Embraer since May 2000 and serves as the Director of International Marketing and Sales for the Defense Market business unit in Latin America and the Caribbean.  He has been named as a defendant in the Brazilian Criminal Actions.

50.     Sergio Gonçalves Horta ("Horta") worked at Embraer as Planning, Prospecting, and New Business Integration Advisor for the Defense Market business unit.  He was deposed by Brazilian regulators on December 10, 2013 and asserted a right to remain silent.

51.     Carlos Alberto Molina ("Molina") worked at Embraer as a Sales Manager for the Parts and Services department between 1979 and 2012.

52.     Braulio Innocêncio da Motta Neto ("Motta") worked at Embraer in Accounts Payables and Receivables between 2008 and 2011.  He was deposed by Brazilian regulators on November 11, 2013.

53.     Eduardo Munhós de Campos ("Campos") was Embraer's VP of the Airline Market department in Latin America.  Campos was named as a defendant in the Brazilian Criminal Actions.

54.     Acir Luiz de Almeida Padilha Junior ("Padilha") was Embraer's VP of Marketing and Sales in the Americas.  Padilha was named as a defendant in the Brazilian Criminal Actions.

55.     Dulce Maria Silva de Campos Riecken ("Riecken") worked at Embraer between 1998 and 2009 and held the position of Contracts Administrator.

56.     Jose Vitor da Rocha ("Rocha") started working at Embraer in 2004.  He worked in Procurement & Purchasing of Spare Parts between 2005 and 2011 and then as a Compliance Analyst.  He was deposed by Brazilian regulators on November 11, 2013.

57.     Rosangela Vieira Vilhena Santoro Caetano ("Caetano") worked at Embraer between 2002 and 2011 as Manager of Proposals and Contracts in the Defense Market business unit.

58.     Marlon Castilho da Matta Silveira ("Silveira") worked at Embraer for 12 years and held the position of Senior Manager for Spare Parts Purchasing.

59.     Paula Staciarini ("Staciarini") has worked at Embraer since October 2010 and holds the position of Senior Contracts Manager.

60.     Colin Steven ("Steven") was appointed as Embraer's VP of Executive Aircraft Marketing and Sales in November 2005 and left Embraer in January 2014.

61.    Andres Juan Pablo Toro Amigo ("Amigo") worked at Embraer as Legal Counsel between 2007 and 2009.  He was deposed by Brazilian regulators on November 27, 2013.

62.    Mauro Kern Junior ("Kern") worked at Embraer as Executive VP of the Airline Market business unit between 2007 and 2011 and then as Executive VP of the Engineering and Technology business unit.  He served as an Embraer Executive Board member during the Class Period.

63.    Antonio Luiz P. Manso ("Manso") was Embraer's CFO and Executive VP of Finance from 1995 to 2008.  He was also Executive VP of Corporate from 2001 through 2008 and served on the Executive Board during that period.

64.    Elio Moti Sonnenfeld ("Sonnenfeld") was Embraer's commercial representative for decades.  He was named as a defendant in the Brazilian Criminal Actions, but all charges against him were dismissed in February 2016 as a result of his cooperation with authorities.

65.    Vipin Khanna ("Khanna") is a United Kingdom-based defense consultant and alleged arms dealer.  He conspired with Embraer to bribe at least one official with the Indian Air Force, through a fraudulent commercial-representation agreement, to obtain a contract with the Company for three aircrafts valued at $208 million.

66.    Carlos Piccini Nunez ("Piccini") was the General Manager of Programs and Special Projects to the Secretary of the DRAF.  He is currently in preventive detention in the Dominican Republic as a result of allegations of bribery in connection with the Dominican Republic bribery scheme.

67.    Mazen Isam Snobar ("Snobar") worked at the public Saudi Arabian company Saudi Aramco between 1977 and 2012, serving as Executive Director of Industrial Services from 2009 until his retirement.

68.     Mateus Lisboa Gentil Zimba ("Zimba") worked as a Resident Director at Sasol Petroleum International in Mozambique from 2007 through 2016.  He facilitated Embraer's bribe to at least one Mozambique official in connection with a contract between LAM and the Company for two aircrafts valued at $32.69 million per aircraft and a down payment of $312,000 for a third aircraft.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

69.     Embraer was founded in 1969.  The Company was formerly known as Embraer-Empresa Brasileira de Aeronáutica S.A. and changed its name to Embraer S.A. in November 2010. Shares of Embraer's stock trade on the New York Stock Exchange ("NYSE") as American depositary receipts ("ADRs") under the ticker symbol ERJ.  Embraer's common stock trades on the BM&F Bovespa stock exchange in Sao Paulo, Brazil.  Several of Embraer's debt securities traded during the Class Period as well.

70.     Embraer Representations LLC ("Embraer RL") is Embraer's wholly owned subsidiary incorporated in Delaware.  Its financial statements are consolidated into Embraer's financial statements.  A substantial function of Embraer RL was to execute the extremely atypical and fraudulent commercial-representation agreements and pay illegal bribes necessary to effectuate the schemes in the Dominican Republic, Saudi Arabia, Mozambique, and India.

71.     ECC Investment Switzerland AG ("ECC Investment") is Embraer's wholly owned subsidiary based in Switzerland.  ECC Investment's financial statements are consolidated into Embraer's financial statements.  A substantial function of ECC Investment was to pay illegal bribes in the scheme in India.

72.     Embraer manufactures commercial, executive, and defense aircrafts and sells them to governmental and private customers throughout the world.  It is the world's largest manufacturer

15

of mid-size commercial jets and a leading Brazilian exporter.  Embraer supplies defense aircrafts to the Brazilian Air Force and other countries throughout the world.  It also manufactures executive and regional aircrafts and offers aviation services.  In 2015, Embraer employed over 22,000 employees worldwide and had revenues of just under $6 billion.

73.    As part of its Commercial Aviation business unit, Embraer developed the ERJ 145 aircraft family ("ERJ 145"), which is a 37-50 passenger twin jet-powered regional aircraft. Embraer also developed larger aircrafts, including the EMBRAER 170 ("170") and EMBRAER 190 ("190") aircraft families, which are the Company's 70-130 passenger jet offerings.

74.    In 2011, Embraer added capabilities to its Defense and Security business unit, which was an important step for the Company to become a key supplier of the Brazilian federal government and governments worldwide.  This unit's operations mainly involve research, development, production, modification, and support for military and security aircraft purchasers.

75.    Based on Embraer's ERJ 145 regional aircraft platform, the Company developed the Airborne Early Warning and Control ("AEW&C") EMB 145 aircraft ("AEW&C 145").

76.    Another Embraer aircraft offering within its Defense and Security business unit is the Super Tucano aircraft.

77.    According to Embraer's By-Laws, the Company's Board and Executive Board are the Company's management bodies.  Representation of the Company falls on the Executive Board.

78.    Embraer's By-Laws task the Executive Board at each fiscal year's end to prepare the following financial statements: balance sheet; statement of changes in stockholders' equity; income statement; statement of changes in financial position; and statement of cash flows.

79.    Also, Embraer's By-Laws mandate that the Executive Board has authority to perform generally all acts required to achieve the Company's purposes.  It is specifically

incumbent on the Executive Board to do the following, without limitation: annually prepare and submit to the Board the Company's business and strategic plans and general budget and monitor their implementations; propose to the Board the Company's basic guidelines; annually submit to the Board the management report and accounts of the Executive Board, auditors' opinions, and proposed earnings allocations for the preceding year; appoint and remove directors, officers, and managers of the Company's operating units and controlled companies; create and terminate the Company's operating units; submit to the Board and Fiscal Council detailed quarterly balance sheets of the Corporation; annually prepare and present to the Board action, target, and performance plans for each office of the executive officer; and authorize the Company to offer security or guaranty and to extend financing to its controlled companies, special-purpose companies, and other companies directly or indirectly controlled by the Company, duly consolidated with the Company in its financial statements.

80.    All of the Individual Defendants were on Embraer's Executive Board at various times during the Class Period.

**B.    The Fraudulent Scheme**

81.    As set forth in detail below, Embraer has admitted in the DPA and other agreements with U.S. and Brazilian regulators to a bribery scheme whose far reaching tentacles span the globe.

17



82.     Specifically, the Company's high level executives engaged in a bribery scheme between 2007 and 2011 to secure contracts with government officials in the Dominican Republic, Saudi Arabia, Mozambique, and India, which generated $463.1 million in revenue and $83 million in profits.  For purposes of comparison: (i) the $83 million in profits from the contracts executed through bribes represents about 7% of the Company's net income throughout the Class Period; (ii) the $304.4 million in revenue from the contracts executed through bribes within Embraer's Defense and Security business unit represents about 6% of this unit's revenue throughout the Class Period; and (iii) the $158.7 million in revenue from the contracts executed through bribes within

Embraer's Commercial Aviation business unit within this unit's Other geographic operating region (including Mozambique and Saudi Arabia) represents about 20% of this unit's revenue within that geographic region throughout the Class Period.

### 1. Dominican Republic Bribery Scheme

83. Between 2008 and 2010, Embraer paid Piccini, the General Manager of Programs and Special Projects to the Secretary of the DRAF, a $3.52 million bribe to obtain a defense contract for eight Super Tucano aircrafts valued at $96.4 million.  Of this amount, Embraer documents revealed that the Company transferred $100,000 directly to Piccini's company and $3.42 million to the company Globaltix S.A. ("Globaltix"), an Uruguayan company controlled by Sonnenfeld, who was a commercial representative that Embraer contracted for sales campaigns in other countries.  The latter amount was ultimately funneled to Piccini.  These bribe amounts were expressly referenced in the contract with Globaltix.

84. The process began around June 2007 when Embraer intensified efforts to sell Super Tucano aircrafts to the DRAF, without any bid contest or public process of acquisition.

85. In the middle of 2008, Embraer negotiated a majority of the contract terms with the DRAF.  But the Dominican Republic Senate ("Dominican Senate") had not yet approved the contract nor its financing model with the National Economic and Social Development Bank, which were necessary steps for the deal.  Several high-level Embraer executives and Piccini then discussed how to influence the Dominican Senate to provide the necessary approvals.

86. On August 7, 2008, Piccini presented the agreement terms and defended the acquisition of the Super Tucanos before the Dominican Senate's Finance Committee.

87. A chain of Embraer emails reflect that on August 25, 2008, Fumagalli, then Embraer's Director of International Marketing and Sales for the Defense Market business unit in Latin America and the Caribbean, informed Campos, then Embraer's former VP of the Airline

19

Market department in Latin America, that Piccini would discuss the "PLR$"—an abbreviation that refers to the participation in profits and results—with a Dominican senator.  Piccini wanted to talk with a Dominican Senator about compensation for the Senator and wanted to raise this with Embraer beforehand.

88.     Around September 1, 2008, Campos undertook to pay Piccini 3.7% of the value of the purchase-and-sales contract with the DRAF, which amounted to nearly $3.52 million.  Around that same time, Campos emailed Defendant Aguiar, then Executive VP of the Defense Market business unit and an Executive Board member, indicating that the Dominican Senate would meet shortly to approve the financing of the deal and that they wanted to have the representation contract signed beforehand.

89.     Embraer documents reveal that around September 8, 2008, Piccini and Campos discussed the value to be paid to Piccini.  Piccini indicated that Embraer should pay $2.408 million, indicating that value would be $92,000 less than what was agreed upon in the meeting, and that $920,000 still needed to be paid, corresponding to 1% of the value of the contract.

90.     Around September 17, 2008, an Embraer document reflects that Campos informed Defendant Aguiar about a call from Piccini informing Campos that the Dominican Senate approved the financing for the deal.

91.     Embraer employees discussed how to handle the commission that Piccini demanded.  Embraer's Legal Department viewed consulting agreements signed after the execution of a sales contract as "high risk."  So around September 17, 2008, a senior Embraer sales executive emailed another senior Embraer executive in the Defense and Government Markets business unit requesting that he ask a senior Embraer Legal Department executive to find a solution.

92.     In December 2008, Embraer mailed official correspondence relating to the sales contract to Piccini's office.

93.     Around December 24, 2008, the Dominican Senate approved the sales and financing contracts for the eight Super Tucano aircrafts for $96.4 million.  Shortly before this, Embraer received a letter reflecting that the Secretary of the DRAF authorized Piccini to sign the necessary invoices and certificates on the Dominican Republic's behalf.

94.     Around January 9, 2009, Embraer publicly announced the sale of eight Super Tucano planes to the DRAF.  Piccini then repeatedly solicited Embraer for the promised bribes.

95.     Embraer documents reflect that around January 22, 2009, Piccini specified the amounts and the names of the companies to receive each payment: Ferraboc, $2.5 million; Magycorp, $920,000; and 4D Business Group, $100,000.

96.     At this time, Embraer had not yet paid Piccini the bribes that he demanded—for himself or on behalf of others—in part because some Embraer employees raised questions about the sales commission and sought guidance from Embraer's senior executives, including employees in Embraer's Legal Department, about how to proceed.  Rather than terminate the promise to pay Piccini, Embraer's senior executives merely instructed subordinates to find a solution that did not involve the Legal Department.

97.     Embraer was alerted to the suspicious nature of these Dominican Republic dealings. Embraer emails reflect that around March 11, 2009, an internal-controls-related email signaled the illicit character of the bribe-related transactions associated with the Dominican Republic dealings.

98.     Around March 16, 2009, Piccini emailed Fagundes, then an Embraer Manager and Contracts Negotiator for the Defense Market business unit, copying Campos, insisting that

Embraer initiate the agreed payments and noting that Piccini was under pressure from interested and compromised parties.

99.     Embraer documents reflect that in response to Piccini's repeated requests, around April 24, 2009, Embraer RL effectuated a transfer in the amount of $100,000 from its bank account in New York to a bank account in the Dominican Republic, in favor of the company 4D Business Group.  That payment was realized when two Embraer employees, Fagundes and Bueno, then Contracts Negotiator in the Defense Market business unit, traveled to the Dominican Republic and had their passports retained as individuals allegedly linked to Piccini.  Embraer's internal investigation ascertained that after these employees were stopped, Close sent proof of the payment of the solicited value, referring to it as their "life-line."

100.     In his deposition before Brazilian regulators around November 12, 2013, Bueno testified that Piccini held Fagundes' passport when he was in the Dominican Republic to encourage Embraer to pay a debt to 4D Business Group of about $100,000.  Bueno testified that every time that he was in the Dominican Republic, he never saw 4D Business nor its employees, nor even knew where it was located.

101.     After the first $100,000 payment, Piccini continued insisting on receiving bribes that were promised and, as reflected in Embraer's documents, Defendant Rimoli, then Embraer's General Counsel and an Executive Board member, advised senior Embraer executives and managers involved in the Dominican bribes how to effectuate them to hide their true purpose.

102.     Around September 30, 2009, Close emailed Orlando stating that Defendant Rimoli had advised the use of an intermediary, Sonnenfeld, who previously acted as Embraer's commercial representative, to effectuate the two remaining payments to Piccini, instead of making the payments directly to the companies named by Piccini.  This was also discussed with Defendant

Aguiar.  Indeed, in his deposition before Brazilian regulators around November 11, 2013, Aguiar, who worked at Embraer in the areas of sales, finance, accounts payable and receivables, and treasury, testified that all contracts for commissions in the Embraer defense area needed authorization from the Embraer VPs of Defense and Legal.

103.    Another Embraer document reflects that around October 16, 2009, Geraldo Ferreira ("Ferreira"), then Embraer's VP of Customer Support for the Defense and Government Market business unit, emailed Defendant Rimoli, asking for directions on how to proceed and adding that Ferreira feared the pressure from "four stars"—a reference to high-ranking Dominican military officials.

104.    A November 5, 2009 email reflects that Campos informed Sonnenfeld that Piccini would be Sonnenfeld's point of contact in the Dominican Republic, Piccini was a DRAF Colonel and a friend of four star generals, Piccini supplied a secure telephone number to use to contact DRAF members, and Piccini was designated as the intermediary between Embraer and DRAF members.

105.    Another Embraer email reflects that around November 16, 2009, Piccini emailed Campos to confirm that Piccini spoke with Sonnenfeld and warning that at least the first of the pending payments needed to be made by the month's end.

106.    Around February 3, 2010, a senior Embraer manager indicated in an internal email that a senior Embraer legal executive was in favor of using a consulting agreement with Piccini as a conduit to pay the remaining bribes owed.  Around that time, a senior Embraer sales executive and Piccini exchanged several emails discussing the roles each would play in resolving the matter. These emails described Piccini as the interface between two groups in the Dominican Republic

involved in obtaining the Super Tucano contract.  Piccini was also described as the bridge between Embraer and the Dominican official.

107.    Embraer's internal investigation revealed that around March 12, 2010, Embraer RL and Sonnenfeld's company, Globaltix signed a purported commercial-representation agreement for sales to the Jordanian Air Force, the terms of which included Embraer RL paying Globaltix an 8% commission on all successful plane sales.   The agreement also included provisions of anticipated payments to Sonnenfeld in the amounts of $2.5 million and $920,000.  These totaled $3.42 million, the exact value that Embraer promised to Piccini.

108.    Defendants knew, or should have known, well before the execution of the Globaltix contract, that Globaltix had a tainted history of suspicious activity.  Indeed, almost a year before Embraer RL and Globaltix executed the commercial-representation agreement, an internal Embraer August 10, 2009 email from Santoro, then Embraer's Manager of Proposals and Contracts in the Defense Market business unit, to Fagundes reflects the startling results from a preliminary investigation into Globaltix Ltd.  A mere Google search revealed that Globaltix's founders, Daniel Angel Perez Blanco ("Blanco") and Marisa Cristina Gonzalez Silvestri ("Silvestri"), were involved in companies that sold weapons illegally, irregularities in property acquisitions, money laundering, and Argentinian arms dealing being investigated by Interpol.  Subsequent Embraer emails around September 22, 2009 reflect that Bester and Molina, then Embraer's Sales Manager for the Parts and Services department, discussed a "Cousin" who was trying to "change shells." Then around November 20, 2009, there was email discussion between Sonnenfeld and Close reflecting that the names of Blanco and Silvestri were taken off of Globaltix's board.  Email correspondence around April 2, 2010 also alerted Embraer executives about the suspicious nature of the dealings with Globaltix.

109.    In his deposition to Brazilian regulators around November 11, 2013, Motta, who worked in Embraer's Accounts Payables and Receivables department, testified that he noticed several red flags in the agreement with Globaltix—for example, the agreement referred to Jordan, while an associated invoice referred to the Dominican Republic, and the payment to Globaltix did not involve any actual sale to Jordan.  Motta testified that he alerted an Embraer executive about these glaring irregularities, who nevertheless insisted that the payments to Globaltix go through.

110.    During their investigations, Embraer also revealed to regulators two invoices for "sales promotion services" paid around April 6, 2010 by Globaltix to Embraer RL in the amounts of $2.5 million and $920,000.  An internal Embraer memorandum indicated that these payments related to the sale of Super Tucano planes to the DRAF and not to potential sales to the Jordanian Air Force as the agreement between the companies had falsely indicated.  Indeed, Sonnenfeld did not provide regular or legitimate services to Embraer related to the sale of Super Tucanos for the DRAF, Embraer never sold any aircraft to the Jordanian Air Force, and Sonnenfeld did not render any services in connection with any attempted sale to the Jordanian Air Force.

111.    Around May 24, 2010 and June 22, 2010, Embraer RL effectuated two bank transfers, one for $2.5 million and another for $920,000, respectively, from its bank account in New York to the bank account of Sonnenfeld's Globaltix in Uruguay.

112.    Around October 21, 2010, Piccini sent Sonnenfeld a message from a U.S. email account containing wiring instructions to a Panamanian bank account.  Sonnenfeld then transferred more than $3 million to Piccini.

113.    Evidence revealed from the regulators' investigations reflects that Campos had help from the following in bribing Piccini: Close; Fumagalli; Fagundes; Orlando, then Embraer's Executive VP of the Defense and Government Market business unit; Padilha, then Embraer's VP

of Marketing and Sales in the Americas; Fonseca, then Embraer's Senior Manager of Special Programs Contracts and Contracts Negotiator for the Defense and Government Markets business unit; and Bester, then Embraer's Director of Marketing and Sales in the Defense and Government Market business unit.  In particular, Campos directly liaised with Piccini, reiterating the promise of the pending bribe values and instructing Sonnenfeld on the conduct of dealings to achieve that goal.  Orlando instructed Close, Padilha, Fonseca, and Bester on the process of contracting with Sonnenfeld in connection with the bribes to Piccini.  Close, Padilha, Fonseca, and Bester conducted the operational dealings with Sonnenfeld and with executives in the relevant technical areas of Embraer, in order for the Company to contract with Globaltix and transfer funds to it for the payment of bribes to Piccini.  Sonnenfeld maintained contact with Piccini to adjust the payment of the bribes.

114.    Orlando, in his capacity as Embraer's Managing VP for the Defense and Government business unit, offered the CVM a settlement of R$300,000 (approximately $89,140) in connection with his involvement in the Dominican Republic bribes.  The CVM rejected his settlement offer partially because of findings that Orlando helped effectuate the bribes, discussed them with other Embraer executives, furnished instructions on how to hide the payments, and approved the purported agency contract with Globaltix.

115.    **Sonnenfeld's Testimony:**  Testimony by Sonnenfeld renders Defendants' knowledge of the Dominical Republic Bribes indisputable.  Sonnenfeld has testified that several Embraer high-level executives knew about the Dominican Republic bribery scheme, including, without limitation, Defendants Curado, while he was the Company's President and CEO, Aguiar, while he was the Company's CFO and Executive VP of the Defense and Government business unit, and Rimoli, while he was the Company's General Counsel.  Defendant Rimoli left Embraer

in 2013 to head the compliance department of Construtora Camargo Correa, a company that is embroiled in the massive collusion and bribery scheme involving Petroleo Brasileiro S.A. – Petrobras.

116.    In a deposition that occurred around March 23, 2015 before Brazilian regulators, Sonnenfeld testified that Orlando approached Sonnenfeld for help with effectuating the payments to Piccini in connection with the Super Tucano sales in the Dominican Republic.  According to Sonnenfeld's testimony, Orlando made a statement to the effect of "they left some bad things there before my time for me to resolve[.]"  Sonnenfeld testified that Orlando said that Defendants Curado, Rimoli, and Aguiar knew about the payments to Piccini.

117.    In a deposition before Brazilian regulators on April 17, 2015, Sonnenfeld testified that he maintained close relationships with several Embraer executives during his more than 30 years in working with the Company.  These executives, some of which were Embraer former presidents, included, without limitation, Defendant Curado, Ozires Silva, Ozilio Carlos da Silva, Joao Cunha, Juarez Wanderley, and Mauricio Botelho.

118.    During the same deposition, Sonnenfeld provided compelling testimony demonstrating the probability that Defendant Curado, along with other Defendants, were aware of the decision to pay bribes in connection with the Dominican Republic sales.

119.    First, after a dinner with Orlando and Padilha, Orlando told Sonnenfeld about the Dominican Republic situation and said that Defendants Curado, Rimoli, and Aguiar knew about it and that Campos would be in contact with him.

120.    Second, Defendant Curado shared a deep history and relationship of trust with Sonnenfeld.  They regularly dined together at Embraer's offices and at air shows where Embraer courted business.

121.    Third, Defendant Rimoli signed the contract with Globaltix around March, 2010 as the Embraer head and VP of the Legal Department, despite the contract having been extremely atypical, including, without limitation, an advance payment of a fixed commission.  Under the conditions that Defendant Rimoli signed the contract, it was clear to Sonnenfeld that Defendant Rimoli needed Defendant Curado's backing.

122.    Fourth, Defendant Aguiar signed the purchase-and-sale contract with the DRAF when he was the Company's VP of the Defense and Government business unit, and he signed the contract with Globaltix around March, 2010 when he was Embraer's CFO, despite the contract having been extremely atypical, including, without limitation, an advance payment of a fixed commission.  It was clear to Sonnenfeld that under these conditions, Defendant Aguiar would not have signed these contracts without Defendant Curado's backing.

123.    Fifth, Sonnenfeld testified that he met with Defendant Aguiar in 2012 to discuss the burgeoning Embraer bribery investigation.  Sonnenfeld made a statement to the effect of "I did a favor for you, and you got me in trouble[.]"  Sonnenfeld testified that Defendant Aguiar made a statement to the effect of "Are you seeing now why it's not good to write many emails?"

124.    Sonnenfeld's testimony about Defendant Curado's knowledge of the Dominican Republic bribes is corroborated by Embraer emails revealed to the Brazilian regulators.  For example, around August 27, 2008, Sonnenfeld emailed Defendant Curado about "FACh" (the Chilean Air Force) to congratulate him on a historic victory in an "(almost) neighboring country[,]" reiterating that Sonnenfeld and Defendants Curado and Aguiar's meeting gave Sonnenfeld an additional boost, amongst other things.  Defendant Curado replied that same day to the apparently same email chain, congratulating Sonnenfeld, stating that it was a joint victory and a "happy ending[.]"

125.    In another deposition before Brazilian regulators around April 20, 2015, Sonnenfeld testified that around January 2008, Sonnenfeld worked with Defendants Curado and Aguiar on a campaign representing Embraer in Chile.  Sonnenfeld also asked to represent Embraer in Ecuador at that time.  Defendant Curado responded that Sonnenfeld should focus on Chile and not pursue a campaign in Ecuador.  Sonnenfeld believed that Embraer's business configuration in Ecuador denoted corruption.  Also, Sonnenfeld believed that there was a perception that Embraer's sales of 170 and 175 aircrafts to the Argentinian company Air Austral was tainted with bribery.

126.    Indeed, around March 29, 2010, an allegation of irregularities in these transactions was made in the Argentinian paper *La Nacion* and refuted by Embraer in a press release issued around that time.  Also in early 2009, in an article entitled "Cobranca Suspeita" ("Suspicious Payment"), Brazil's *Veja* magazine reported accusations of improper payments associated with attempted Super Tucano sales to the Colombian government.  On February 5, 2009, Embraer filed a Form 6-K with SEC, which Defendant Aguiar signed, denying these accusations.

127.    Sonnenfeld's deposition testimony is corroborated by Embraer emails revealed from the investigations.  For example, in June 4, 2007, "Satoshi" emailed Defendant Curado, copying the following: Defendant Aguiar; Manso, then Embraer's Executive FP of Finance and an Embraer Executive Board member; Kern, then Embraer's Executive VP of the Airline Market business unit and an Executive Board member; Henrique Rzezinski; and Alexandre Gock.  This email concerned a meeting with Manuel Vasquez ("Vasquez") of Argentina.  Satoshi stated that an initial conversation with Vasquez was strange in that Vasquez explained that he was not from the government but had access to powerful Argentinian politicians, including the Secretary of Transport and the Minister of Infrastructure.  For Satoshi, there were big questions about Vasquez.  Around June 6, 2007, Defendant Curado replied to the same email string stating that his suspicions

were confirmed, that they needed to find out more before proceeding, and that up until that point,

100% of the time that a matter came to Embraer in this form, nothing came of it.

128.    Sonnenfeld's deposition testimony was also corroborated by an Embraer email

from Campos to Defendant Aguiar around September 1, 2008, discussing Ecuador:

> I am under attack since they said there is no contract for the Super Tucano due to a
> legal report.  I don't see risk in detonating the contract but I don't think we should
> make a good-will gesture together with the group.  My suggestion is to raise the
> Legacy commission from 1% to 2% (it would be $600k).  We would make an
> international consulting contract to be paid in December after Legacy's submission
> without mentioning the plane and the country.  We would have them tied up to give
> us time to close the Super Tucano [contract] without surprises and to do the Legacy
> submission without fear. ***This way, I avoid infringing the anti-corruption laws of
> the country and I keep them supporting us.***

129.    In a deposition before Brazilian regulators around May 15, 2015, Alvaro Moreira

Sapha ("Sapha"), who worked for Embraer for 11 years until 1990 and then began working for

Sonnenfeld at his company Logistica, testified about hearing from Sonnenfeld that Sonnenfeld met

with Defendant Curado.   Also, Sapha heard rumors of bribe payments by Embraer in some

countries, specifically recalling Colombia and Peru.  From what Sapha knew about Embraer, bribe

payments could not have occurred without the President [or CEO] authorizing them, since they

would involve advising from the Legal Department, which was directly linked to the President.

130.    **The Effects of the Dominican Bribes on Embraer's Financial Statements:**

Embraer admitted that the $3.52 million in illegal bribes associated with the DRAF purchases of

eight Super Tucano aircrafts were falsely booked as Sales Commissions or Consulting Fees in

Embraer RL's internal accounting records and consolidated in Embraer's 2010 financial

statements under Operating Income (Expense) as a Selling Expense, specifically a

Commercialization Expense.  Embraer's segment reporting of these financial metrics for the

Company's Defense and Security business unit (which includes the Super Tucano aircrafts),

including, without limitation, this unit's financial metrics within the Latin America region (which

includes the Dominican Republic), were also false and misleading throughout the Class Period. As stated in Embraer's Form 20-F for the fiscal year ended 2011, the Company recognizes revenue for aircrafts and services at the time of delivery or shipment, when the risks and benefits have transferred to the customer. This policy is consistent throughout the Class Period. The $96.4-million value of this agreement with DRAF would have been recognized when the Super Tucano aircrafts were delivered, which was during periods reported in Defendants' Class Period financial statements and disclosures, rendering false and misleading the revenue and income figures that the Company disclosed throughout the Class Period. Embraer's segment reporting of revenue and income for the Company's Defense and Security business unit, including, without limitation, this unit's revenue within the Latin America region, as well as reported revenues and income for the Company as a whole, were also false and misleading throughout the Class Period as a result of the bribery scheme.

### 2.     Saudi Arabia Bribery Scheme

131.     Between 2009 and 2011, Embraer agreed to pay Snobar, an Executive Director of Industrial Services at the public Saudi Arabian company Saudi Aramco, more than $1.5 million to obtain a sales contract for three 170 aircrafts with a value of $93 million.

132.     The Saudi Arabian bribery scheme began around 2007, when Embraer learned that Saudi Aramco was interested in purchasing executive jets. By 2009, Saudi Aramco narrowed its scope of possible suppliers to Embraer and another manufacturer. This sales process did not involve a public tender or bid.

133.     Around December 2009 in a meeting in London, Snobar told an Embraer employee, Steven, then Embraer's VP of Executive Aircraft Marketing and Sales, that Snobar could influence Saudi Aramco's decision to purchase new planes from Embraer instead of used planes—a more-

lucrative deal for the Company.  Steven knew that Snobar was a high-level employee in Saudi Aramco and believed that Snobar could fulfill this promise.

134.     Steven and Snobar initiated negotiations on the bribe amount.   According to documents revealed to regulators by Embraer, Snobar rejected Embraer's initial offer of $200,000 per plane.  Around December 10, 2009, Steven emailed Affonso, then Embraer's Executive VP of the Executive Jets business unit and Executive Board member, and Frias, then VP of Contracts for the Executive Jets business unit, to report this conversation, indicating that Snobar justified his request for a higher bribe because Saudi Aramco's budget was only for used planes, so Snobar would have to lobby to get more funds to acquire new planes.  Steven added that there was long-term business potential because Saudi Aramco would substitute its whole fleet for 170s.  After Affonso traded messages with Frias, who analyzed the financial aspects of the payment, Affonso approved the contracting of an agent, a South African company named Cyclone Industrial Supply CC ("Cyclone"), for the value of a $550,000 bribe per aircraft.

135.     Steven and Snobar agreed that Snobar would receive $550,000 per plane acquired, or $1.65 million.  Around December 30, 2009, Steven met in person with Saudi Aramco and later told Frias that Saudi Aramco decided to acquire three new jets.

136.     Steven assisted Snobar in hiding the origin and nature of the bribes by making the payments through Cyclone, which was contracted as a commercial representative though it had no experience in the aeronautics industry or in Saudi Arabia.

137.     Around January 5, 2010, Steven emailed Affonso, Frias, Staciarini, then an Embraer Senior Contracts Manager, and Casarsa, then Embraer's Director of Contracts in the Executive Jets business unit, and Araujo, then an Embraer Proposals and Contracts Manager, copying Fitzpatrick, then Embraer's Regional Sales Director for the Middle East, with an update

as to "where we are based on our latest conversations today with senior management [of Saudi Aramco] and the person who is conducting the negotiations, with whom we are working by means of a [contract for commercial representation.]"  Steven did not identify Snobar by name in the message but referred to a meeting between "the head of [Saudi Arabia Instrumentality's] Aviation Department (who is helping us with this deal)" and the committee allocating funds for the purchase, and Steven stated that "our contact on the transaction (head of the department) has advised that we must hold our price during the negotiation on the basis that we have put forward our best offer for the basic aircraft and therefore[] cannot negotiate further on this."   Steven explained that it "had been made extremely clear and agreed with our contact that should any additional funds be required to cover any other concession that exceeds our $120k limit, this would be from the [agency commission] amount in reserve."

138.    Around February 26, 2010, Embraer executives, including at least one from Embraer's Legal Department, approved a purported agency agreement with Snobar, pursuant to which he would purportedly serve as the Company's sales agent for the deal with Saudi Aramco.

139.    Around March 5, 2010, Embraer RL executed a purported agency contract with Snobar signed by Embraer executives, pursuant to which he would promote sales of aircrafts manufactured by Embraer solely and specifically to a subsidiary of Saudi Aramco.

140.    Around May 2010, Embraer finalized the purchase agreement with Saudi Aramco's U.S. subsidiary for the purchase of three new 170 aircrafts valued at approximately $93 million.

141.    Embraer documents reflect that around December 2010, Cyclone presented three bills for $550,000 each in commission, although it had not lent any services to Embraer for aircraft sales.  Embraer approved the payments made through two transfers from an Embraer RL bank account in New York to a Cyclone bank account in South Africa: $550,000 around December 22,

2010 and $1.1 million around February 18, 2011.  Embraer RL accounted for those payments as sales commissions, and they were consolidated into Embraer's financial statements.

142.    Cyclone then transferred more than $1.4 million of the $1.65 million received from Embraer RL to bank accounts identified by Snobar in Geneva, Switzerland, and Saudi Arabia. According to information revealed by Embraer, Cyclone's owner Hugh McDulling kept some of the money and transferred the rest to Snobar.

143.    Saudi Aramco's own internal-auditing activities that took place a few years prior to this Action revealed irregularities and violations associated with its transactions with Embraer. Based on these findings, Saudi Aramco ceased doing business with Embraer around 2012.

144.    **The Effects of the Saudi Arabian Bribes on Embraer's Financial Statements:** Embraer admitted that the $1.5 million in illegal bribes associated with Saudi Aramco's purchases of three 170 aircrafts were falsely booked as Sales Commissions or Consulting Fees in Embraer RL's internal accounting records and consolidated in Embraer's financial statements under Operating Income (Expense) as a Selling Expense, specifically a Commercialization Expense or Sales Commission.  As a result, Embraer's segment reporting of these financial metrics for the Company's Commercial Aviation business unit (which includes the 170 aircrafts), including, without limitation, this unit's financial metrics within the Other geographic region (which includes Saudi Arabia), were also false and misleading throughout the Class Period.  As disclosed in Embraer's Form 20-F for its fiscal year ended 2011 20-F, the Company recognizes revenue for aircrafts and services at the time of delivery or shipment, when the risks and benefits have transferred to the customer.  This policy is consistent throughout the Class Period.  The $93-million value of this agreement with Saudi Aramco would have been recognized when the three 170 aircrafts were delivered, which was during periods reported in Defendants' Class Period financial

statements and disclosures, rendering false and misleading the revenue and income figures that the Company disclosed throughout the Class Period. Embraer's segment reporting of revenue and income for the Company's Commercial Aviation business unit, including, without limitation, this unit's revenue and income within the Other geographic region, as well as the Company's reported consolidated revenue and net income, were also false and misleading throughout the Class Period.

### 3.    Mozambique Bribery Scheme

145.    Around May 22, 2008, Embraer formalized a proposal to sell two 190 aircrafts for the unit price of $32 million to LAM, the state-controlled and owned commercial airline in Mozambique, with an option to purchase two more planes at the same price.

146.    An Embraer email around August 11, 2008 from Candaten, then Embraer's Head of Sales for the Commercial Aviation business unit, to Close and Fuchs, then the President and Managing Director of Embraer Aviation Europe, SAS, stated that after the sale was concluded, the Mozambican Zimba, who had not previously worked with nor had any contact with Embraer, contacted Candaten to say that Zimba would act as a "consultant" in the deal. Rather than reject this proposal, Candaten proposed that Embraer create some margins for commissions for Zimba, on behalf of at least one Mozambique official, in the formation of the price for the two subsequent options for aircraft sales. This same e-mail chain indicates that around August 13, 2008, Fuchs emailed Candaten, copying other Embraer employees, reporting a conversation that Fuchs had with Zimba, in which Zimba said, "we would like to have a 'gesture' when delivering the first plane." In the email, Fuchs proposed that "we have to show some gesture and maybe the value mentioned by [another Embraer executive] (50k to 80k) would fit the actual need[.]" Fuchs advised Zimba on how to create a company to receive Embraer's purported consulting payments, telling Zimba that in order to receive an Embraer payment, Zimba "needs to have a company, names, address and not be established in a [tax-haven] country." In response, D'Avila, then

Embraer's VP of Contracts for the Commercial Aviation business unit, who had also received these emails, approved the offer of $50,000 to Zimba for each of the first two sold aircrafts, with a margin to go up to $80,000 per aircraft if necessary.  D'Avila also approved the payment of between 2 and 2.5% of the sales price of the two options if LAM exercised them to purchase other aircrafts.

147.   Around August 18, 2008, Fuchs wrote that he offered $50,000 to Zimba.  Then in an email to Candaten, copying other Embraer employees, Fuchs stated that he perceived that Zimba was hoping for a much higher commission and Zimba insinuated that LAM could sign a contract with another company instead.

148.   The President of LAM, Jose Ricardo Zuzarte Viegas ("Viegas"), called Fuchs. Around August 25, 2008, Fuchs emailed Candaten a narration of this conversation.  Fuchs remembered Viegas stressing that he had received very unpleasant comments from some people about the commission proposal from Embraer.  Fuchs further stated that some people took the Embraer proposal as an insult and that offering nothing would have been less offensive.  Fuchs asked Viegas what he wanted from Embraer, to which Viegas responded that he was thinking about $1 million dollars.  After Fuchs negotiated, Viegas finally suggested accepting $800,000 and taking it from the profit margin of the two options and also asked if the price of the aircraft could be elevated.

149.   On September 15, 2008, Embraer and LAM signed a sales-and-purchase contract for two 190 aircrafts for the unit price of $32.69 million, plus a down payment of $312,000 for a third aircraft.  Viegas was one of the three LAM executives who signed the contract.

150.   On April 22, 2009, before the first plane delivery, Defendants Aguiar and Rimoli executed a contract on Embraer RL's behalf for purported commercial representation with the

company Xihivele – Consultoria e Servicos Ltda., which had been recently created by Zimba in Sao Tome e Principe.  This contract authorized Zimba's company to promote sales of the 190 aircraft "only and specifically" for LAM, although the sale of those aircrafts had been contracted for seven months before the signing of this purported commercial-representative contract.  Zimba's company did not even exist when the purchase-and-sale contract for the aircrafts was signed with LAM and did not act in any capacity in the ambit of that contract.  The contract with Zimba's company falsely affirmed that the work for promotion of sales had commenced in March 2008.

151.    Embraer RL promised through this commercial-representation contract to pay Zimba's company $400,000 per plane, exactly the amount that Viegas said that LAM would accept.  Neither Zimba nor his company ever provided services to Embraer.

152.    Zimba's company presented two bills to Embraer for $400,000 each, the first dated around August 15, 2009 and the second around September 24, 2009.  Campos signed and approved both bills for payment.  On August 31, 2009, Embraer RL made a $400,000 transfer from its Citibank account in the U.S. to an account at the Banco Internacional de Sao Tome e Principe, to credit an account at the Caixa Geral de Depositos in Portugal, the title holder of which was Zimba's company.  Around October 2, 2009, Embraer RL transferred another $400,000 from its account to the account in Portugal belonging to Zimba's company.  Embraer RL recorded these payments as Sales Commissions, and they were consolidated into Embraer's books under Net Operating (Expenses) Income as a Selling Expense, specifically, Sales Commission.

153.    **The Effects of the Mozambique Bribes on Embraer's Financial Statements:** Embraer admitted that the $800,000 in illegal bribes associated with LAM's purchases of two 190 aircrafts—with an option to purchase a third—were falsely booked as Sales Commissions in Embraer RL's internal accounting records and consolidated in Embraer's financial statements

under Operating Income (Expense) as a Selling Expense, specifically a Sales Commission. Embraer's segment reporting of these financial metrics for the Company's Commercial Aviation business unit (which includes the two 190 aircrafts), including, without limitation, this unit's financial metrics within the Other geographic region (which includes Mozambique), were also false and misleading throughout the Class Period.  As disclosed in Embraer's Form 20-F for the year ended 2011, the Company recognizes revenue for aircrafts and services at the time of delivery or shipment, when the risks and benefits have transferred to the customer.  This policy is consistent throughout the Class Period.  Embraer's disclosures throughout the Class Period reflect that the first two aircrafts were not delivered to LAM until the middle of 2014.  The $62-million value of this agreement with LAM would have been recognized when the two 190 aircrafts were delivered, rendering false and misleading the revenue and income figures that the Company disclosed during the Class Period.  Embraer's segment reporting of revenue and income for the Company's Commercial Aviation business unit, including, without limitation, this unit's revenue and income within the Other geographic region, as well as the Company's reported consolidated net income and revenues, were also false and misleading throughout the Class Period.

### 4.     **India Bribery Scheme**

154.     Around July 3, 2008, Embraer executed a contract with the Indian Air Force to supply three highly specialized AEW&C 145 military aircrafts for $208 million.  In the context of this contract, Embraer contracted the services of Khanna through a purported commercial-representation agreement falsely assigned back to 2005.  Afterwards, Embraer paid $5.76 million to Khanna, on behalf of at least one Indian official, to cover a second fraudulent purported commercial-representation contract signed in 2008.

155.     Khanna is no stranger to scandals: he is an alleged U.K.-based arms dealer, was investigated for an oil-for-food scam around 2005, and suspected of kickbacks.

156.    Embraer's internal investigation identified that around January 2005, Embraer signed a purported commercial-representation agreement with the company Interposta established in the U.K. and linked to Khanna.  For this agreement, Embraer agreed to pay a company named Cleveden Limited ("Cleveden") a commission of 9% over the value of any sales contracts that the Embraer defense segment would obtain in India.  Embraer believed that Khanna could intercede so that any contracts could be obtained without bid contests, though Company executives knew that the contracting of agents for military sales was prohibited by Indian law.  Although Khanna was not mentioned in this agreement by name, internal Embraer emails reflect that employees knew that he was affiliated with this agreement.

157.    Embraer took steps to hide the agreement's existence.  These steps included Defendant Rodrigues, who then worked in the Company's Legal Department, hiding the agreement with Khanna in a lockbox in London.  This lockbox could only have be opened in the presence of an authorized Embraer employee and Khanna (or someone linked to him).

158.    Around February 8, 2005, less than a month after executing the agreement with Khanna's company, Embraer announced that it had signed a memorandum of understanding with India's Defense Research and Development Organisation to collaborate for the development of a new early-warning radar alert system for the Indian Air Force, which Embraer believed could ultimately result in a purchase-and-sale contract for three AEW&C 145 aircrafts.

159.    Around July 3, 2008, almost three years after the signing of the memorandum of understanding, the Indian Air Force and Embraer signed a purchase-and-sale contract for three AEW&C 145 aircrafts for nearly $208 million.  The next day, Khanna contacted Defendant Aguiar and Alves, then Embraer's VP of Marketing and Sales for the Defense and Government business unit in Asia, and demanded the payment provided for in the purported commercial-representation

agreement with Cleveden.  But this agreement had already expired.  Khanna through his attorneys continued demanding payment from Embraer.

160.    Embraer documents reflect that around February and March 2009, Ferreira met with Khanna's attorneys to discuss the payment demands.  As a result of these discussions, Embraer paid $5.76 million to Khanna through a purported commercial-representation agreement unrelated to the sale in India.

161.    To hide this payment, Embraer signed the second purported commercial-representation agreement around November 21, 2009, more than a year after the signing of the purchase-and-sale contract with the Indian Air Force.  Through its wholly owned subsidiary ECC Investment, Embraer executed a purported commercial-representation agreement with a company established in Singapore named Interdev Aviation Services Pte Ltd. ("Interdev"), which was also linked to Khanna.  According to fraudulent clauses from this agreement, Khanna acted as a commercial representative for Embraer in the sale of planes to a European client in Austria, effectuated more than a year prior, around July 2008.  But the Singaporean shell company never provided any services related to the sale in Europe nor the sale in India.

162.    On the same day when this agreement was signed, Interdev submitted three bills to ECC Investment, each in the value of $1.92 million.  Embraer, through ECC Investment, made three payments to Interdev around January and February 2010.  Embraer's accounting does not reflect that this operation was related to the agreement with Khanna.

163.    Embraer, through Embraer RL's bank account in New York, transferred to ECC Investment's account the funds ultimately remitted to the Singapore Entity.  ECC Investment's payments to the Singapore Entity were recorded, and the accounting entries for these transactions indicate that the payments to the Singapore Entity were made "on behalf of Embraer RL."

164.    **The Effects of the India Bribes on Embraer's Financial Statements:**  Embraer admitted that the $5.76 million in illegal bribes associated with the Indian Air Force's purchases of three AEW&C 145 aircrafts were falsely booked through the intercompany transfers from Embraer RL to ECC Investments and impacted Embraer's "Accounts Receivable – Intercompany" and "Operating Income – Intercompany" accounts.  The payments to the Singapore Entity were consolidated in the Company's financial statements under Operating Income (Expense) and mischaracterized as a Selling Expense, specifically under Commercialization Expense.  Embraer's segment reporting of these financial metrics for the Company's Defense and Security business unit (which includes the AEW&C 145 aircrafts), including, without limitation, this unit's financial metrics within the Asia Pacific geographic region (which includes India), were also false and misleading throughout the Class Period.  As disclosed in Embraer's Form 20-F for its fiscal year ended 2011 20-F, the Company recognizes revenue for aircrafts and services at the time of delivery or shipment, when the risks and benefits have transferred to the customer.  This policy is consistent throughout the Class Period.  Embraer's disclosures throughout the Class Period reflect that as of the Company's filing of its Form 20-F for its fiscal year ended 2014, the third AEW&C 145 was not yet delivered to the Indian Air Force.  The $208-million value of this agreement with the Indian Air Force would have been recognized when the AEW&C 145 aircrafts were delivered throughout the Class Period, rendering false and misleading the revenue and income figures that the Company disclosed throughout the Class Period.  Embraer's segment reporting of revenue and income for the Company's Government and Security business unit, including, without limitation, this unit's revenue and income within the Asia Pacific geographic region, as well as the Company's reported consolidated revenues and net income were also false and misleading throughout the Class Period.

5.    **Regulatory Action and Embraer's Admissions**

165.    As a result of the egregious misconduct described above, Embraer agreed to pay approximately $205 million in total to settle investigations by U.S. and Brazilian regulators into these bribery schemes that began in 2010, which is above 16% of the Company's net income throughout the Class Period.  Authorities from around the globe cooperated to investigate Embraer, including regulators from Brazil, France, South Africa, Spain, Switzerland, Uruguay, and the U.S. Those investigations led to Embraer's conducting an internal investigation, led by external counsel, which involved a review of hundreds of thousands of documents and over a hundred employee and third-party interviews.

166.    On October 24, 2016, Embraer filed a Form 6-K with the SEC, signed by Defendant Filippo, disclosing that the Company agreed to pay the following: $98.2 million to the SEC as disgorgement of profits, up to $20 million of which may be deducted if such amount is paid to the Brazilian Federal Public Ministry ("MPF") and Brazilian Securities Exchange Commission ("CVM"); $107.3 million to the DOJ for violating the anti-bribery, books-and-records, and internal-controls provisions of the FCPA; and R$65[4] million (approximately $18.2 million) to the MPF and CVM for damages and disgorgement of illegal profits.  Also, pursuant to the settlement with the U.S. regulators, Embraer further agreed to engage an external monitor for up to three years to assess compliance with the FCPA and internal controls and procedures.

167.    The base of the fines to the U.S. regulators was the $83,816,476 of profits that Embraer generated from the bribery schemes.  ***However, the investigations are ongoing and imposition of future costly penalties is still an omnipresent threat to the Company.***

---

[4] "R$ __" refers herein to Brazilian reais.

i.      **U.S. Regulatory Actions**

168.     **The DOJ DPA**: On October 24, 2016, the DOJ filed an information and concurrent deferred prosecution agreement ("DPA") with Embraer.  Paulo Cesar de Souza e Silva, Embraer's CEO, and Fabiana Leschziner, Embraer's General Counsel, signed the DPA.

169.     In the DPA, Embraer admitted to conspiring to commit offenses against the U.S. in violation of 18 U.S.C. § 371, which is a violation of the anti-bribery and books-and-records provisions of the FCPA, as amended, 15 U.S.C §§ 78dd-1, 78m(b)(2)(A), 78m(b)(5), and 78ff(a). Also, Embraer admitted to violating the internal-controls provisions of the FCPA, 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff(a).  Embraer admitted, accepted, and acknowledged that it was responsible under the U.S. laws for the acts of its officers, directors, employees, and agents.

170.     As of October 24, 2016, according to the DPA, Embraer had engaged in partial remediation by disciplining a number of its employees and executives who engaged in misconduct in connection with the bribery scheme.  However, as of October 24, 2016, Embraer had not disciplined a senior executive with oversight responsibility over the employees engaged in the illegal activity, even though the senior executive was at least aware of the bribery discussions in 2004, as reflected in emails.

171.     According to the DPA, the nature and seriousness of Embraer's offenses was "pervasive[] throughout each of the Company's three separate sales divisions and [had] involvement of high-level executives in each set of criminal conduct[.]"

172.     The DOJ noted that the seriousness of Embraer's offense level included "Multiple Bribes," "High Level Official" involvement, and the "Value of benefit received [being] more than $65,000,000."

173.    Embraer's culpability hinged partially on "the organization [having] 5,000 or more employees and an individual within *high-level personnel of the organization participat[ing] in, condon[ing], or was willfully ignorant of the offense[.]*"

174.    Embraer admitted the following:

[N]umerous high-level EMBRAER executives knew that the various agency agreements referenced above falsely represented that payments were being made for legitimate agency services, and that the true purpose of the payments made to the agents was to funnel bribes to foreign officials.  *Many of the high-level executives who knew about the false nature of the agreements and the improper purpose of the payments had the authority and responsibility to ensure that EMBRAER devised and maintained an adequate system of internal accounting controls, knew that EMBRAER'S then-existing internal accounting controls failed to prevent EMBRAER from entering into false agency agreements and making improper payments, and knowingly and willfully failed to implement adequate internal accounting controls to address the known weaknesses, in part to permit EMBRAER to enter into false agency agreements and funnel bribes to foreign officials.*

175.    Embraer also admitted to having an inadequate compliance program at the time of the criminal conduct.  The Company admitted to having knowingly and willfully failed to devise and maintain an adequate system of internal accounting controls.  In particular, Embraer admitted to having no internal accounting controls over the following, without limitation: (a) requiring adequate due diligence for retaining agents or third-party consultants; (b) requiring fully executed contracts with third parties before making payments; (c) requiring documentation or other proof that services had been rendered by third parties before making payments; and (d) implementing oversight over payment processes to ensure that payments were made pursuant to appropriate controls.

176.    Embraer committed to designing and implementing an adequate compliance program and system of internal accounting controls and to engaging a monitor for at least three years.  The Company agreed to modifying its existing compliance program and adopting a new one, including internal controls, compliance policies, and procedures to ensure maintenance of the

44

following: (a) an effective system of internal accounting controls designed to produce fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program incorporating relevant internal accounting controls and policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.

177.   **The SEC Complaint:** On October 25, 2016, the day after the DOJ filed the DPA, the SEC filed a complaint against Embraer.  As a result of these illegal bribery schemes, the SEC alleged that Embraer violated the following: Section 30A of the Exchange Act (15 U.S.C. § 78dd-1) by authorizing or paying bribes to foreign officials in order to retain business; Section 13(b)(2)(A) of the Exchange Act (15 U.S.C. § 78m(b)(2)(A)) by creating false books and records to conceal the authorization of bribes; and Section 13(b)(2)(B) of the Exchange Act (15 U.S.C. § 78m(b)(2)(B)) by failing to have sufficient internal accounting controls in place to detect and prevent the authorization or payment of bribes.

178.   The SEC alleged that between 2008 and 2011, Embraer bribed foreign government officials in the Dominican Republic, Saudi Arabia, and Mozambique through its U.S.-based subsidiary, Embraer RL.

179.   The SEC alleged that these "bribes were authorized by senior executives at Embraer and its subsidiaries while knowing or recklessly ignoring red flags which indicated a high probability that such payments were intended for, or would be passed to, foreign officials." Moreover, "Embraer's legal department was responsible for approving the consultants its senior legal executive engaged on behalf of ERL.  As a result, senior Embraer executives in Brazil, including a senior legal executive at the time, at least two other senior Embraer executives, and several Embraer managers, circumvented the Company's internal accounting controls by, among other things, approving the engagement of third parties through sham contracts to act as conduits

for bribes to foreign officials, and concealing bribe payments as legitimate expenses under contracts obtained in countries that bore no relation to any legitimate services rendered and that were intended largely to pay bribes to foreign government officials."

180.    The SEC alleged that Embraer created false books and records to conceal the authorization of at least three bribes to at least one government official in the Dominican Republic and another two bribes to a government official in Saudi Arabia.  Embraer also created false books and records to conceal two bribes to a government official in Mozambique.  These bribes were paid from a New York-based bank account held in Embraer's U.S. subsidiary's name and paid through intermediaries from as early as April 2009 through at least February 2011.  These payments were improperly recorded as legitimate expenses in Embraer's U.S. subsidiary's books and records and were consolidated into Embraer's financial statements.

181.    Additionally, the SEC alleged that between 2005 and 2009, Embraer, through its employees, improperly booked large payments to an agent, concealing its relationship with this agent, while trying to obtain business in India.  The great pains Embraer undertook to conceal the existence of this agreement included, without limitation, falsely recording a payment to this agent in order to conceal the payment's true nature, which Embraer employees believed were in violation of Indian law, under a different contract serviced in another country that did not, in reasonable detail, accurately and fairly reflect its payments to this agent.

182.    The SEC alleged that Embraer failed to devise and maintain an adequate system of internal accounting controls:

> During the relevant time period, Embraer's policies, procedures, or controls required that all commitments above a certain sum with third parties have a formal, written contract.  However, Embraer did not enter into a written contract with the Dominican Official, the Saudi Arabian Official, the Mozambican Official, or the Indian Agent even though these individuals were the intended beneficiaries of the payments referred to in this complaint.  Similarly, Embraer's code of ethics and

internal company directives required due diligence on sales representatives or agents, such as checking corporate documentation and publicly available information, gathering evidence of access to the customer or market, and inquiring whether the representative or agent was recommended by government officials. In each of the schemes described in this Complaint, the bribes and improper payments involved were transacted through third parties. Critical steps that Embraer's internal process at the time required, such as checking publicly available information about the third parties' access to customers or relevant markets, were either ignored or circumvented. The information obtained, had these steps been taken, would have alerted Embraer employees that some or all of the agents identified in this Complaint lacked any experience or expertise in the aviation industry or access to the relevant markets in question.

      **ii.**        **Brazilian Regulatory Actions**

183.   The MPF, through its Federal Prosecutors, and the CVM around October 6, 2016 executed a settlement agreement with Embraer, which was represented by Defendant Filippo, Fabiana Klajner Leschziner, Esther M. Flesch, and Erica Sellin Sarubbi.

184.   In this settlement agreement, Embraer admitted to violating Brazilian law. In particular, Embraer admitted that it paid illicit funds constituting enrichment without legal cause and involving corruption payments to public officials of the Dominican Republic, Saudi Arabia, and Mozambique in the context of three contracts for the purchases and sales of aircrafts executed, respectively, on June 26, 2007, March 15, 2010, and September 29, 2008. These illicit funds were transferred through intermediaries tasked with passing the funds to the recipients of the bribes. Embraer admitted to maintaining false accounting records of the fraudulent funds paid to effectuate these transactions.

185.   Also, Embraer admitted to making unlawful payments through a trade representative in India in the context of selling military aircrafts. Embraer admitted to hiding these unlawful payments through fraudulent commercial-representation contracts that masked the true identity of the recipient of the illicit funds and services provided. To hide these unlawful payments,

Embraer made false accounting records of the fraudulent expenses paid to the trade representative in India, listing these as pertaining to the commercial-aircraft business unit.

186.   The settlement agreement encompassed several proceedings, including the following, without limitation: (1) the MPF's complaint against several Embraer high-level executives; (2) a penal case at the 7th Federal Criminal Court of the headquarters of the judiciary section of the state of Rio de Janeiro, the allegations of which impute the practice of crimes of active transnational corruption and money laundering in the context of selling aircrafts to the Dominican Republic to ten current and former Embraer managers; (3) a criminal investigation by the Brazilian Federal Prosecutor of the state of Rio de Janeiro against other Embraer current and former managers in connection with this Dominican Republic penal case and also in connection with active transnational corruption and money laundering in other countries; and (4) an administrative inquiry and administrative case opened by the CVM to investigate any infractions by Embraer of Brazilian law in international transactions and aircraft sales.

### iii.      Indian Regulatory Actions

187.   Around October 26, 2016, India's Central Bureau of Investigation ("CBI") reported that it would continue its probe into Embraer for the Indian bribery scheme.  India's CBI is already pursuing an action against the U.K.-based arms dealer, Khanna, whom Embraer used as an agent to effectuate $5.76 million in bribes to at least one Indian official in connection with the sale of three AEW&C 145 aircrafts.  This probe is reportedly seeking penalties in addition to the hundreds of millions of dollars that Embraer already agreed to pay to other regulators.

### iv.      Embraer's FCPA Violations

188.   Embraer violated the anti-bribery provisions of the FCPA, which Congress enacted to prohibit bribery and corruption of foreign officials and to promote fair business practices, integrity, and accountability in companies operating on a global stage.

189.     Moreover, by mischaracterizing bribe payments made from Embraer to agents in connection with the Dominican Republic, Saudi Arabia, Mozambique, and India schemes as "Consulting Fees," "Sales Commissions," and/or other categorizations, Defendants clearly violated the books-and-records accounting provisions of the FCPA.   This had the effect of circumventing and concealing the bribes.

190.     There is no materiality threshold under the books-and-records provision.  Instead, issuers must maintain books and records that accurately and fairly represent the company's activity, as well as "devise and maintain a system of internal accounting controls sufficient to assure management's controls, authority, and responsibility over the firm's assets."[5]   In this provision, the FCPA is echoing the requirements set forth by the Exchange Act.[6]

191.     It was Embraer's senior-most executives, including, without limitation, Defendants, who were responsible for the breakdown of internal controls by allowing the approval and engagement of third parties through sham contracts and false agency agreements to act as conduits for bribes to foreign officials.  They had maintained a "tone at the top" that was not conducive to accurate and reliable financial reporting.

**v.        Embraer's Failure to Adhere to its Code of Ethics and Conduct**

192.     Throughout the Class Period, Embraer touted the sufficiency of its ethics program. It adopted a Code of Ethics and Conduct ("Code of Ethics") along with establishing an Ethics and Compliance Program aimed at assuring the establishment of policies, internal-control standards, and monitoring and assessments of potential deviance from established conduct or procedures. The Compliance Program is coordinated by the Compliance Office.  Embraer's Code of Ethics

---

[5] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, Chapter 3, p. 38.
[6] Exchange Act §§ 13(b)(2)(A) & 13(b)(2)(B).

and details about its anti-corruption policy are maintained on the Company's website and strictly

prohibit extortion, bribery, and money laundering.  Also throughout the Class Period, Embraer's

Code of Ethics has been disclosed regularly to investors as exhibits to the Company's Form 20-F

annual reports.

193.    Embraer disclosed that all of the Company's employees, including its senior-most

executives and directors, and the third parties that represented the Company were bound by the

Code the Ethics.

194.    Examples of patently false and misleading statements from Embraer's Code of

Ethics include the following, without limitation:

> "The Company must work against corruption in all its forms, including extortion
> and bribery."

> \*\*\*

> "Embraer seeks to adhere to all laws and accounting standards applicable to its
> ledgers, accounting records and financial statements, undertaking to record all
> financial transactions with accuracy and reliability."

> \*\*\*

> "Embraer prohibits its board members, directors, employees, suppliers, business
> partners or other third parties that represent the Company from authorizing or
> effecting, directly or indirectly, any improper or illegal payments to obtain business
> advantages.  Improper payments such as money, assets, resources, private benefits,
> favors, gifts, entertainment and hospitality, among others, may be characterized as
> anything of value to obtain business or improper advantage."

> \*\*\*

> "Embraer has a firm commitment to fight corruption in all its forms, including
> extortion and bribery.  To this end, the Company complies with the anticorruption
> laws and regulations in all places where it operates."

> \*\*\*

"Embraer shall not tolerate any form of active or passive corruption, such as extortion or bribery, in the attempt to influence negotiations, or to obtain any undue advantage."

\*\*\*

"[I]n sales processes, Embraer must comply with all laws, rules and procedures, operating with the highest level of integrity, ethics and transparency.  In the case of sales to governmental agencies, employees of Embraer must know and observe the laws and the specific, applicable procedures, with guidance from the legal and compliance departments, as appropriate."

195.    Embraer's Anti-Corruption Policy requires compliance with Embraer's Code of Ethics and all relevant laws and regulations against bribery and corruption including, without limitation, the laws of Brazil, the FCPA, the U.K. Bribery Act, and other applicable national anti-bribery statutes and implementing rules and regulations.

196.    The Company's Anti-Corruption Policy forbids directly or through third-party intermediaries any offers, promises, authorizations, or payments of money or anything of value to a government official or private individual or entity in order to secure an improper advantage.  It also requires that management and employees act with integrity and that they keep records that are consistent with rules and best practices.  These statements were clearly false and misleading.

197.    The statements related to Embraer's ethics and compliance programs were also false and misleading because Embraer executives knew or should have known that the company had paid at least $11.5 million in bribes in return for receiving contracts for the sale of aircrafts worth $463.1 million that generated $83 million in profits.  This bribery scheme was hidden from investors.

### vi.    Embraer's Woefully Inadequate Internal Controls

198.    Embraer failed to maintain an adequate system of internal controls in violation of the FCPA, the Sarbanes Oxley Act of 2002 ("SOX"), and the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

199.    Throughout the Class Period, Embraer consistently touted the compliance of its internal financial controls and procedures to the standards set forth by the COSO by stating that its internal controls were effective based on the COSO criteria.  For example, in Embraer's Form 20-F for the fiscal year ended 2011, the Company stated the following, in pertinent part: "Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2011.  In making this assessment, our management used the criteria established set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework.  Based on this assessment, our management concluded that as of December 31, 2011, our internal control over financial reporting was effective based on those criteria."  The Company made similar statements throughout the Class Period in its Forms 20-F.

200.    During the Class Period, Embraer filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of Embraer's internal controls and procedures.  Embraer also consistently represented that the Company identified no change in its internal controls over financial reporting throughout the class period.

201.    Further, during the Class Period, the Company's senior-most executives, including Defendants Curado, Filippo, and Marques, acting on Embraer's behalf, signed certifications pursuant to SOX.  Those certifications contained representations that Embraer had disclosed all of its significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting.  Also, the SOX certifications include the following statements, as reflected in the Company's Form 20-F for the fiscal year ended 2011: "The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and to the audit committee of the company's board

of directors (or persons performing the equivalent functions):  …  b) any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."  This certification was repeated in all material respects throughout the Class Period.

202.    In making its assessment of internal control over financial reporting, Embraer used the criteria established by the COSO Report.[7]  The COSO Report defines internal control as a process "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.[8]

203.    Defendants failed to comply with SEC regulations and the requirements of COSO and the FCPA.  The Company also failed to disclose material weaknesses in internal controls. There was a clear failure to adhere to the culture of integrity and high ethical standards touted by Embraer.  Corruption, bribery, and collusion were part and parcel of Embraer's normal operations.

204.    More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's Board, Executive Board, management at all levels, and employees in running the business.

205.    The COSO Report describes internal control within a certain framework that consists of five separate components.  The five components of an internal-control framework

---

[7] The COSO report was originally issued in September 1992 as a four-volume set.  An *Addendum to Reporting to External Parties* was issued in May 1994.  On May 14, 2013, COSO released an updated version of the entire framework.  Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.
[8] COSO Report Executive Summary.

needed to enable a business to achieve its objectives consist of the control environment, risk assessment, control activities, information and communication, and monitoring.

206.    Control Environment:  The control environment sets the tone of an organization often referred to as "tone at the top" and provides an atmosphere in which people carry out their responsibilities.

207.    Risk Assessment:  Risk assessment requires the identification and analysis of relevant risks to the achievement of the objectives.  As a result of this assessment, management determines how the risks should be managed.

208.    Control Activities:  According to the COSO Report Executive Summary, "Control activities are the policies and procedures that help ensure management directives are carried out. They help ensure that necessary actions are taken to address risks to achievement of the entity's objectives."  Control activities occur throughout the organization, at all levels and in all functions, and include a range of activities as diverse as approvals, authorizations, verifications, reconciliations, reviews of operating performance, security of assets, and segregation of duties.

209.    Information and Communication:  Relevant information is identified, captured, and communicated in a form and time frame that enables people to carry out their responsibilities.  All personnel must receive a clear message from management that control responsibilities are taken seriously.

210.    Monitoring:  Monitoring an internal-control system is a process that assesses the quality of the system's performance over time.  Ongoing monitoring includes regular management and supervisory activities and other actions personnel take in performing their duties.

211.    Embraer violated multiple components of the COSO framework.  At minimum, Embraer violated the control environment, control activities, and monitoring components of the

framework.  The Company failed to maintain the proper control environment, implement the appropriate control activities, and ensure that controls that were in place were operating as designed.

212.   Embraer's poor "tone at the top" fostered an environment whereby the payment of bribes to secure contracts was considered acceptable business practice.  Everyone in an organization has responsibility for internal control.  However, the CEO sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment.  According to the COSO Report, Chapter 8, "In any organization, 'the buck stops' with the chief executive.  He or she has ultimate ownership responsibility for the internal control system.  The influence of the CEO on an entire organization cannot be overstated."  The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

213.   Embraer failed to ensure that its control activities were being carried out as designed or were even designed correctly in the first place.

214.   As the SEC alleged in their complaint, during the relevant time period, Embraer's policies, procedures, or controls required that all commitments above a certain sum with third parties have a formal, written contract.  However, Embraer did not enter into a written contract with the relevant officials and agents in the Dominican Republic, Saudi Arabia, Mozambique, and India, who were implicated in the bribery schemes, even though these individuals were the intended beneficiaries of the payments referred to in this Complaint.  This clear red flag should have prompted management to investigate further.

215.   Embraer's Code of Ethics and internal company directives required due diligence on sales representatives or agents, such as checking corporate documentation and publicly

available information, gathering evidence of access to the customer or market, and inquiring whether the representative or agent was recommended by government officials.  In each of the schemes described in this Complaint, the bribes and improper payments involved were transacted through third parties.  Critical steps that Embraer's internal process at the time required, such as checking publicly available information about the third parties' access to customers or relevant markets, were either ignored or circumvented.  Had these steps been taken, the information obtained would have alerted Embraer employees that some or all of the agents identified in this Complaint lacked any experience or expertise in the aviation industry.

216.    Embraer's Legal Department was responsible for approving the consultants that its senior legal executives engaged on behalf of Embraer.  As a result, senior Embraer executives in Brazil—including, without limitation, some of the Defendants, a senior legal executive at the time, at least two other senior Embraer executives, and several Embraer managers—approved the engagement of third parties through sham contracts to act as conduits for bribes to foreign officials. They concealed bribe payments as legitimate expenses under contracts obtained in countries that bore no relation to any legitimate business services rendered and that were intended largely to pay bribes to foreign government officials.

217.    As described above, the payments that were made to the third-party consultants lacked adequate documentation, since in many cases they were not made pursuant to a written contract.  Furthermore, there was no documentation or other proof that any services had been rendered by the third parties or the companies associated with them.   These supposed commission payments in fact had no relation to any legitimate services rendered because they were intended to pay bribes to foreign government officials

218.     At a minimum, no competitive bidding process or any other public-auction-type process took place in connection with securing the contracts for the sale of Embraer's planes to the Dominican Republic and India.  As a result, there were no written Requests For Proposals ("RFP") detailing specifications, payment terms, and other requirements that are typically part of an RFP.  For example, in connection with the sale of the Super Tucano planes to the DRAF, Embraer negotiated directly with representatives of the DRAF without having to participate in any bidding process.  The lack of a bidding process to secure an approximately $96.4 million contract should have served as a major red flag.

219.     Moreover, the false agency contracts—such as the contract to sell military airplanes to the Indian Air Force—contained fraudulent clauses.  Had Embraer's Legal Department performed adequate reviews of these false agency contracts, they could have easily discovered the fraud.

220.     There were additional red flags that should have raised concern and led Embraer to investigate further: (a) Certain bribe payments were funneled through companies that had no experience in the aeronautics industry; (b) Third-party intermediaries were not qualified and lacked the necessary experience and resources to perform the functions for which the third-party intermediaries had been purportedly hired or retained; (c) There were inadequately documented payments or expenses; (d) Employee or third-party intermediaries requested that certain transactions be structured to disguise material facts or to evade local laws; and (e) Third-party intermediaries requested payments in countries other than the country in which Embraer has its registered headquarters or senior management offices, or in which it had a permanent establishment directly involved in the performance of the business for which it was retained—for example, Embraer flagged the first payment of $100,000 to Piccini as suspicious in 2009.

221.    Several of these red flags are cited in Embraer's Anti-Corruption Policy as warnings to scrutinize.

222.    Embraer had a control environment that enabled the bribe payments.  This control environment also had a clear lack of monitoring and oversight over the payment process to ensure that such payments were made pursuant to valid written contracts, for which Embraer received services that were commensurate with the payments made.

###     vii.    Embraer's Failure to Record a Charge for Anticipated Regulatory Penalties

223.    Embraer violated the requirements of International Financial Reporting Standards ("IFRS"), under which the Company reported financial statements throughout the Class Period, by not recording a provision for disgorgement of profits that it earned from aircraft sales that otherwise would not have occurred without bribes paid to foreign officials.

224.    According to International Accounting Standard ("IAS") 37, entitled *Provisions, Contingent Liabilities and Contingent Assets*, a provision should be recognized when (a) an entity has a present obligation (legal or constructive) as a result of a past event, (b) it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation, and (c) a reliable estimate can be made of the amount of the obligation.[9]

225.    Under this standard, when it is more likely than not that a present obligation exists at the end of the reporting period, an entity must record a provision, assuming all of the other criteria are met.[10]  An outflow of resources is deemed to be probable if the event is more likely

---

[9] IAS 37, Par. 14.

[10] The "more likely than not" standard under IFRS is a lower threshold than under U.S. GAAP, where the standard is defined as "Probable[,]" which is defined as likely.

than not to occur; the probability that the event will occur is greater than the probability that it will not.[11]

226.     It is clear that Embraer had met the criteria for recording a provision in its financial statements but failed to take action until it negotiated a settlement with the regulatory authorities. The past event—the bribe payments to government officials through third-party agents—occurred and gave rise to an obligation.  It was also more likely than not that Embraer was going to be fined by regulators.  Management was also in a position to make a reasonable estimate of the amount of the obligation to be used in recording a provision in its financial statements.

227.     *IFRS makes the point that it is only in "extremely rare" cases that a reliable estimate will not be able to be made.*[12]  Management should have based its estimate from the amount of profits it earned from business obtained through the use of bribes paid to government officials in the Dominican Republic, Saudi Arabia, Mozambique, and India.  As described herein, Embraer made over $83 million in profits as a result of the bribe payments.  Management knew or should have known that at least the U.S. regulators were going to base their fine in part on the amount of illegal profits earned by the company.  Ultimately, that is exactly what happened.

228.     As a result, Embraer was forced to pay the following: $98.2 million to the SEC as disgorgement of profits, up to $20 million of which may be deducted if such amount is paid to the MPF and CVM; $107.3 million to the DOJ for violating the anti-bribery, books-and-records, and internal-controls provisions of the FCPA; and R$65 million (approximately $18.2 million) to the MPF and CVM for damages and disgorgement of illegal profits.

---

[11] IAS 37, Pars. 16 and 23.
[12] IAS 37. Par. 26.

viii.        **Embraer's Violations of Management Discussion and Analysis**

229.    Consistent with Item 303[13], the management discussion and analysis ("MD&A") should be a discussion and analysis of a company's business from the perspective of those who manage the business.  The SEC specifically states that the MD&A "should not be a recitation of financial statements in narrative form or an otherwise uninformative series of technical responses to MD&A requirements."  Furthermore, when addressing accounting estimates, the MD&A should supplement and not duplicate the notes to the financial statements.  Management should "provide greater insight into the quality and variability of information regarding financial condition and operating performance."[14]

230.    Embraer's footnote disclosures in its audited financial statements in the Company's Form 20-F for the fiscal year ended 2011 reads as follows:

> The Company received a subpoena from the SEC, which inquired about certain operations concerning sales of aircraft abroad.  In response to this SEC-issued subpoena and associated inquiries into the possibility of non-compliance with the U. S. Foreign Corrupt Practices Act ("FCPA"), the Company retained outside counsel to conduct an internal investigation on transactions carried out in three specific countries.

> The investigation remains ongoing and the Company, through its outside counsel, continues to cooperate fully with the authorities responsible for reviewing the matter (SEC and US Department of Justice).  Management, with the support of the Company's outside counsel, has concluded that, as of December 31, 2011, it is still not possible to estimate the duration, scope or results of the investigation.  In the event that an illegal activity is identified or the parties enter into an agreement to bring finality to the matter, the Company may be required to pay substantial fines, as provided in the FCPA.  Management, based upon the opinion of the Company's outside counsel, understands that, as of December 31, 2011, there is no basis for estimating reserves or quantifying any possible contingency.

---

[13] Item 303 of Regulation S-K (§229.303).

[14] Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations. 17 C.F.R. Parts 211, 231, and 241 [Release Nos. 33-8350; 34-48960; FR-72]; Section I.E.

231.    The disclosure in the MD&A for the same year in the Company's Form 20-F for

the fiscal year ended 2011 reads as follows:

> ***SEC/DOJ Investigation.*** We received a subpoena from the SEC, which inquired
> about certain operations concerning sales of aircraft abroad.  In response to this
> SEC-issued subpoena and associated inquiries into the possibility of non-
> compliance with the U.S. Foreign Corrupt Practices Act, or FCPA, we retained
> outside counsel to conduct an internal investigation on transactions carried out in
> three specific countries.
>
> The investigation remains ongoing and we, through our outside counsel, continue
> to cooperate fully with the SEC and U.S. Department of Justice, which are the
> authorities responsible for reviewing the matter.  Our management, with the support
> of our outside counsel, has concluded that, as of December 31, 2011, it is still not
> possible to estimate the duration, scope or results of the investigation.  In the event
> that an illegal activity is identified or the parties enter into an agreement to settle
> the matter, we may be required to pay substantial fines and/or to incur other
> sanctions, as provided in the FCPA.  Our management, based upon the opinion of
> our outside counsel, believes that, as of December 31, 2011, there is no basis for
> estimating reserves or quantifying any possible contingency.

232.    When a user of the financial statements compares the two disclosures in the Form

20-F for the fiscal year ended 2011, it is clear that the MD&A does not provide any greater insight

into the FCPA violations and potential financial penalties of the violations.  The MD&A disclosure

was purely a recitation of the footnotes in the financial statements with an adjustment to the nouns

and pronouns to change the point of view.  As previously discussed, senior Embraer executives,

including the Individual Defendants, had the information regarding the illegally earned-profit

amounts for the countries under investigation readily available to them.

233.    In addition to recording a provision for the illegal profits, Embraer should have

disclosed the amount of the potential disgorgement under the penalty rules for FCPA violations in

the MD&A.

### ix.        Pre-Class Period False and Misleading Statements and Omissions

234.    Even starting from before the Class Period, Embraer misled investors regarding its

participation in the bribery scheme.  On November 4, 2011, Embraer hosted a conference call to

discuss the Company's Q311 results.  During Defendant Curado's opening remarks, he said that Defendant Aguiar would provide details about a topic later that day, reflecting that Defendant Aguiar was participating on the call as well.  In response to a question from Nicolai Sebrell regarding the recently announced regulatory investigations into the bribery schemes, Defendant Curado said the following: "So I apologize, but this is exactly where we are.  And as I said, we remain with serenity, knowing the seriousness of what the process like that is, the serenity of a company that has voluntarily adopted all the processes, the code ethics, adhere to the Global Compact of the United Nations with – following with follow-up reports. So we just have to wait and in an orderly way."

## C.     False and Misleading Statements and Omissions During the Class Period

235. As detailed below, throughout the Class Period, Defendants issued statements that were materially false and misleading because they misrepresented and/or failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Defendants or recklessly disregarded by them.   Specifically, and without limitation, Defendants made false and misleading statements about and/or failed to disclose the following:

(a)     Between 2007 and 2011, Defendants paid $11.5 million in bribes to secure contracts with government officials or agents in the Dominican Republic, Saudi Arabia, Mozambique, and India, worth $463.1 million in revenue and $83 million in profits.  For purposes of comparison: (i) the $83 million in profits from the contracts executed through bribes represents about 7% of the Company's net income throughout the Class Period; (ii) the $304.4 million in revenue from the contracts executed through bribes within Embraer's Defense and Security business unit represents about 6% of this unit's revenue throughout the Class Period; and (iii) the $158.7 million in revenue from the

contracts executed through bribes within Embraer's Commercial Aviation business unit within this unit's Other geographic operating region (including Mozambique and Saudi Arabia) represents about 20% of this unit's revenue within that geographic region throughout the Class Period.

(b)    Embraer's contracts with the Dominican Republic government were tainted with fraud as a result of bribes used to effectuate them.  Indeed, in connection with the Dominican Republic bribery scheme, $3.52 million in illegal bribes associated with the DRAF purchases of eight Super Tucano aircrafts were falsely consolidated in Embraer's 2010 financial statements under Operating Income (Expense) as a Selling Expense, specifically a Commercialization Expense.  Embraer's segment reporting of these financial metrics for the Company's Defense and Security business unit (which includes the Super Tucano aircrafts), including, without limitation, this unit's financial metrics within the Latin America region (which includes the Dominican Republic), were also false and misleading throughout the Class Period.  The $96.4-million value of this agreement with DRAF would have been recognized when the Super Tucano aircrafts were delivered, which was during periods reported in Defendants' Class Period financial statements and disclosures, rendering false and misleading the revenue and income figures that the Company disclosed throughout the Class Period.  Embraer's segment reporting of revenue and income for the Company's Defense and Security business unit, including, without limitation, this unit's revenue within the Latin America region, as well as reported revenues and income for the Company as a whole, were also false

and misleading throughout the Class Period as a result of the bribery scheme.

(c)     Embraer's contracts with the Saudi Arabian government were tainted with fraud as a result of bribes used to effectuate them.  In connection with the Saudi Arabia scheme, the $1.5 million in illegal bribes associated with Saudi Aramco's purchases of three 170 aircrafts were falsely consolidated in Embraer's financial statements under Operating Income (Expense) as a Selling Expense, specifically a Commercialization Expense or Sales Commission.  As a result, Embraer's segment reporting of these financial metrics for the Company's Commercial Aviation business unit (which includes the three 170 aircrafts), including, without limitation, this unit's financial metrics within the Other geographic region (which includes Saudi Arabia), were also false and misleading throughout the Class Period.  The $93-million value of this agreement with Saudi Aramco would have been recognized when the three 170 aircrafts were delivered, which was during periods reported in Defendants' Class Period financial statements and disclosures, rendering false and misleading the revenue and income figures that the Company disclosed throughout the Class Period.  Embraer's segment reporting of revenue and income for the Company's Commercial Aviation business unit, including, without limitation, this unit's revenue and income within the Other geographic region, as well as the Company's reported consolidated revenue and net income, were also false and misleading throughout the Class Period.

(d)     Embraer's contracts with the Mozambique government were tainted with fraud as a result of bribes used to effectuate them.   In connection with the

Mozambique bribery scheme, the $800,000 in illegal bribes associated with LAM's purchases of two 190 aircrafts—with an option to purchase a third—were falsely consolidated in Embraer's financial statements under Operating Income (Expense) as a Selling Expense, specifically a Sales Commission. Embraer's segment reporting of these financial metrics for the Company's Commercial Aviation business unit (which includes the two 190 aircrafts), including, without limitation, this unit's financial metrics within the Other geographic region (which includes Mozambique), were also false and misleading throughout the Class Period. The $62-million value of this agreement with LAM would have been recognized when the two 190 aircrafts were delivered, rendering false and misleading the revenue and income figures that the Company disclosed during the Class Period. Embraer's segment reporting of revenue and income for the Company's Commercial Aviation business unit, including, without limitation, this unit's revenue and income within the Other geographic region, as well as the Company's reported consolidated net income and revenues, were also false and misleading throughout the Class Period.

(e)     Embraer's contracts with the Indian government were tainted with fraud as a result of bribes used to effectuate them. In connection with the India bribery scheme, the $5.76 million in illegal bribes associated with the Indian Air Force's purchases of three AEW&C 145 aircrafts were falsely consolidated in the Company's financial statements under Operating Income (Expense) and mischaracterized as a Selling Expense, specifically under Commercialization

Expense.  Embraer's segment reporting of these financial metrics for the Company's Defense and Security business unit (which includes the AEW&C 145 aircrafts), including, without limitation, this unit's financial metrics within the Asia Pacific geographic region (which includes India), were also false and misleading throughout the Class Period.  The $208-million value of this agreement with the Indian Air Force would have been recognized when the AEW&C 145 aircrafts were delivered throughout the Class Period, rendering false and misleading the revenue and income figures that the Company disclosed throughout the Class Period.  Embraer's segment reporting of revenue and income for the Company's Government and Security business unit, including, without limitation, this unit's revenue and income within the Asia Pacific geographic region, as well as the Company's reported consolidated revenues and net income, were also false and misleading throughout the Class Period.

(f)     Embraer' subsidiaries Embraer RL and ECC Investment were used as tools to execute fraudulent commercial-representation contracts with and dole out bribes to parties necessary to effectuate the bribery schemes in the Dominican Republic, Saudi Arabia, Mozambique, and India, as opposed to legitimate corporate entities.

(g)     Throughout the Class Period, Embraer was subject to significant regulatory fines as a result of its illegal conduct, requiring a charge of at least $83 million in disgorgement of profits earned as a result of the bribery scheme.

(h)     Embraer, in conducting and hiding the bribery schemes, was violating the

FCPA and other anti-bribery, accurate-accounting, and internal-control laws.

(i)     Embraer was violating its Code of Ethics because its senior-most executives, including Individual Defendants and the Company's Executive Board members, were aware of and even participated in the bribery schemes.

(j)     Statements by Defendants regarding the adequacy of internal controls failed to account for rampant pilfering of the Company's cash coffers by scheming executives.

(k)     Statements by Defendants regarding the adequacy of internal controls failed to disclose that the Company's internal controls were insufficient to insure that the Company did not violate the FCPA and other anti-bribery laws.

(l)     Statements by Defendants regarding the adequacy of internal controls failed to disclose that the Company's internal controls were insufficient to insure accurate accounting and financial reporting.

(m)     Embraer hid significant bribe payments in its cost of sales and revenues.

(n)     As a result of the foregoing, Defendants' statements about Embraer's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

### 1.     2012 Statements

236.     On January 11, 2012, Embraer disclosed on its website information about its fourth quarter 2011 aircraft deliveries.  The Company stated that the "development program of the EMB 145 AEW&C (Airborne Early Warning and Control) jet for the Indian government, which ordered three platforms, also advanced, with the aircraft's first flight."  Also, the Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered one, and had one in backlog.

237.    The statements in ¶236 were materially false and misleading for the reasons set forth in ¶235(a), (d), (e), and (n).

238.    On March 20, 2012, Embraer disclosed on its website its financial statements for the fourth quarter of 2011 ("Q411 Financial Statements").  The Company reported the following financial metrics:

| Line Item | Year Ended 2011 | Year Ended 2010 | Year Ended 2009 |
|---|---|---|---|
| Revenue | $5,803.0[15] | $5,364.1 | $5,497.8 |
| (Cost of sales and services) | $(4,495.9) | $(4,388.1) | $(4,428.4) |
| (Administrative expense) | $(262.5) | $(197.5) | $(191.3) |
| (Selling expense) | $(419.3) | $(374.1) | $(304.6) |
| Other operating income (expense) | $(221.5) | $9.4 | $(138.5) |
| Net Income | $120.4 | $345.4 | $478.9 |
| Commercial Aviation business unit revenue. | R$6,273.6 | R$5,707.3 | R$6,780.7 |
| Commercial Aviation business unit (cost of sales and services) | R$(4,894.7) | R$(4,696.7) | R$(5,658.6) |
| Commercial Aviation business unit gross profit | R$1,378.9 | R$1, 010.6 | R$1,132.1 |
| Commercial Aviation business unit (operating expense) | R$(1,165.8) | R$(615.6) | R$(881.9) |
| Defense and Security business unit revenue | R$1,444.7 | R$1,445.2 | R$948.9 |
| Defense and Security business | R$(1,091.3) | R$(1,052.9) | R$(737.8) |

---

[15] All figures are in millions.

| | | | |
|---|---|---|---|
| unit cost of sales and services | | | |
| Defense and Security business unit gross profit | R$353.4 | R$392.3 | R$211.1 |
| Defense and Security business unit operating expense | R$(210.6) | R$(200.5) | R$(114.4) |

239. In the Q411 Financial Statements, the Company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): R$596.4 million in 2009, R$186.4 million in 2010, and R$219.29 million in 2011.  The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): R$331.5 million in 2009, R$495.7 million in 2010, and R$27 million in 2011.  The Company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): R$144 million in 2009, R$213 million in 2010, and R$242.4 million in 2011.

240.    The statements in ¶¶238-39 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h), and (n).

241.    In the Q411 Financial Statements, the Company stated "The AEW India program is moving ahead as contracted and, in December 2011, Embraer performed the maiden flight of the first of three aircraft ordered by the Indian government."

242.    The statements in ¶241 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), and (n).

243. In the Q411 Financial Statements, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

244. The statements in ¶243 were materially false and misleading for the reasons set forth in ¶235(m).

245. In the Q411 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

246. In the Q411 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. 'ECC Insurance' located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. 'EFL' located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

247. The statements in ¶¶245-46 were materially false and misleading for the reasons set forth in ¶235(f).

248. In the Q411 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations: "Management, with the support of the Company's outside counsel, has concluded that, as of December 31, 2011, it is still not possible to estimate the duration, scope or results of the investigation. … Management, based upon the opinion of the Company's outside counsel,

believes that, as of December 31, 2011, there is no basis for estimating reserves or quantifying any possible contingency."

249.    In the Q411 Financial Statements, the Company reported Current Liabilities-Provisions for contingencies on a consolidated basis of R$12.572 million for the year ended 2010 and R$10 million for the year ended 2011.  The Company reported Non-Current Liabilities-Provisions for contingencies on a consolidated basis of R$115.5 million for the year ended 2010 and $107.6 million for the year ended 2011.

250.    The statements in ¶¶248-49 were materially false and misleading for the reasons set forth in ¶235(a)-(h), (j), and (n).

251.    On March 21, 2012, during the Embraer conference call to discuss the Company's Q411 results, Defendant Curado highlighted in his opening remarks dealings with the Indian Airforce:  "We also advanced the AEW program for India."

252.    The statements in ¶251 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), and (n).

253.    During this call regarding the Q411 results, Curado also said "and talking about SG&A expense, the expenses were somewhat stable in the last three quarters – second, third and fourth quarters of 2011, and all are between $170 million to $186 million.  And that's an area where we always pay very close attention to control, and to become more and more efficient."

254.    The statements in ¶253 were materially false and misleading for the reasons set forth in ¶(a)-(g), (m), and (n).

255.    On April 16, 2012, Embraer filed a Form 20-F with the SEC for the fiscal year ended December 31, 2011 ("2011 20-F"), which Defendants Curado and Marques signed. Defendants Aguiar, as Embraer's Executive VP of the Defense and Security business unit, and

Rimoli, as Embraer's Executive VP-General Counsel, had ultimate authority to approve the disclosures made in the 2011 20-F—indeed, Defendant Rimoli was the Board's Secretary at that time.  Both Defendants Aguiar and Rimoli were Embraer Executive Board members at this time. The Company reported the following financial metrics:

| Line Item | Year Ended 2011 | Year Ended 2010 | Year Ended 2009 |
|---|---|---|---|
| Revenue | $5,803.0[16] | $5,364.1 | $5,497.8 |
| (Cost of sales and services) | ($4,495.9) | ($4,338.1) | ($4,428.4) |
| (Administrative expense) | ($262.5) | ($197.5) | ($191.3) |
| (Selling expense) | ($419.3) | ($374.1) | ($304.6) |
| Other operating income (expense) | ($221.5) | $9.4 | ($138.5) |
| Net Income | $120.4 | $345.4 | $478.9 |
| Commercial Aviation business unit revenue | $3,714.1 | $3,257.9 | $3,785.7 |
| Commercial Aviation business unit (cost of sales and services) | ($2,895.8) | ($2,680.8) | ($3,072.2) |
| Commercial Aviation business unit gross profit | $818.3 | $577.1 | $713.5 |
| Commercial Aviation business unit (operating expense) | ($672.5) | ($345.3) | ($400.0) |
| Defense and Security business unit revenue | $851.9 | $821.8 | $677.8 |
| Defense and Security business unit cost of sales and services | ($644.5) | ($599.5) | ($520.1) |

---

[16] All figures are in millions.

| Defense and Security business unit gross profit | $207.4 | $222.3 | $157.7 |
|---|---|---|---|
| Defense and Security business unit operating expense | ($125.5) | ($115.6) | ($89.6) |

256.   In the 2011 20-F, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): $268.6 million in 2009; $106.4 million in 2010; and $128.4 million in 2011.  The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): $185.3 million in 2009; $276.9 million in 2010; and $15.5 million in 2011.  The Company reported that the Defense and Security business unit (which includes the AEW&C 145 aircrafts) generated the following revenues in Asia Pacific (which includes India): $78.6 million in 2009; $123 million in 2010; and $145.2 million in 2011.

257.   The statements in ¶¶255-56 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h), and (n).

258.   In the 2011 20-F, the Company reported having delivered the following numbers of aircrafts: in 2009, 26 Super Tucano aircrafts, 7 145 aircrafts, 22 170 aircrafts, and 13 190 aircrafts; in 2010, 16 Super Tucano aircrafts (in backlog), 6 145 aircrafts, 9 170 aircrafts, and 58 190 aircrafts; in 2011, 24 Super Tucano aircrafts (in backlog), 2 145 aircrafts, 1 170 aircraft, and 68 190 aircrafts.

259.   The statements in ¶258 were materially false and misleading for the reasons set forth in ¶235(a)-(g).

260.    In the 2011 20-F, the Company stated that "[w]e believe that we will be able to compete favorably on the basis of our aircraft performance, efficiency, low operating costs, product development experience, global customer base, market acceptance, cabin design and aircraft price."

261.    The statements in ¶260 were materially false and misleading for the reasons set forth in ¶235(h), (i), (m), and (n).

262.    In the 2011 20-F, the Company stated "In addition, in 2008 we executed a contract with the Indian Air Force to sell them three units of our EMB 145 AEW&C aircraft."

263.    In the 2011 20-F, the Company stated that for LAM, it had firm orders of three 190 aircrafts, delivered 2, and backlogged 1.

264.    The statements in ¶¶262-63 were materially false and misleading for the reasons set forth in ¶235(a), (d), (e), and (n).

265.    In the 2011 20-F, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

266.    The statements in ¶265 were materially false and misleading for the reasons set forth in ¶235(m).

267.    In the 2011 20-F, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

268.    In the 2011 20-F, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. 'ECC Insurance' located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of

Embraer aircraft. … Embraer Finance Ltd. 'EFL' located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

269.    The statements in ¶¶267-68 were materially false and misleading for the reasons set forth in ¶235(f).

270.    In the 2011 20-F, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "Our management, with the support of our outside counsel, has concluded that, as of December 31, 2011, it is still not possible to estimate the duration, scope or results of the investigation. … Our management, based upon the opinion of our outside counsel, believes that, as of December 31, 2011, there is no basis for estimating reserves or quantifying any possible contingency."

271.    In the 2011 20-F, the Company reported Current Liabilities-Provisions for contingencies of $7.5 million for the year ended 2010 and $5.3 million for the year ended 2011. The Company reported Non-Current Liabilities-Provisions for contingencies of $69.3 million for the year ended 2010 and $57.4 million for the year ended 2011.

272.    The statements in ¶¶270-71 were materially false and misleading for the reasons set forth in ¶235(a)-(h), (j), and (n).

273.    In the 2011 20-F, the Company disclosed that it "adopted a Code of Ethics and Conduct applicable to [its] directors, officers, and employees worldwide."  The statements in the Code of Ethics and Conduct were substantially similar to those described above in ¶194.

274.    The statements in ¶273 were materially false and misleading for the reasons set forth in ¶235(a), (h), and (i).

275.    In the 2011 20-F, the Company stated the following in connection with its Disclosure Controls and Procedures:

> Our President and CEO, Frederico Pinheiro Fleury Curado, and our executive vice-president and chief financial and investor relations officer, Paulo Penido Pinto Marques, after evaluating, together with management, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a15(e) and 15d15( e)) as of December 31, 2011, the end of the period covered by this annual report, concluded that, as of such date, our disclosure control and procedures were effective to ensure information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and were effective in ensuring that such information is accumulated and communicated to our management, including our CEO and chief financial officer, as appropriate to allow timely decisions regarding required disclosures.

276.    In the 2011 20-F, the Company stated the following in connection with its internal control over financial reporting:

> Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2011. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework. Based on this assessment, our management concluded that, as of December 31, 2011, our internal control over financial reporting was effective based on those criteria.  …  Our internal audit department periodically evaluates our internal controls for the main cycles, documenting by flow charts the processes used in each cycle, identifying opportunities and suggesting improvements for the existing control mechanisms. There was no change in our internal control over financial reporting that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

277.    The statements in ¶¶275-76 were materially false and misleading for the reasons set forth in ¶235(j)-(l).

278.    The 2011 20-F contained signed certifications pursuant to SOX by Defendants Curado and Marques, stating that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Also, the SOX certifications include the following statements:  "The company's other

certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and to the audit committee of the company's board of directors (or persons performing the equivalent functions): … b) any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." This certification was repeated in all material respects throughout the Class Period.

279.  The statements in ¶278 were materially false and misleading for the reasons set forth in ¶235.

280.  On April 17, 2012, Embraer disclosed on its website information about its first quarter 2012 aircraft deliveries. The Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

281.  The statements in ¶280 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m).

282.  On April 26, 2012, Embraer filed a Form 6-K with the SEC to release its operating results for the first quarter of 2012 ("Q112 6-K"), which Defendant Curado signed. The Company reported the following financial figures:

| Line Item | Three Months Ended 3/31/2012 | Three Months Ended 3/31/11 |
|---|---|---|
| Revenue | $1,155.9[17] | $1,055.7 |
| (Cost of sales and services) | ($887.7) | ($799.3) |
| (Administrative expense) | ($71.0) | ($57.2) |
| (Selling expense) | ($108.7) | ($94.0) |
| Other operating income (expense) | ($13.4) | ($19.3) |

---

[17] All figures are in millions.

| Net Income | $63.6 | $106.3 |
|------------|-------|--------|

283.    The statements in ¶282 were materially false and misleading for the reasons set forth in ¶235(a)-(g), (m), and (n).

284.    In the Q112 6-K, the Company stated that "The AEW India program is moving ahead as contracted. In the first quarter, the second aircraft ordered by the Indian government performed its maiden flight.  The first two of three aircraft ordered by the Indian government are scheduled for delivery in the second semester."

285.    The statements in ¶284 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), (m), and (n).

286.    In the Q112 Financial statements, the Company reported Current Liabilities-Provisions for contingencies of R$10 million as of December 31, 2011 and R$10.3 million as of March 31, 2012.  The Company reported Non-Current Liabilities-Provisions for contingencies of R$107.6 million as of December 31, 2011 and R$103.0 million as of March 31, 2012.

287.    The statements in ¶286 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g), (h), (i), and (n).

288.    On April 26, 2012, Embraer released on its website its financial statements for the first quarter of 2012 ("Q112 Financial Statements").  The Company reported the following figures:

| Line Item | Quarter Ended March 31, 2012 |
|-----------|------------------------------|
| Commercial Aviation business unit revenue | R$1,345.4[18] |
| Commercial Aviation business unit (cost of sales and services) | R$(1,011.8) |
| Commercial Aviation business unit gross profit | R$333.5 |

---

[18] All figures are in millions, unless stated otherwise.

| Commercial Aviation business unit (operating expense) | R$(191.0) |
| Defense and Security business unit revenue | R$411.3 |
| Defense and Security business unit cost of sales and services | R$(312.1) |
| Defense and Security business unit gross profit | R$99.2 |
| Defense and Security business unit operating expense | R$(64.2) |

289.    In the Q112 Financial Statements, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): R$8.1 million for the quarter ended March 31, 2011.  The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): R$18.2 million for the quarter ended March 31, 2011.  The Company reported that the Defense and Security business unit (which includes the AEW&C 145 aircrafts) generated the following revenues in Asia Pacific (which includes India): R$39.2 million for the quarter ended March 31, 2011.

290.    The statements in ¶¶288-89 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (m), and (n).

291.    In the Q112 Financial Statements, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

292.    The statements in ¶291 were materially false and misleading for the reasons set forth in ¶235(m).

293.    In the Q112 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

294.    In the Q112 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. 'ECC Insurance' located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. 'EFL' located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

295.    The statements in ¶¶293-94 were materially false and misleading for the reasons set forth in ¶235(f).

296.    On July 31, 2012, Embraer filed a Form 6-K with the SEC to release its operating results for the second quarter of 2012 ("Q212 6-K"), which Defendant Curado signed.  The Company reported the following financial metrics:

| Line Item | Six Months Ended 6/30/2012 | Six Months Ended 6/30/11 |
| --- | --- | --- |
| Revenue | $2,873.2[19] | $2,414.3 |
| (Cost of sales and services) | ($2,199.7) | ($1,853.1) |
| (Administrative expense) | ($146.3) | ($121.6) |
| (Selling expense) | ($227.3) | ($202.8) |
| Other operating income (expense) | $13.8 | $1.5 |
| Net Income | $118.2 | $204.7 |

[19] All figures are in millions, unless stated otherwise.

297.    The statements in ¶296 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (m), and (n).

298.    In the Q112 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations: "Management, with the support of the Company's outside counsel, has concluded that, as of March 31, 2012, it is still not possible to estimate the duration, scope or results of the investigation. … Management, based upon the advice of the Company's outside counsel, believes that, as of March 31, 2012, there is no basis for estimating a provision or quantifying any possible contingency."

299.    The statements in ¶298 were materially false and misleading for the reasons set forth in ¶235(a)-(i), (m), and (n).

300.    On April 27, 2012, during the Company's call to discuss its Q112 results, Defendant Curado highlighted in his opening remarks dealings with the Indian Airforce: "We have the first flights of the second AEW 145 for India aircraft of the three so the program is -- keeps moving."

301.    The statements in ¶300 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), (m), and (n).

302.    On June 13, 2012, Embraer filed with a Form 424(b)(2) with the SEC concerning its Notes due 2022, which Defendant Filippo signed ("2022 Notes 424(b)(2)").  The Company incorporated by reference its 2011 20-F, amongst other documents.

303.    The statements in ¶302 were materially false and misleading for the reasons set forth in ¶235.

304.    In the 2022 Notes 424(b)(2), the Company reported having delivered the following numbers of aircrafts: in 2009, 26 Super Tucano aircrafts, 7 145 aircrafts, 22 170 aircrafts, and 62

190 aircrafts; in 2010, 6 145 aircrafts, nine 170 aircrafts, and 58 190 aircrafts; in 2011, 2 145 aircrafts, 1 170 aircraft, and 68 190 aircrafts.

305.    In the 2022 Notes 424(b)(2), the Company stated that for LAM, it had firm orders of three 190 aircrafts, delivered two, and backlogged one.

306.    The statements in ¶¶304-35 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h), (m), and (n).

307.    In the 2022 Notes 424(b)(2), the Company stated the following in connection with regulators' investigations into the bribery schemes:  "The SEC and DOJ investigation continues, and our management, with the support of our outside counsel, continues to believe that it is not possible to estimate the duration, scope or results of the investigation. … Our management, based upon the opinion of our outside counsel, continues to believe that there is no basis for estimating reserves or quantifying any possible contingency."

308.    The statements in ¶307 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g), (h), and (i).

309.    In Ex. 12.1 of the 2022 Notes 424(b)(2), the Company reported the following financial metrics:

| Financial Metric | As of March 31, 2012 | As of March 31, 2011 | Year Ended 2011 | Year Ended 2010 | Year Ended 2009 |
|---|---|---|---|---|---|
| Income before income taxes, equity results and minority results | $78.2[20] | $103.7 | $247.5 | $408.1 | $320.8 |
| Ratio of earnings to fixed charges | 3.87 | 5.5 | 3.38 | 5.36 | 3.68 |

---

[20] All figures in the top row of this table are in millions.

310.    The statements in ¶309 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (m), and (n).

311.    On June 15, 2012, Embraer filed a Form 6-K with the SEC concerning its 2022 Notes, which Defendant Filippo signed ("2022 Notes 6-K").  In Exhibit ("Ex.") 1.1 to the 2022 Notes 6-K, which Defendants Curado and Filippo signed, the Company stated that the 2011 20-F, which was incorporated by reference, amongst other documents, did not contain any untrue statement of material fact nor omit to state any material fact required to be stated or necessary in order to make the statements therein not misleading, and that the Company's financial statements were in compliance with IFRS.

312.    The statements in ¶311 were materially false and misleading for the reasons set forth in ¶235.

313.    In Ex. 1.1 of the 2022 Notes 6-K, the Company stated the following:

Except as described in the Registration Statement, the Disclosure Package and the Final Prospectus, there are no legal, governmental or regulatory investigations, actions, suits or proceedings pending before any Brazilian, U.S. federal or state, or other court, governmental agency or body to which the Company or any of its Subsidiaries is a party or to which any property of the Company or any of its Subsidiaries is the subject that, individually or in the aggregate, if determined adversely to the Company or any of its Subsidiaries, would, individually or in the aggregate, have a Material Adverse Effect; and, except as described in the Registration Statement, the Disclosure Package and the Final Prospectus, no such investigations, actions, suits or proceedings, to the knowledge of the Company, are threatened or contemplated by any governmental or regulatory authority or by others.

314.    In Ex. 1.1 of the 2022 Notes 6-K, the Company stated the following:

Except as to matters in connection with the ongoing investigations by the Commission and the U.S. Department of Justice (the existence of such investigations having been previously disclosed by the Company in the Registration Statement, the Disclosure Package and the Final Prospectus), none of the Company and any of its Subsidiaries or, to the knowledge of the Company, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries (each of the foregoing, a "Company Person")

has (i) used any corporate funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) taken or will take any action in furtherance of an unlawful offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of applicable law; (iii) made any payment or taken any action which would have violated or would be in violation of any Brazilian law, the FCPA or the equivalent laws of other applicable jurisdictions; or (iv) made any bribe, influence payment, unlawful rebate or kickback, or any other unlawful payment; and the Company and its Subsidiaries have conducted their businesses in compliance in all material respects with applicable anticorruption laws and have instituted and maintain policies and procedures reasonably designed to comply with such laws.

315.    The statements in ¶¶313-14 were materially false and misleading for the reasons set forth in ¶235.

316.    In Ex. 1.1 of the 2022 Notes 6-K, the Company stated that it did the following: maintained an effective system of disclosure controls and procedures, as defined under the Exchange Act; carried out evaluations of the effectiveness of its disclosure controls and procedures, as required by the Exchange Act; maintained systems of internal control over financial reporting, as defined under the Exchange Act, that complied with Exchange Act requirements designed to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles; maintained internal accounting controls sufficient to provide reasonable assurances; had no material weakness or significant deficiencies in its internal controls, in accordance with SOX; and had no failures, including by its officers or directors, to comply with SOX.

317.    The statements in ¶316 were materially false and misleading for the reasons set forth in ¶235(j)-(l).

84

318.    On July 10, 2012, Embraer disclosed on its website information about its second quarter 2012 aircraft deliveries.  The Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

319.    The statements in ¶318 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), (m), and (n).

320.    On July 30, 2012, Embraer released on its website its financial statements for the second quarter of 2012 ("Q212 Financial Statements").  The Company reported the following financial figures:

| Line Item | As of 6/30/12 |
|---|---|
| Revenue | R$5,434.0[21] |
| (Cost of sales and services) | R$(4,160.8) |
| (Administrative expense) | R$(273.2) |
| (Selling expense) | R$(425.7) |
| Other operating income (expense) | R$25.9 |
| Net Income | R$228.1 |
| Commercial Aviation business unit revenue | R$3,650.5 |
| Commercial Aviation business unit (cost of sales and services) | R$(2,748.4) |
| Commercial Aviation business unit gross profit | R$902.1 |
| Commercial Aviation business unit (operating expense) | R$(409.6) |
| Defense and Security business unit revenue | R$939.7 |

---

[21] All figures in millions, unless stated otherwise.

| | |
|---|---|
| Defense and Security business unit cost of sales and services | R$(723.0) |
| Defense and Security business unit gross profit | R$216.7 |
| Defense and Security business unit operating expense | R$(138.2) |

321.    In the Q212 Financial Statements, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): R$67.7 million for the quarter ending June 30, 2011.  The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): R$16.2 million for the quarter ending June 30, 2011.  The Company reported that the Defense and Security business unit (which includes the AEW&C 145 aircrafts) generated the following revenues in Asia Pacific (which includes India): R$130.1 million for the quarter ending June 30, 2011.

322.    The statements in ¶¶320-21 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (m), and (n).

323.    In the Q212 Financial Statements, the Company stated that "The AEW India program is moving ahead as contracted. The tests campaign is underway, with the first delivery expected for the Third Quarter."

324.    The statements in ¶323 were materially false and misleading for the reasons set forth in ¶235(a), (e), (m), and (n).

325.    In the Q212 Financial Statements, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw

materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

326.    The statements in ¶325 were materially false and misleading for the reasons set forth in ¶235(m).

327.    In the Q212 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

328.    In the Q212 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

329.    The statements in ¶¶327-28 were materially false and misleading for the reasons set forth in ¶235(f).

330.    In the Q212 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations: "Management, with the support of the Company's outside counsel, has concluded that, as of June 30, 2012, it is still not possible to estimate the duration, scope or results of the investigation. …. Management, based upon the advice of the Company's outside counsel, believes that, as of June 30, 2012, there is no basis for estimating a provision or quantifying any possible contingency."

331.    In the Q212 Financial Statements, the Company reported Current Liabilities-Provisions for contingencies on a consolidated basis of R$10 million for the year ended 2011 and

R$20 million as June 30, 2012.  The Company reported Non-Current Liabilities-Provisions for contingencies on a consolidated basis of R$107.6 million for the year ended 2011 and R$88 million as June 30, 2012.

332.   The statements in ¶¶330-31 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), (m), and (n).

333.   On August 16, 2012, Embraer issued a press release disclosing that it delivered the first EMB 145 AEW&C aircraft to the Indian Government.  Defendant Aguiar, then the Executive VP of Embraer's Defense and Security business unit and Executive Board member, stated that the "collaboration with DRDO in such a complex program strengthens the ties between Brazil and India[,]" … [w]e are very proud to meet the expectations of our clients in providing CABS, DRDO with this platform."  The press release also stated that the "[r]emaining AEW&C aircraft are due to be delivered to the Indian Air Force as part of a contract signed in 2008 that includes a comprehensive package for training, technical support, spare parts, and ground support equipment."

334.   The statements in ¶333 were materially false and misleading for the reasons set forth in ¶235(a) and (e).

335.   On October 11, 2012, Embraer filed a Form 6-K with the SEC regarding its third quarter 2012 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

336.   The statements in ¶335 were materially false and misleading for the reasons set forth in ¶235(a) and (d).

337.    On October 23, 2012, Embraer disclosed on its website its financial statements for the third quarter of 2012 ("Q312 Financial Statements"), stating that they conformed with IFRS. The Company reported the following financial figures:

| Line Item | Consolidated Nine Months Ended 9/30/12 | Consolidated Nine Months Ended 9/30/11 |
|---|---|---|
| Revenue | R$8,283.5[22] | R$6,190.8 |
| (Cost of sales and services) | R$(6,290.1) | R$(4,797.8) |
| (Administrative expense) | R$(393.1) | R$(311.2) |
| (Selling expense) | R$(650.9) | R$(497.8) |
| Other operating income (expense) | R$100.4 | R$49.8 |
| Net Income | R$446.6 | R$337.2 |
| Commercial Aviation business unit revenue | R$5,590.5 | R$4,356.1 |
| Commercial Aviation business unit (cost of sales and services) | R$(4,154.4) | R$(3,360.7) |
| Commercial Aviation business unit gross profit | R$1,436.2 | R$995.4 |
| Commercial Aviation business unit (operating expense) | R$(738.6) | R$(513.4) |
| Defense and Security business unit revenue | R$1,464.7 | R$914.8 |
| Defense and Security business unit cost of sales and services | R$(1,133.5) | R$(726.8) |
| Defense and Security business unit gross profit | R$331.1 | R$188.0 |
| Defense and Security business unit operating expense | R$(204.4) | R$(143.8) |

---

[22] All figures are in millions, unless stated otherwise.

338.    In the Q312 Financial Statements, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): R$196.6 million as of September 30, 2011; and R$243.8 million as of September 30, 2012.  The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): R$18.6 million as of September 30, 2011; and R$20.9 million as of September 30, 2012.  The Company reported that the Defense and Security business unit (which includes the 145 aircrafts) generated the following revenues in Asia Pacific (which includes India): R$180.8 million as of September 30, 2011; and R$89.4 million as of September 30, 2011.

339.    The statements in ¶¶337-38 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (m), and (n).

340.    In the Q312 Financial Statements, the Company stated that "In 3Q12 the first EMB 145 AEW&C (Airborne Early Warning and Control) was delivered to the Indian Government. This delivery represents an important milestone in the program, which continues on track."

341.    The statements in ¶340 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), and (m)-(n).

342.    In the Q312 Financial Statements, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

343.    The statements in ¶342 were materially false and misleading for the reasons set forth in ¶235(m).

344.     In the Q312 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

345.     In the Q312 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of … ECC Insurance & Financial Co. Ltd. … located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

346.     The statements in ¶¶344-45 were materially false and misleading for the reasons set forth in ¶235(f).

347.     In the Q312 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "The SEC and DOJ investigations continue, and our management, with the support of our outside counsel, continues to believe that it is not possible to estimate the duration, scope or results of the investigations. In the event that the SEC and/or DOJ investigations result in enforcement action, we may be required to pay substantial fines and/or to incur other sanctions, as provided in the FCPA. Our management, based upon the opinion of our outside counsel, continues to believe that there is no basis for estimating reserves or quantifying any possible contingency."

348.     In the Q312 Financial Statements, the Company reported Current Liabilities-Provisions for contingencies for the consolidated balance sheet of R$10 million as of December 31, 2011 and R$20 million as of September 30, 2012.  The Company reported Non-Current

Liabilities-Provisions for contingencies for the consolidated balance sheet of R$107.6 million as of December 31, 2011 and R$85.1 million as of September 30, 2012.

349.    The statements in ¶¶347-48 were materially false and misleading for the reasons set forth in ¶¶235(a)-(e), (g)-(i), and (m)-(n).

350.    On October 24, 2012, Embraer filed a Form 6-K with the SEC to release its operating results for the third quarter of 2012 ("Q312 6-K"), which Defendant Curado signed.  The Company reported the following financial figures:

| Line Item | Nine Months Ended 9/30/2012 | Nine Months Ended 9/30/11 |
|---|---|---|
| Revenue | $4,277.7[23] | $3,777.9 |
| (Cost of sales and services) | ($3,249.2) | ($2,927.2) |
| (Administrative expense) | ($205.4) | ($191.0) |
| (Selling expense) | ($338.3) | ($305.4) |
| Other operating income (expense) | ($48.5) | $29.1 |
| Net Income | $225.9 | $209.0 |

351.    The statements in ¶350 were materially false and misleading for the reasons set forth in ¶235(a)-(g), and (m)-(n).

**2.    2013 Statements**

352.    On January 14, 2013, Embraer filed a Form 6-K with the SEC regarding its fourth quarter 2012 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

---

[23] All figures are in millions, unless stated otherwise.

353.    The statements in ¶352 were materially false and misleading for the reasons set forth in ¶235(a) and (d).

354.    On March 12, 2013, Embraer disclosed on its website its financial statements for the fourth quarter of 2012 ("Q412 Financial Statements") and stated that they were in compliance with IFRS.  The Company reported the following financial figures:

| Line Item | Year ended 2012 (consolidated) | Year Ended 2011 (consolidated) | Year Ended 2010 (consolidated) |
|---|---|---|---|
| Revenue | R$12,201.7[24] | R$9,858.1 | R$9,380.6 |
| (Cost of sales and services) | R$(9,248.6) | R$(7,638.8) | R$(7,582.7) |
| (Administrative expense) | R$(547.9) | R$(440.0) | R$(346.1) |
| (Selling expense) | R$(946.8) | R$(702.9) | R$(657.0) |
| Other operating income (expense) | R$(88.3) | R$(410.4) | R$16.7 |
| Net Income | R$699.0 | R$171.3 | R$600.2 |
| Commercial Aviation business unit revenue | R$7,371.3 | R$6,337.4 | R$5,707.3 |
| Commercial Aviation business unit (cost of sales and services) | R$(5,516.0) | R$(4,937.7) | R$(4,696.7) |
| Commercial Aviation business unit gross profit | R$1,855.4 | R$1,399.7 | R$1,010.6 |
| Commercial Aviation business unit (operating expense) | R$(998.1) | R$(1,171.0) | R$(615.6) |
| Defense and Security business unit revenue | R$2,080.8 | R$1,444.8 | R$1,445.2 |
| Defense and Security business | R$(1,558.2) | R$(1,092.0) | R$(1,052.9) |

[24] All figures are in millions, unless stated otherwise.

| unit cost of sales and services | | | |
|---|---|---|---|
| Defense and Security business unit gross profit | R$523.0 | R$352.8 | R$392.3 |
| Defense and Security business unit operating expense | R$(292.5) | R$(209.9) | R$(200.5) |

355.    In the Q412 Financial Statements, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): R$186.4 million in 2010; R$206.6 million in 2011; and R$524.7 million in 2012. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): R$495.7 million in 2010; R$27 million in 2011; and R$43 million in 2012. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): R$213 million in 2010; R$242.3 million in 2011; and R$157.1 million in 2012.

356.    The statements in ¶354-55 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g), and (m)-(n).

357.    In the Q412 Financial Statements, the Company stated that "In 2012, two of the first three EMB 145 AEW&C (Airborne Early Warning and Control) were delivered to the Indian Government. The last delivery is scheduled for late 2013."

358.    The statements in ¶357 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), (m), and (n).

359.    In the Q412 Financial Statements, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

360.    The statements in ¶359 were materially false and misleading for the reasons set forth in ¶235(m).

361.    In the Q412 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

362.    In the Q412 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third party financing, as well as providing support for some of the Company's purchase and sale transactions."

363.    The statements in ¶¶361-62 were materially false and misleading for the reasons set forth in ¶235(f).

364.    In the Q412 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations: "The Company, with the support of our outside counsel, has concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or government's review. … The Company, based upon the opinion of our outside counsel, believes that, there is no basis for estimating reserves or quantifying any possible contingency."

365.    The statements in ¶¶364 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

366.    On March 26, 2013, Embraer filed a Form 20-F with the SEC for the fiscal year ended December 31, 2012 ("2012 20-F"), which Defendants Curado and Filippo signed. Defendants Aguiar, as Embraer's Executive VP of the Defense and Security business unit, and Rimoli, as Embraer's Executive VP-Corporate Services, had ultimate authority to approve the disclosures made in the 2012 20-F.  Both Defendants Aguiar and Rimoli were members of the Embraer Executive Board at this time.  The Company reported the following financial metrics:

| Line Item | Year ended 2012 | Year Ended 2011 | Year Ended 2010 |
|---|---|---|---|
| Revenue | $6,177.9[25] | $5,803.0 | $5,364.1 |
| (Cost of sales and services) | $(4,683.0) | $(4,495.9) | $(4,338.1) |
| (Administrative expense) | $(280.5) | $(262.5) | $(197.5) |
| (Selling expense) | $(482.0) | $(419.3) | $(374.1) |
| Other operating income (expense) | $(42.8) | $(221.5) | $9.4 |
| Net Income | $348.6 | $120.4 | $345.4 |
| Commercial Aviation business unit revenue | $3,755.4 | $3,751.2 | $3,257.9 |
| Commercial Aviation business unit (cost of sales and services) | $(2,809.2) | $(2,921.8) | $(2,680.8) |
| Commercial Aviation business unit gross profit | $946.2 | $829.4 | $577.1 |
| Commercial Aviation business | $(507.6) | $(672.3) | $(345.3) |

---

[25] All figures are in millions, unless stated otherwise.

| | | | |
|---|---|---|---|
| unit (operating expense) | | | |
| Defense and Security business unit revenue | 1,056.2 | $852.0 | $821.8 |
| Defense and Security business unit cost of sales and services | $(791.9) | $(644.6) | $(599.5) |
| Defense and Security business unit gross profit | $264.3 | $207.4 | $222.3 |
| Defense and Security business unit operating expense | $(149.3) | $(125.4) | $(115.6) |

367.    In the 2012 20-F, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): $106.4 million in 2010; $121.4 million in 2011; and $258.1 million in 2012. The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): $276.9 million in 2010; $15.6 million in 2011; and $21.7 million in 2012.  The Company reported that the Defense and Security business unit (which includes the 145 aircrafts) generated the following revenues in Asia Pacific (which includes India): $123 million in 2010; $145.2 million in 2011; and $79.5 million in 2012.

368.  The statements in ¶¶366-67 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

369.    In the 2012 20-F, the Company reported having delivered the following numbers of aircrafts: in 2009, 26 Super Tucano aircrafts, 7 145 aircrafts, 22 170 aircrafts, and 64 190

aircrafts; in 2010, 16 Super Tucano aircrafts (in backlog), 6 145 aircrafts, 9 170 aircrafts, and 58 190 aircrafts; in 2011, 22 Super Tucano aircrafts (in backlog), 2 145 aircrafts, 1 170 aircraft, and 68 190 aircrafts; and in 2012, 14 Super Tucano aircrafts, 1 170 aircraft, and 62 190 aircrafts.

370.    The statements in ¶369 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h), (m), and (n).

371.    In the 2012 20-F, the Company stated that "[w]e believe that we will be able to compete favorably on the basis of our aircraft performance, efficiency, low operating costs, product development experience, global customer base, market acceptance, cabin design and aircraft price."

372.    The statements in ¶371 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h)-(i), and (m)-(n).

373.    In the 2012 20-F, the Company stated "The EMB 145 AEW&C is operational in the Brazilian, Mexican, Greek and Indian Air Forces. In 2008 we executed a contract with the Indian Air Force to sell them three units of our EMB 145 AEW&C aircraft. In 2012, we delivered two of the three EMB 145 AEW&C aircraft ordered by the Indian government. These deliveries represent an important milestone in the program, which continues on track. The remaining aircraft is currently being assembled in accordance with the delivery schedule for this contract."

374.    In the 2012 20-F, the Company stated that for LAM, it had firm orders of three 190 aircrafts, delivered two, and backlogged one.

375.    The statements in ¶¶373-74 were materially false and misleading for the reasons set forth in ¶235(a), (d), (e), (h), and (m)-(n).

376.    In the 2012 20-F, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple elements arrangements.

377.    The statements in ¶376 were materially false and misleading for the reasons set forth in ¶235(m).

378.    In the 2012 20-F, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

379.    In the 2012 20-F, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. 'EFL' located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

380.    The statements in ¶¶378-79 were materially false and misleading for the reasons set forth in ¶235(m).

381.    In the 2012 20-F, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "We, with the support of our outside counsel, have concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or government's review.  …  We, based upon the opinion of our outside counsel, believe that there is no basis for estimating reserves or quantifying any possible contingency."

382.    The statements in ¶382 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

383.    In the 2012 20-F, the Company disclosed that it "adopted a Code of Ethics and Conduct applicable to [its] directors, officers, and employees worldwide.  The statements in the Code of Ethics and Conduct were substantially similar to those described above in ¶194.

384.    The statements in ¶383 were materially false and misleading for the reasons set forth in ¶235(i).

385.    In the 2012 20-F, the Company stated the following in connection with its Disclosure Controls and Procedures:

> Our President and CEO, Frederico Pinheiro Fleury Curado, and our executive vice-president and chief financial and investor relations officer, Jose Antonio de Almeida Filippo, after evaluating, together with management, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d15(e)) as of December 31, 2012, the end of the period covered by this annual report, concluded that, as of such date, our disclosure control and procedures were effective to ensure information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and were effective in ensuring that such information is accumulated and communicated to our management, including our CEO and chief financial officer, as appropriate to allow timely decisions regarding required disclosures.

386.    In the 2012 20-F, the Company stated the following in connection with its internal control over financial reporting:

> Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2012. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework. Based on this assessment, our management concluded that, as of December 31, 2012, our internal control over financial reporting was effective based on those criteria. … Our risks and internal controls department periodically evaluates our internal controls for the main cycles, documenting the processes used in each cycle, identifying opportunities and suggesting improvements for the existing control mechanisms. There was no change in our internal controls over financial reporting that occurred during the period covered by this annual report that has materially

affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

387.    The statements in ¶¶385-86 were materially false and misleading for the reasons set forth in ¶235(j)-(l).

388.    The 2012 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Curado and Filippo, stating that the financial information contained in the 2012 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The SOX certifications also included language similar, in all material respects, to those statements disclosed in the 2011 20-F.

389.    The statements in ¶388 were materially false and misleading for the reasons set forth in ¶235.

390.    On April 12, 2013, Embraer filed a Form 6-K with the SEC regarding its first quarter 2013 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

391.    The statements in ¶390 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

392.    On April 29, 2013, Embraer released its financial statements for first quarter of 2013 ("Q113 Financial Statements") on its website, stating that they complied with IFRS.  In the Q113 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

393.    The statements in ¶392 were materially false and misleading for the reasons set forth in ¶235(f).

394.    In the Q113 Financial Statements, Embraer disclosed on its website its financial statements for the first quarter of 2013 ("Q113 Financial Statements").  The Company reported the following financial metrics:

| Line Item | Three Months Ended 3/31/2013 | Three Months Ended 3/31/2012 |
|---|---|---|
| Revenue | R$2,156,716 | R$2,042,503 |
| (Cost of sales and services) | R$(1,676,643) | R$(1,570,500) |
| (Administrative expense) | R$(105,894) | R$(124,772) |
| (Selling expense) | R$(215,116) | R$(191,511) |
| Other operating income (expense) | R$(37,015) | R$24,224 |
| Net Income | R$62,541 | R$189,287 |
| Commercial Aviation business unit revenue. | R$1,272,299 | R$1,345,357 |
| Commercial Aviation business unit (cost of sales and services) | R$(972,133) | R$(1,011,830) |
| Commercial Aviation business unit gross profit | R$300,166 | R$333,527 |

| Commercial Aviation business unit (operating expense) | R$(210,792) | R$(190,974) |
| Defense and Security business unit revenue | R$497,947 | R$404,649 |
| Defense and Security business unit cost of sales and services | R$(405,839) | R$(308,830) |
| Defense and Security business unit gross profit | R$92,108 | R$95,819 |
| Defense and Security business unit operating expense | R$(73,437) | R$(61,144) |

395.    In the Q113 Financial Statements, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): R$144,223 in the quarter ended 3/31/2013 and R$8,501 in the quarter ended 3/31/2012. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): R$5,267 in the quarter ended 3/31/2013 and R$8,355 in the quarter ended 3/31/2012. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): R$20,983 in the quarter ended 3/31/2013 and R$25,620 in the quarter ended 3/31/2012.

396.    The statements in ¶¶394-95 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g), and (m)-(n).

397.    In the Q113 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, this company is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. …  Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

398.    The statements in ¶397 were materially false and misleading for the reasons set forth in ¶235(f).

399.    In the Q113 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "The Company, with the support of our outside counsel, has concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or government's review. … The Company, based upon the opinion of our outside counsel, believes that, there is no basis for estimating reserves or quantifying any possible contingency."

400.    In the Q113 Financial Statements, the Company reported Current Liabilities-Provisions on a consolidated basis of R$197.7 million for the year ended 2012 and R$213 million as of March 31, 2012.   The Company reported Non-Current Liabilities-Provisions on a consolidated basis of R$320.7 million for the year ended 2012 and R$337 million as of March 31, 2013.

401.    The statements in ¶¶399-400 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

402.     On July 15, 2013, Embraer filed a Form 6-K with the SEC concerning its aircraft deliveries for the second quarter of 2013, which Defendant Filippo signed.  The Company stated that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

403.     The statements in ¶402 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

404.     On July 26, 2013, Embraer filed with the SEC a Form 6-K concerning the Company's results for the second quarter of 2013 ("Q213 6-K"), which Defendant Filippo signed. The Company stated that the "The AEW&C India program is in the campaign certification tests phase. Of the three aircraft ordered by the Indian government, there is only one left to be delivered and this will occur after the international flight test campaign and military certification in India."

405.     The statements in ¶404 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), and (m)-(n).

406.     In the Q213 6-K, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "The Company, with the support of our outside counsel, has concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or the government's review. … The Company, based upon the opinion of our outside counsel, believes that there is no basis for estimating reserves or quantifying any possible contingency."

407.     In the Q213 6-K, the Company reported Current Liabilities-Provisions of $105.8 million as of March 31, 2013 and $95.6 million as of June 30, 2013.  The Company reported Non-Current Liabilities-Provisions of $167.5 million as of March 31, 2013 and $158.9 million as of June 30, 2013.

408.    The statements in ¶¶406-07 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

409.    In the Q213 6-K, the Company reported the following financial metrics:

| Line Item | Three Months Ended 6/30/2012 | Three Months Ended 6/30/2013 | Six Months Ended 6/30/2012 | Six Months Ended 6/30/2013 |
|---|---|---|---|---|
| Revenue | $1,714.9[26] | $1,557 | $2,867 | $2,642.9 |
| (Cost of sales and services) | $(1,310.2) | $(1,197.2) | $(2,196.1) | $(2,042.2) |
| (Administrative expense) | $(75.0) | $(53.5) | (145.6) | $(106.8) |
| (Selling expense) | $(118.2) | $(121.4) | $(226.5) | $(229.5) |
| Other operating income (expense) | $0.2 | $(19.3) | $13.8 | $(37.8) |
| Net Income | $54.8 | $(3.8) | $160.4 | $26.5 |

410.    In the Q213 Financial Statements, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): $112.5 million in the six months ended 6/30/2013 and $41.2 million in the six months ended 6/30/2012. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): $5.3 million in the six months ended 6/30/2013 and $7.3 million in the six months ended 6/30/2012. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which

---

[26] All figures are in millions, unless stated otherwise.

includes India): $28.2 million in the six months ended 6/30/2013 and $38.4 million in the six months ended 6/30/2012.

411.   The statements in ¶¶409-10 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

412.   On October 15, 2013, Embraer filed with the SEC a Form 6-K regarding its third quarter 2012 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

413.   The statements in ¶412 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

414.   On October 31, 2013, Embraer disclosed through its website its financial statements for the third quarter of 2013 ("Q313 Financial Statements").  The Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "We, with the support of our outside counsel, have concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or related inquiries by relevant authorities. … The Company, based upon the opinion of our outside counsel, believes that there is no basis for estimating reserves or quantifying any possible contingency at this time."

415.   In the Q313 Financial Statements, the Company reported Current Liabilities-Provisions on a consolidated basis of R$197.7 million as of December 31, 2012 and $217.9 million as of September 30, 2013.  The Company reported Non-Current Liabilities-Provisions on a consolidated basis of R$320.7 million as of December 31, 2012 and $361.9 million as of September 30, 2013.

416.    The statements in ¶¶414-15 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

417.    In the Q313 Financial Statements, the Company reported the following financial metrics:

| Line Item | Nine Months Ended 9/30/2013 | Nine Months Ended 9/30/2012 | Three Months Ended 9/30/2013 | Three Months Ended 9/30/2012 |
|---|---|---|---|---|
| Revenue | R$8,340,142 | R$8,267,646 | R$2,943,586 | R$2,845,028 |
| (Cost of sales and services) | R$(6,545,721) | R$(6,280,944) | R$(2,377,706) | R$(2,126,771) |
| (Administrative expense) | R$(333,832) | R$(391,365) | R$(117,397) | R$(119,454) |
| (Selling expense) | R$(720,825) | R$(648,488) | R$(255,657) | R$(224,402) |
| Other operating income (expense) | R$73,853) | R$(100,391) | R$2,900 | R$(126,298) |
| Net Income | R$178,068 | R$446,617 | R$122,183 | R$132,862 |

418.    In the Q313 Financial Statements, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): R$318,816 for the semester ended 9/30/2013 and R$243,776 for the semester ended 9/30/2012. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): R$19,767 for the semester ended 9/30/2013 and R$20,929 for the semester ended

9/30/2012. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): R$78,477 for the semester ended 9/30/2013 and R$89,409 for the semester ended 9/30/2012.

419.    The statements in ¶¶417-18 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

420.    In the Q313 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

421.    In the Q313 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, this company is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. …  Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

422.    The statements in ¶¶420-21 were materially false and misleading for the reasons set forth in ¶235(f).

423.    On October 15, 2013, Embraer filed a Form 6-K with the SEC concerning its aircraft deliveries, which Defendant Filippo signed.  The Company stated that for LAM, it had firm orders of three 190 aircrafts, delivered two, and backlogged one.

424.    The statements in ¶423 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

### 3.     2014 Statements

425.     On January 15, 2014, Embraer a Form 6-K with the SEC regarding its fourth quarter 2013 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

426.     The statements in ¶425 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

427.     On February 26, 2014, Embraer disclosed on its website its financial statements for the fourth quarter of 2013 ("Q413 Financial Statements").  In the Q413 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

428.     In the Q413 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

429.     The statements in ¶¶427-28 were materially false and misleading for the reasons set forth in ¶235(f).

430.     In the Q413 Financial Statements, the Company reported the following financial metrics:

| Line Item | Year Ended 12/31/2013 | Year Ended 12/31/2012 | Year Ended 12/31/2011 |
|---|---|---|---|
| Revenue | R$13,635,846 | R$12,180,463 | R$9,837,903 |

| | | | |
|---|---|---|---|
| (Cost of sales and services) | R$(10,540,019) | R$(9,236,209) | R$(7,625,899) |
| (Administrative expense) | R$(453,664) | R$(545,350) | R$(437,955) |
| (Selling expense) | R$(978,829) | R$(943,684) | R$(701,589) |
| Other operating income (expense) | R$100,609 | R$(88,189) | R$(407,522) |
| Net Income | R$786,410 | R$699,008 | R$171,254 |
| Commercial Aviation business unit revenue | R$7,186,439 | R$7,371,335 | R$6,273,599 |
| Commercial Aviation business unit (cost of sales and services) | R$(5,511,457) | R$(5,515,966) | R$(4,894,744) |
| Commercial Aviation business unit gross profit | R$1,674,982 | R$1,855,369 | R$1,378,855 |
| Commercial Aviation business unit (operating expense) | R$(556,672) | R$(998,062) | R$(1,165,745) |
| Defense and Security business unit revenue | R$2,601,017 | R$2,059,523 | R$1,424,586 |
| Defense and Security business unit cost of sales and services | R$(2,064,762) | R$(1,545,822) | R$(1,078,426) |
| Defense and Security business unit gross profit | R$536,255 | R$513,701 | R$346,160 |
| Defense and Security business unit operating expense | R$(333,165) | R$(283,939) | R$(203,097) |

431.    In the Q413 Financial Statements, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): R$413,983 in the year ended 12/31/2013; R$524,661 in the year ended 12/31/2012; and

R$206,610 in the year ended 12/31/2011. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): R$36,505 in the year ended 12/31/2013; R$43,043 in the year ended 12/31/2012; and R$26,935 in the year ended 12/31/2011. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): R$156,463 in the year ended 12/31/2013; R$157,148 in the year ended 12/31/2012; and R$242,318 in the year ended 12/31/2011.

432.    The statements in ¶¶430-31 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

433.    In the Q413 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "The Company, with the support of its outside counsel, has concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or related inquiries by relevant authorities. … The Company, based upon the opinion of its outside counsel, believes that there is no basis for estimating reserves or quantifying any possible contingency at this time."

434.    In the Q413 Financial Statements, the Company reported Current Liabilities-Provisions on a consolidated basis of R$230.6 million for the year ended 2013, R$197.7 million for the year ended 2012, and R$181.2 million for the year ended 2011.  The Company reported Non-Current Liabilities-Provisions on a consolidated basis of R$388.4 million for the year ended 2013, R$320.7 million for the year ended 2012, and R$223.1 million for the year ended 2011.

435.    The statements in ¶¶433-34 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

436.    In the Q413 Financial Statements, the Company disclosed the following financial information:

| Line Item | Year Ended 2013 |
|---|---|
| Revenue | R$13,635.8[27] |
| (Cost of sales and services) | R$(10,540.0) |
| (Administrative expense) | R$(453.7) |
| (Selling expense) | R$(978.8) |
| Other operating income (expense) | R$100.6 |
| Net Income | R$786.4 |
| Commercial Aviation business unit revenue | R$7,186.4 |
| Commercial Aviation business unit (cost of sales and services) | R$(5,511.5) |
| Commercial Aviation business unit gross profit | R$1,675.0 |
| Commercial Aviation business unit (operating expense) | R$(556.7) |
| Defense and Security business unit revenue | R$2,601.0 |
| Defense and Security business unit cost of sales and services | R$(2,064.8) |
| Defense and Security business unit gross profit | R$536.3 |
| Defense and Security business unit operating expense | R$(333.2) |

437.    The statements in ¶436 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

438.    In the Q413 Financial Statements, the Company stated that its costs of sales and services consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw

---

[27] All figures are in millions, unless stated otherwise.

materials, labor, depreciation, amortization, product warranties, and multiple elements arrangements.

439.   The statements in ¶438 were materially false and misleading for the reasons set forth in ¶235(m).

440.   On March 21, 2014, Embraer filed a Form 20-F with the SEC for the fiscal year ended December 31, 2013 ("2013 20-F"), which Defendants Curado and Filippo signed. Defendant Rodrigues, as Embraer's Executive VP-General Counsel, had ultimate authority to approve the disclosures made in the 2013 20-F.  Defendant Rodrigues was serving on Embraer's Executive Board at that time.  The Company reported the following financial metrics:

| Line Item | Year Ended 2013 | Year Ended 2012 (Restated) | Year Ended 2011 (Restated) |
|---|---|---|---|
| Revenue | $6,235.0[28] | $6,167.0 | $5,790.9 |
| (Cost of sales and services) | $(4,818.9) | $(4,676.6) | $(4,488.1) |
| (Administrative expense) | $(210.5) | $(279.2) | $(261.3) |
| (Selling expense) | $(454.4) | $(480.4) | $(418.6) |
| Other operating income (expense) | $36.9 | $(42.8) | $(219.7) |
| Net Income | $346.0 | $348.6 | $120.4 |
| Commercial Aviation business unit revenue | $3,307.0 | $3,755.4 | $3,751.2 |
| Commercial Aviation business unit (cost of sales and services) | $(2,532.6) | $(2,809.3) | $(2,921.8) |
| Commercial Aviation business unit gross profit | $774.4 | $946.1 | $829.4 |

---

[28] All figures are in millions, unless stated otherwise.

| | | | |
|---|---|---|---|
| Commercial Aviation business unit (operating expense) | $(272.3) | $(507.7) | $(672.3) |
| Defense and Security business unit revenue | $1,196.9 | $1,045.2 | $839.9 |
| Defense and Security business unit cost of sales and services | $(951.2) | $(785.5) | $(636.8) |
| Defense and Security business unit gross profit | $245.7 | $259.7 | $203.1 |
| Defense and Security business unit operating expense | $(154.1) | $(144.9) | $(121.1) |

441.  In the 2013 20-F, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): $268.6 million in 2009; $106.4 million in 2010; $121.6 million in 2011; $257.9 million in 2012; and $193.5 million in 2013.  The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): $185.3 million in 2009; $276.9 million in 2010; $15.6 million in 2011; $21.7 million in 2012; and $16.3 million in 2013.  The Company reported that the Defense and Security business unit (which includes the AEW&C 145 aircrafts) generated the following revenues in Asia Pacific (which includes India): $78.6 million in 2009; $123 million in 2010; $145.2 million in 2011; $79.5 million in 2012; and $71.0 million in 2013.

442.   The statements in ¶¶440-41 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

443.     In the 2013 20-F, the Company reported having delivered the following numbers of aircrafts: in 2009, 26 Super Tucano aircrafts, 7 145 aircrafts, 22 170 aircrafts, and 62 190 aircrafts; in 2010, 16 Super Tucano aircrafts (in backlog), 6 145 aircrafts, 9 170 aircrafts, and 58 190 aircrafts; in 2011, 24 Super Tucano aircrafts (in backlog), 2 145 aircrafts, 1 170 aircraft, and 68 190 aircrafts; in 2012, 14 Super Tucano aircrafts, 1 170 aircraft, and 62 190 aircrafts; and in 2013, 6 Super Tucano aircrafts, 4 170 aircrafts, and 45 190 aircrafts.

444.     The statements in ¶443 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h), and (m)-(n).

445.     In the 2013 20-F, the Company stated that "[w]e believe that we will be able to compete favorably on the basis of our aircraft performance, efficiency, low operating costs, product development experience, global customer base, market acceptance, cabin design and aircraft price."

446.     The statements in ¶445 were materially false and misleading for the reasons set forth in ¶235(a), (g), (h), (m)-(n).

447.     In the 2013 20-F, the Company stated the following:

The EMB 145 AEW&C is operational in the Brazilian, Mexican, Greek and Indian Air Forces. In 2008 we executed a contract with the Indian Air Force to sell them three units of our EMB 145 AEW&C aircraft. In 2012, we delivered two of the three EMB 145 AEW&C aircraft ordered by the Indian government. These deliveries represent an important milestone in the program, which continues on track. The remaining aircraft is currently being assembled in accordance with the delivery schedule for this contract.

448.     In the 2013 20-F, the Company stated that for LAM, it had firm orders of three 190 aircrafts, delivered two, and backlogged one.

449.     The statements in ¶¶447-48 were materially false and misleading for the reasons set forth in ¶235(a), (d), (e), (h), and (m)-(n).

450.    In the 2013 20-F, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

451.    The statements in ¶450 were materially false and misleading for the reasons set forth in ¶235(m).

452.    In the 2013 20-F, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

453.    In the 2013 20-F, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

454.    The statements in ¶¶452-53 were materially false and misleading for the reasons set forth in ¶235(f).

455.    In the 2013 20-F, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "We, with the support of our outside counsel, have concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or related inquiries by relevant authorities. … We, based upon the opinion of our outside counsel, believe that there is no basis for estimating reserves or quantifying any possible contingency at this time."

456.    In the 2013 20-F, the Company reported Current Liabilities-Provisions for contingencies of $96.5 million for the year ended 2011, $96.7 million for the year ended 2012, and $98.5 million for the year ended 2013.  The Company reported Non-Current Liabilities-Provisions for contingencies of $118.7 million for the year ended 2011, $156.9 million for the year ended 2012, and $165.7 million for the year ended 2013.

457.    The statements in ¶¶455-56 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

458.    In the 2013 20-F, the Company disclosed that it "adopted a Code of Ethics and Conduct applicable to [its] directors, officers, and employees worldwide."  The statements in the Code of Ethics and Conduct were substantially similar to those described above in ¶194.

459.    The statements in ¶458 were materially false and misleading for the reasons set forth in ¶235(i).

460.    In the 2013 20-F, the Company stated the following in connection with its Disclosure Controls and Procedures:

> Our President and CEO, Frederico Pinheiro Fleury Curado, and our executive vice-president and chief financial and investor relations officer, Jose Antonio de Almeida Filippo, after evaluating, together with management, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d15(e)) as of December 31, 2013 , the end of the period covered by this annual report, concluded that, as of such date, our disclosure control and procedures were effective to ensure information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and were effective in ensuring that such information is accumulated and communicated to our management, including our CEO and chief financial officer, as appropriate to allow timely decisions regarding required disclosures.

461.    In the 2013 20-F, the Company stated the following in connection with its internal control over financial reporting:

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2013. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (1992). Based on this assessment, our management concluded that, as of December 31, 2013, our internal control over financial reporting was effective based on those criteria. … Our risks and internal controls department periodically evaluates our internal controls for the main cycles, documenting the processes used in each cycle, identifying opportunities and suggesting improvements for the existing control mechanisms. There was no change in our internal controls over financial reporting that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

462.    The statements in ¶¶460-61 were materially false and misleading for the reasons set forth in ¶235(j)-(l).

463.    The 2013 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Curado and Filippo, stating that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The SOX certifications also included language similar, in all material respects, to those statements disclosed in the 2011 20-F.

464.    The statements in ¶463 were materially false and misleading for the reasons set forth in ¶235.

465.    On April 15, 2014, Embraer filed a Form 6-K with the SEC regarding its first quarter 2014 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of three 190 aircrafts, delivered two, and had one in backlog.

466.    The statements in ¶465 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

467.    On June 24, 2014, Embraer filed with the SEC a Form F-3/A, which Defendants Curado and Filippo signed (amongst others), in connection with the Company's Notes due 2023

("2023 Notes F-3/A").  The 2023 Notes F-3/A incorporated by reference the Company's 2013 20-F, amongst other documents.

468.    The statements in ¶467 were materially false and misleading for the reasons set forth in ¶235.

469.    In 2023 Notes F-3/A, the Company and Embraer Overseas reported the following financial metrics:

| Financial Metric | Three Months Ended March 31, 2014 | Year Ended 2013 | Year Ended 2012 | Year Ended 2011 | Year Ended 2010 | Year Ended 2009 |
|---|---|---|---|---|---|---|
| Ratio of earnings to fixed charges[29] | 3.98 | 5.49 | 6.19 | 3.38 | 5.36 | 3.68 |

470.    The statements in ¶469 were materially false and misleading for the reasons set forth in ¶235(a), (g), (m), and (n).

471.    On June 25, 2014, Embraer filed a Form 6-K with the SEC to disclose its financial statements for the first quarter of 2014 ("Q114 6-K"), which Defendant Filippo signed.  The Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "We, with the support of our outside counsel, have concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or related inquiries by relevant authorities. … We, based upon the opinion of our outside counsel, believe that there is no basis for estimating reserves or quantifying any possible contingency at this time."

---

[29] According to the 2023 Notes F-3/A, "[f]or purposes of computing the ratio of earnings to fixed charges, earnings are defined as income before taxes plus fixed charges and amortization of capitalized interest minus capitalized interest and preferred stock dividend requirements, if any."

472.    In the Q114 6K, the Company reported Current Liabilities-Provisions of $98.5 million as of December 31, 2013 and $103.8 million as of March 31, 2014.  The Company reported Non-Current Liabilities-Provisions of $165.7 million as of December 31, 2013 and $171 million as of March 31, 2014.

473.    The statements in ¶¶471-72 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

474.    In the Q114 6-K, the Company reported the following financial metrics:

| Line Item | Three Months Ended 3/31/2014 | Three Months Ended 3/31/2013 |
|---|---|---|
| Revenue | $1,242.3[30] | $1,085.9 |
| (Cost of sales and services) | $(973.4) | $(845) |
| (Administrative expense) | $(47.5) | $(53.3) |
| (Selling expense) | $(92.4) | $(108.1) |
| Other operating income (expense) | $(27.6) | $(18.4) |
| Net Income | $112.3 | $30.4 |
| Commercial Aviation business unit revenue | $555.3 | $639.6 |
| Commercial Aviation business unit (cost of sales and services) | $(431.9) | $(489.2) |
| Commercial Aviation business unit gross profit | $123.4 | $150.4 |
| Commercial Aviation business unit (operating expense) | $(89.1) | $(105.8) |

---

[30] All figures are in millions, unless stated otherwise.

| Defense and Security business unit revenue | $394.3 | $251.7 |
|---|---|---|
| Defense and Security business unit cost of sales and services | $(282.2) | $(204.9) |
| Defense and Security business unit gross profit | $112.1 | $46.8 |
| Defense and Security business unit operating expense | $(38.3) | $(37.2) |

475.    In the Q114 6-K, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): $8.2 million for the quarter ended 3/31/2014 and $72 million for the quarter ended 3/31/2013. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): $6.1 million for the quarter ended 3/31/2014 and $2.6 million for the quarter ended 3/31/2013. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): $29.6 million for the quarter ended 3/31/2014 and $10.4 million for the quarter ended 3/31/2014.

476.    The statements in ¶¶474-75 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

477.    On July 14, 2014, Embraer filed a Form 6-K with the SEC regarding its second quarter 2014 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of two 190 aircrafts and delivered two.

478.   The statements in ¶477 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

479.   On August 11, 2014, Embraer filed a Form 6-K with the SEC to disclose its financial statements for the second quarter of 2014 ("Q214 6-K"), which Defendant Filippo signed. The Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "We, with the support of our outside counsel, have concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or related inquiries by relevant authorities. … We, based upon the opinion of our outside counsel, believe that there is no basis for estimating reserves or quantifying any possible contingency at this time."

480.   In the Q214 6-K, the Company reported Current Liabilities-Provisions of $98.5 million for the year ended 2013 and $107.9 million as of June 30, 2014.  The Company reported Non-Current Liabilities-Provisions of $165.7 million for the year ended 2013 and $190.1 million as June 30, 2014.

481.   The statements in ¶¶479-80 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

482.   In the Q214 6-K, the Company reported the following financial metrics:

| Line Item | Six Months Ended 6/30/2014 | Six Months Ended 6/30/2013 | Three Months Ended 6/30/2014 | Three Months Ended 6/30/2013 |
|---|---|---|---|---|
| Revenue | $3,003.6[31] | $2,642.9 | $1,761.3 | $1,557 |
| (Cost of sales and services) | $(2,349.6) | $(2,042.2) | $(1,376.1) | $(1,197.2) |
| (Administrative expense) | $(100.5) | $(106.8) | $(53) | $(53.5) |

---

[31] All figures are in millions, unless stated otherwise.

| | | | | |
|---|---|---|---|---|
| (Selling expense) | $(207.5) | $(229.5) | $(115.1) | $(121.4) |
| Other operating income (expense) | $(46.5) | $(37.8) | $(18.9) | $(19.4) |
| Net Income | $259 | $26.6 | $146.7 | $(3.9) |
| Commercial Aviation business unit revenue | $1,527.2 | $1,500 | N/A | N/A |
| Commercial Aviation business unit (cost of sales and services) | $(1,192.1) | $(1,124.7) | N/A | N/A |
| Commercial Aviation business unit gross profit | $335.1 | $375.3 | N/A | N/A |
| Commercial Aviation business unit (operating expense) | $(188.7) | $(225.3) | N/A | N/A |
| Defense and Security business unit revenue | $751.3 | $560.8 | N/A | N/A |
| Defense and Security business unit cost of sales and services | $(568.6) | $(452.4) | N/A | N/A |
| Defense and Security business unit gross profit | $182.7 | $108.4 | N/A | N/A |
| Defense and Security business unit operating expense | $(75.2) | $(73.8) | N/A | N/A |

483.    In the Q214 6-K, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): $17.2 million for the semester ended 6/30/2014 and $112.5 million for the semester ended 6/30/2013. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): $18.6 million for the semester ended 6/30/2014 and $5.3 million for the semester ended 6/30/2013. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): $57.6 million for the semester ended 6/30/2014 and $28.2 million for the semester ended 6/30/2013.

484.    The statements in ¶¶482-83 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

485.    On October 15, 2014, Embraer filed with the SEC a Form 6-K regarding its third quarter 2014 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of 2 190 aircrafts and delivered 2.

486.    The statements in ¶485 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

487.    On November 10, 2014, Embraer filed with the SEC a Form 6-K to disclose its financial statements for the third quarter of 2014 ("Q314 6-K"), which Defendant Filippo signed. The Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "Based upon the opinion of its outside counsel, the Company believes that there is no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

488.    In the Q314 6-K, the Company reported Current Liabilities-Provisions of $98.5 million as of December 31, 2013 and $98.8 million as of September 30, 2014.  The Company reported Non-Current Liabilities-Provisions of $165.7 million as of December 31, 2013 and $174.4 million as of September 30, 2014.

489.    The statements in ¶¶487-88 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

490.    In the Q314 6-K, the Company reported the following financial metrics:

| Line Item | Quarter to 9/30/2014 | YTD 9/30/2014 | Quarter to 9/30/2013 | YTD 9/30/2013 |
|---|---|---|---|---|
| Revenue | $1,239.7[32] | $4,243.3 | $1,288.1 | $3,931 |
| (Cost of sales and services) | $(997.6) | $(3,347.1) | $(1,040.4) | $(3,082.6) |
| (Administrative expense) | $(51.6) | $(152.1) | $(51.3) | $(158.1) |
| (Selling expense) | $(99.2) | $(306.7) | $(111.9) | $(341.4) |
| Other operating income (expense) | $(13.5) | $(60) | $1.1 | $(36.7) |
| Net Income | $(6.2) | $252.8 | $54.5 | $81.0 |
| Commercial Aviation business unit revenue. | N/A | $2,188 | N/A | $2,187.4 |
| Commercial Aviation business unit (cost of sales and services) | N/A | $(1,748.0) | N/A | $(1,680.8) |
| Commercial Aviation business unit gross profit | N/A | $440.0 | N/A | $506.6 |
| Commercial Aviation business unit (operating expense) | N/A | $(266.8) | N/A | $203.7 |

[32] All figures are in millions, unless stated otherwise.

126

| Defense and Security business unit revenue | N/A | $1,097.5 | N/A | $827.6 |
|---|---|---|---|---|
| Defense and Security business unit cost of sales and services | N/A | $(834.7) | N/A | $(663.4) |
| Defense and Security business unit gross profit | N/A | $262.8 | N/A | $164.2 |
| Defense and Security business unit operating expense | N/A | $(109.8) | N/A | $57.6 |

491. In the Q314 6-K, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): $37.1 million in the nine months ended 9/30/2014 and $151.9 million in the nine months ended 9/30/2013. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): $26.4 million in the nine months ended 9/30/2014 and $9.2 million in the nine months ended 9/30/2013. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): $72.8 million in the nine months ended 9/30/2014 and $36.9 million in the nine months ended 9/30/2013.

492. The statements in ¶¶490-91 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

**4.    2015 Statements**

493.    On January 14, 2015, Embraer filed a Form 6-K with the SEC regarding its fourth quarter 2014 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of two 190 aircrafts and delivered two.

494.    The statements in ¶493 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

495.    On March 4, 2015, Embraer disclosed on its website its financial statements for the fourth quarter of 2014 ("Q414 Financial Statements").  In the Q414 Financial Statements, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

496.    The statements in ¶495 were materially false and misleading for the reasons set forth in ¶235(f).

497.    In the Q414 Financial Statements, the Company reported the following financial metrics:

| Line Item | Year Ended 12/31/2013 | Year Ended 12/31/2012 | Year Ended 12/31/2011 |
|---|---|---|---|
| Revenue | R$13,635,846 | R$12,180,463 | R$9,837,903 |
| (Cost of sales and services) | R$(10,540,019) | R$(9,236,209) | R$(7,625,899) |
| (Administrative expense) | R$(453,664) | R$(545,350) | R$(437,955) |
| (Selling expense) | R$(978,829) | R$(943,684) | R$(701,589) |
| Other operating income (expense) | R$100,609 | R$(88,189) | R$(407,522) |
| Net Income | R$786,410 | R$699,008 | R$171,254 |

| Commercial Aviation business unit revenue | R$7,186,439 | R$7,371,355 | R$6,273,599 |
|---|---|---|---|
| Commercial Aviation business unit (cost of sales and services) | R$(5,511,457) | R$(5,515,966) | R$(4,894,744) |
| Commercial Aviation business unit gross profit | R$1,674,982 | R$1,855,369 | R$1,378,855 |
| Commercial Aviation business unit (operating expense) | R$(556,672) | R$(998,062) | R$(1,165,745) |
| Defense and Security business unit revenue | R$2,601,017 | R$2,059,523 | R$1,424,586 |
| Defense and Security business unit cost of sales and services | R$(2,064,762) | R$(1,545,822) | R$(1,078,426) |
| Defense and Security business unit gross profit | R$536,255 | R$513,701 | R$346,160 |
| Defense and Security business unit operating expense | R$(333,185) | R$(283,939) | R$(203,097) |

498.    In the Q414 Financial Statements, the company reported that the Commercial Aviation business unit (which includes 170 and 190 aircraft sales) generated the following revenues in the other geographic region (which includes Mozambique and Saudi Arabia): R$413,983 for the year ended 12/31/2013; R$524,661 for the year ended 12/31/2012; and R$206,610 for the year ended 12/31/2011. The Company reported that the Defense and Security business unit (which includes Super Tucano aircraft sales) generated the following revenues in Latin America (which includes the Dominican Republic): R$36,505 for the year ended 12/31/2013; R$43,043 for the year ended 12/31/2012; and R$26,935 for the year ended

12/31/2011. The company reported that the Defense and Security business unit (which includes AEW&C 145 aircraft sales) generated the following revenues in Asia Pacific (which includes India): R$156,463 for the year ended 12/31/2013; R$157,148 for the year ended 12/31/2012; and R$242,318.

499.    The statements in ¶¶497-98 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

500.    In the Q414 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

501.    In the Q414 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

502.    The statements in ¶¶500-01 were materially false and misleading for the reasons set forth in ¶235(f).

503.    In the Q414 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations: "The Company, with the support of its outside counsel, has concluded that it is still not possible to estimate the duration, scope or results of the internal investigation or related inquiries by relevant authorities. … Based upon the opinion of its outside counsel, the Company believes that there is

no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

504.    In the Q414 Financial Statements, the Company reported Current Liabilities-Provisions on a consolidated basis of R\$181.2 million for the year ended 2011, R\$197.7 million for the year ended 2012, and R\$230.6 million for the year ended 2013.  The Company reported Non-Current Liabilities-Provisions on a consolidated basis of R\$223.1 million for the year ended 2011, R\$320.7 million for the year ended 2012, and R\$388.4 million for the year ended 2013.

505.    The statements in ¶¶504-05 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

506.    On March 5, 2015, Embraer filed a Form 6-K with the SEC regarding the fourth quarter 2014 results.  The Company disclosed the following financial metrics:

| Line Item | Year Ended 2014 | Year Ended 2013 |
|---|---|---|
| Revenue | $6,288.8 | $6,235.0 |
| (Cost of sales and services) | $(5,038.3) | $4,818.9 |
| (Administrative expense) | $(207.5) | $210.5 |
| (Selling expense) | $(419.9) | $454.4 |
| Other operating income (expense) | $(32.6) | $36.9 |
| Net Income | $347.7 | $346.0 |
| Commercial Aviation business unit[33] revenue | $3,163.3 | $3,307.0 |
| Defense and Security business unit[34] revenue | $1,456.4 | $1,196.9 |

---

[33] The Commercial Aviation business unit includes the 170 and 190 aircrafts.
[34] The Defense and Security business unit includes the Super Tucano, 145, and 170 aircrafts.

507.    The statements in ¶506 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

508.    On March 27, 2015, Embraer filed a Form 20-F with the SEC for the fiscal year ended December 31, 2014 ("2014 20-F"), which Defendants Curado and Filippo signed. Defendant Rodrigues, as Embraer's Executive VP-General Counsel, had ultimate authority to approve the disclosures made in the 2014 20-F.  Rodrigues was serving on Embraer's Executive Board at that time.  The Company reported the following financial figures:

| Line Item | Year Ended 2014 | Year Ended 2013 | Year Ended 2012 |
|---|---|---|---|
| Revenue | $6,288.8[35] | $6,235.0 | $6,167.0 |
| (Cost of sales and services) | $(5,038.3) | $(4,818.9) | $(4,676.6) |
| (Administrative expense) | $(207.5) | $(210.5) | $(279.2) |
| (Selling expense) | $(419.9) | $(454.4) | $(480.4) |
| Other operating income (expense) | $(32.6) | $36.9 | $(42.8) |
| Net Income | $347.7 | $346.0 | $348.6 |
| Commercial Aviation business unit revenue | $3,163.3 | $3,307.0 | $3,755.4 |
| Commercial Aviation business unit (cost of sales and services) | $(2,542.2) | $(2,532.6) | $(2,809.3) |
| Commercial Aviation business unit gross profit | $621.1 | $774.4 | $946.1 |
| Commercial Aviation business unit (operating expense) | $(321.2) | $(272.3) | $(507.7) |

---

[35] All figures are in US$ millions.

| | | | |
|---|---|---|---|
| Defense and Security business unit[36] revenue | $1,456.4 | $1,196.6 | $1,045.2 |
| Defense and Security business unit cost of sales and services | $(1,158.9) | $(951.2) | $(785.5) |
| Defense and Security business unit gross profit | $297.5 | $245.7 | 259.7 |
| Defense and Security business unit operating expense | $(148.0) | $(154.1) | $(144.9) |

509.   In the 2014 20-F, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): $257.9 million in 2012; $193.5 million in 2013; and $179.6 million in 2014. The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): $21.7 million in 2012; $16.3 million in 2013; and $47.3 million in 2014.  The Company reported that the Defense and Security business unit (which includes the AEW&C 145 aircrafts) generated the following revenues in Asia Pacific (which includes India): $79.5 million in 2012; $71 million in 2013; and $78.5 million in 2014.

510.   The statements in ¶508-09 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

511.   In the 2014 20-F, the Company reported having delivered the following numbers of aircrafts: in 2010, 16 Super Tucano aircrafts (in backlog), 6 145 aircrafts, 9 170 aircrafts, and

---

[36] The Defense and Security business unit includes the Super Tucano, 145, and 170 aircrafts.

58 190 aircrafts; and in 2011, 24 Super Tucano aircrafts (in backlog), 2 145 aircrafts, 1 170 aircraft, and 68 190 aircrafts; in 2012, 14 Super Tucano aircrafts, zero 145 aircrafts, one 170 aircraft, and 62 190 aircrafts; in 2013, 6 Super Tucano aircrafts, 4 170 aircrafts, and 45 190 aircrafts; in 2014, 7 Super Tucano aircrafts, 1 170 aircraft, and 19 190 aircrafts.

512.    The statements in ¶511 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

513.    In the 2014 20-F, the Company stated that "[w]e believe that we will be able to compete favorably on the basis of our aircraft performance, efficiency, low operating costs, product development experience, global customer base, market acceptance, cabin design and aircraft price.."

514.    The statements in ¶513 were materially false and misleading for the reasons set forth in ¶235(a), (g), (h), and (m)-(n).

515.    In the 2014 20-F, the Company stated "Embraer has developed three cost-effective, reliable and flexible special-mission aircraft based on the ERJ 145 regional aircraft platform: the EMB 145 Airborne Early Warning and Control, or AEW&C, the EMB 145 Remote Sensing/Airborne Ground Surveillance, or RS/AGS EMB 145 Multi Intel, and the EMB 145 Maritime Patrol, or MP. A total of 18 aircraft of this category have been manufactured for the Brazilian, Mexican, Greek and Indian Air Forces."

516.    In the 2014 20-F, the Company stated that for LAM, it had firm orders of two 190 aircrafts, and delivered two of them.

517.    The statements in ¶¶515-16 were materially false and misleading for the reasons set forth in ¶235(a), (d)-(e), (h), and (m)-(n).

518.    In the 2014 20-F, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

519.    The statements in ¶518 were materially false and misleading for the reasons set forth in ¶235(f).

520.    In the 2014 20-F, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

521.    In the 2014 20-F, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

522.    The statements in ¶¶520-21 were materially false and misleading for the reasons set forth in ¶235(f).

523.    In the 2014 20-F, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "Based upon the opinion of our outside counsel, we believe that there is no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

524.    In the 2014 20-F, the Company reported Current Liabilities-Provisions of $98.5 million for the year ended 2013 and $95.4 million for the year ended 2014.  The Company reported

Non-Current Liabilities-Provisions of $165.7 million for the year ended 2013 and $153.1 million for the year ended 2014.

525.    The statements in ¶¶523-24 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

526.    In the 2014 20-F, the Company disclosed that it "adopted a Code of Ethics and Conduct applicable to [its] directors, officers, and employees worldwide."  The statements in the Code of Ethics and Conduct were substantially similar to those described above in ¶194.

527.    The statements in ¶526 were materially false and misleading for the reasons set forth in ¶235(i).

528.    In the 2014 20-F, the Company stated the following in connection with its Disclosure Controls and Procedures:

> Our President and CEO, Frederico Pinheiro Fleury Curado, and our executive vice president and chief financial and investor relations officer, Jose Antonio de Almeida Filippo, after evaluating, together with management, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2014, the end of the period covered by this annual report, concluded that, as of such date, our disclosure control and procedures were effective to ensure information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and were effective in ensuring that such information is accumulated and communicated to our management, including our CEO and chief financial officer, as appropriate to allow timely decisions regarding required disclosures.

529.    In the 2014 20-F, the Company stated the following in connection with its internal control over financial reporting:

> Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2014. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (1992). Based on this assessment, our management concluded that, as of December 31, 2014, our internal control over financial reporting was effective based on those criteria.  … Our risks and internal controls department periodically evaluates our

136

internal controls for the main cycles, documenting the processes used in each cycle, identifying opportunities and suggesting improvements for the existing control mechanisms. There was no change in our internal controls over financial reporting that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

530.    The statements in ¶¶528-29 were materially false and misleading for the reasons set forth in ¶235(j)-(l).

531.    The 2014 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Curado and Filippo, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The SOX certifications also included language similar, in all material respects, to those statements disclosed in the 2011 20-F.

532.    The statements in ¶531 were materially false and misleading for the reasons set forth in ¶235.

533.    On April 16, 2015, Embraer filed a Form 6-K with the SEC regarding its first quarter 2015 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of two 190 aircrafts and delivered two.

534.    The statements in ¶533 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

535.    On April 30, 2015, Embraer disclosed on its website its financial statements for the first quarter of 2015 ("Q115 Financial Statements"), stating that they conformed with IFRS.  The Company reported the following financial figures:

| Line Item | Quarter Ended March 31, 2014 | Quarter Ended March 31, 2015 |
|---|---|---|
| Revenue | R$2,928.8 | R$3,068.3 |

| (Cost of sales and services) | R$(2,295.0) | R$2,348.8 |
|---|---|---|
| (Administrative expense) | R$(112.5) | R$(123.7) |
| (Selling expense) | R$(218.5) | R$(247.8) |
| Other operating income (expense) | R$(65.4) | R$(97.5 |
| Net Income | R$262.8 | R$(188.9) |
| Commercial Aviation business unit revenue | | R$ 1,928.2 |
| Commercial Aviation business unit (cost of sales and services) | | R$ (1,441.7) |
| Commercial Aviation business unit gross profit | | R$ 486.5 |
| Commercial Aviation business unit (operating expense) | | R($245.3) |
| Defense and Security business unit revenue | | R$ 614.8 |
| Defense and Security business unit cost of sales and services | | R$(570.3) |
| Defense and Security business unit gross profit | | R$ 44.5 |
| Defense and Security business unit operating expense | | R$ (95.4) |

536.   The statements in ¶535 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

537.   In the Q115 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

538.   In the Q115 Financial Statements, the Company stated that ECC Investment "Switzerland, holds 100% of the capital of the following: … ECC Insurance & Financial Co. Ltd. - 'ECC Insurance' - located in the Cayman Islands, is an in-house insurance company providing

cover for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft. … Embraer Finance Ltd. - 'EFL' - located in the Cayman Islands, assists customers in obtaining third-party financing, as well as providing support for some of the Company's purchase and sale transactions."

539.    The statements in ¶¶537-38 were materially false and misleading for the reasons set forth in ¶235(f).

540.    In the Q115 Financial Statements, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations: "Based upon the opinion of its outside counsel, the Company believes that there is no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

541.    In the Q115 Financial Statements, the Company reported Current Liabilities-Provisions on a consolidated basis of R$253.8 million for the year ended 2014 and R$300.7 million as of March 31, 2015.   The Company reported Non-Current Liabilities-Provisions on a consolidated basis of R$407 million for the year ended 2014 and R$427.3 million as of March 31, 2014.

542.    The statements in ¶¶540-41 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

543.    On May 27, 2015, Embraer and Embraer Netherlands filed with the SEC a Form F-3 registration statement, which Defendants Curado and Filippo signed (amongst others) ("5/27/15 F-3").  The Company incorporated by reference its 2014 20-F, amongst other documents.

544.    The statements in ¶543 were materially false and misleading for the reasons set forth in ¶235.

545.     In Ex. 12.1 of the 5/27/15 F-3, the Company reported the following financial metrics:

| Financial Metric | As of March 31, 2015 | As of March 31, 2014 | Year Ended 2014 | Year Ended 2013 | Year Ended 2012 |
|---|---|---|---|---|---|
| Income before income taxes, equity results and minority results | $59.1[37] | $94.6 | $503.9 | $602.4 | $613.8 |
| Ratio of earnings to fixed charges | 2.52 | 3.75 | 4.37 | 5.18 | 5.78 |

546.     The statements in ¶545 were materially false and misleading for the reasons set forth in ¶235(a), (g), and (m)-(n).

547.     On June 9, 2015, Embraer and Embraer Netherlands filed a Form 424(b)(2) with the SEC concerning the Company's Notes due 2025 ("2025 Notes 424(b)(2)").   The Company incorporated by reference its 2014 20-F, amongst other documents.

548.     The statements in ¶547 were materially false and misleading for the reasons set forth in ¶235.

549.     In the 2025 Notes 424(b)(2), the Company reported having delivered the following numbers of aircrafts: in 2012, 14 Super Tucano aircrafts, 1 145 aircraft, 1 170 aircrafts, and 62 190 aircrafts; in 2013, 6 Super Tucano aircrafts, 4 170 aircrafts, and 45 190 aircrafts; in 2014, 7 Super Tucano aircrafts, 1 170 aircraft, and 19 190 aircrafts; as of March 31, 2014, 1 170 aircraft and 4 190 aircrafts; and as of March 31, 2015, 5 170 aircrafts (in backlog) and 60 190 aircrafts (in backlog).

---

[37] All figures in this table are in U.S.$ millions.

550.    In the 2025 Notes 424(b)(2), the Company stated that for LAM, it had firm orders of two 190 aircrafts and delivered two.

551.    The statements in ¶¶550-51 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h), and (m)-(n).

552.    In the 2025 Notes 424(b)(2), the Company stated the following in connection with regulators' investigations into the bribery schemes:  "We are unable to estimate the duration or outcome of the discussions with the DOJ."

553.    The statements in ¶552 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

554.    On July 15, 2015, Embraer filed a Form 6-K with the SEC regarding its second quarter 2015 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of two 190 aircrafts and delivered two.

555.    The statements in ¶554 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

556.    On August 13, 2015, Embraer filed a 6-K with the SEC to disclose its financial statements for the second quarter of 2015 ("Q215 6-K") and stated that they were in compliance with IFRS.  The Company reported the following financial metrics:

| Line Item | Six months ended June 30, 2015 | Six months ended June 30, 2014 |
|---|---|---|
| Revenue | $2,569.1[38] | $3,003.6 |
| (Cost of sales and services) | $(2,032.1) | $(2,349.5) |
| (Administrative expense) | $(89.8) | $(100.5) |
| (Selling expense) | $(186.3) | $(207.5) |

---

[38] All figures are in millions, unless stated otherwise.

| | | |
|---|---|---|
| Other operating income (expense) | $(18.2) | $(20.7) |
| Net Income | $72.2 | $259.0 |
| Commercial Aviation business unit revenue | $1,527.2 | |
| Commercial Aviation business unit (cost of sales and services) | $(1,192.1) | |
| Commercial Aviation business unit gross profit | $335.1 | N/A |
| Commercial Aviation business unit (operating expense) | $(188.7) | N/A |
| Defense and Security business unit revenue | $751.3 | N/A |
| Defense and Security business unit cost of sales and services | $(568.6) | N/A |
| Defense and Security business unit gross profit | $182.7 | N/A |
| Defense and Security business unit (operating expense) | $(75.2) | N/A |

557.    The statements in ¶556 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

558.    On August 13, 2015, Embraer filed a Form 6-K with the SEC to disclose its financial statements for the second quarter of 2015 ("Q215 6-K"), which Defendant Filippo signed. The Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "Based upon the opinion of its outside counsel, the

Company believes that there is no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

559.    In the Q215 Financial Statements, the Company reported Current Liabilities-Provisions of $95.4 million for the year ended 2014 and $106.2 million as June 30, 2015.  The Company reported Non-Current Liabilities-Provisions of $153.1 million for the year ended 2014 and $132.4 million as June 30, 2015.

560.    The statements in ¶¶558-59 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

561.    On October 15, 2015, Embraer filed with the SEC a Form 6-K regarding its third quarter 2015 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of two 190 aircrafts and delivered two.

562.    The statements in ¶561 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

563.    On November 13, 2015, Embraer filed a Form 6-K with the SEC to disclose its financial statements for the third quarter of 2015 ("Q315 6-K"), stating that they conformed with IFRS.  The Company reported the following financial figures:

| Line Item | Nine months ended November 30, 2015 | Nine months ended November 30, 2014 |
|---|---|---|
| Revenue | $3,853.7.[39] | $4,243.3 |
| (Cost of sales and services) | $(3,092.1) | $(3,347.1) |
| (Administrative expense) | $(132.4) | $(152.1) |
| (Selling expense) | $(264.7) | $(306.7) |

---

[39] All figures are in millions, unless stated otherwise.

| | | |
|---|---|---|
| Other operating income (expense) | $(26.8) | $(30.4) |
| Net Income | $(33.2) | $252.8 |
| Commercial Aviation business unit revenue | $2,233.3 | $2,188.0 |
| Commercial Aviation business unit (cost of sales and services) | $(1,709.6) | $(1,748.0) |
| Commercial Aviation business unit gross profit | $523.7 | $440.0 |
| Commercial Aviation business unit (operating expense) | $(245.4) | $(266.8) |
| Defense and Security business unit revenue | $611.4 | $1,097.5 |
| Defense and Security business unit cost of sales and services | $(609.1) | $(834.7) |
| Defense and Security business unit gross profit | $2.3 | $262.8 |
| Defense and Security business unit (operating expense) | $(84.7) | $(109.8) |

564.    The statements in ¶563 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

565.    The Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "Based upon the opinion of its outside counsel, the Company believes that there is no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

566.    In the Q315 6-K, the Company reported Current Liabilities-Provisions of $95.4 million for the year ended 2014 and $102.9 million as of September 30, 2015.  The Company reported Non-Current Liabilities-Provisions of $153.1 million for the year ended 2014 and $115.2 million as of September 30, 2015.

567.    The statements in ¶¶565-66 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

### 5.    2016 Statements

568.    On January 14, 2016, Embraer filed a Form 6-K with the SEC regarding its fourth quarter 2015 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of this time, for LAM, it had firm orders of two 190 aircrafts and delivered two.

569.    The statements in ¶568 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

570.    On March 3, 2016 Embraer disclosed through its website its financial statements for the fourth quarter and full year of 2015 ("Q415 Financial Statements"), stating that they conformed with IFRS. The Company reported the following financial figures:

| Line Item | Year Ended December 31, 2015 (consolidated) | Year Ended December 31, 2014 (consolidated) | Year Ended December 31, 2013 (consolidated) |
|---|---|---|---|
| Revenue | R$20,201.8[40] | R$14,935.9 | R$13,635.8 |
| (Cost of sales and services) | R$(16,545.4) | R$(11,977.2) | R$(10,540.0) |
| (Administrative expense) | R$(609.2) | R$(489.1) | R$(453.7) |
| (Selling expense) | R$(1,206.6) | R$(989.4) | R$(453.7) |
| Other operating income (expense) | R$(694.2) | R$(63.7) | R$(100.6) |

[40] All figures are in millions, unless stated otherwise.

| | | | |
|---|---|---|---|
| Net Income | R$281.6 | R$826.6 | R$786.4 |
| Commercial Aviation business unit revenue | R$11,348.9 | R$7,475.6 | R$7,186.4 |
| Commercial Aviation business unit (cost of sales and services) | R$(8,702.4) | R$(6,007.7) | R$(5,511.5) |
| Commercial Aviation business unit gross profit | R$2,646.5 | R$1,467.9 | R$1,675.0 |
| Commercial Aviation business unit (operating expense) | R$(1,499.4) | R$(745.2) | R$(556.7) |
| Defense and Security business unit revenue | R$2,695.4 | R$3,428.8 | R$2,601.0 |
| Defense and Security business unit cost of sales and services | R$(2,596.6) | R$(2,736.0) | R$(2,853.7) |
| Defense and Security business unit gross profit | R$98.9 | R$692.9 | R$ 805.0 |
| Defense and Security business unit (operating expense) | R$(400.7) | R$(348.0) | R$(570.8) |

571.   The statements in ¶570 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

572.   The Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "Based upon the opinion of its external counsel, the Company believes that there is no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

573.    In the Q415 Financial Statements, the Company reported Current Liabilities-Provisions on a consolidated basis of R\$253.8 million for the year ended 2014 and R\$374.2 million for the year ended 2015.   The Company reported Non-Current Liabilities-Provisions on a consolidated basis of R\$407 million for the year ended 2014 and R\$425.2 million for the year ended 2015.

574.    The statements in ¶¶572-73 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

575.    In the Q415 Financial Statements, the Company stated that "The ISR family (Intelligence, Surveillance and Reconnaissance), based on the ERJ 145 platform, includes the EMB 145 AEW&C – Anticipated Aerial Alert and Control, EMB 145 Multi Intel – Remote Sensing and Air-Ground Surveillance and EMB 145 MP – Sea Patrol and Anti-Submarine War models. Originally developed to serve the SIVAM program, versions have been ordered by the Greek, Mexican and Indian governments."

576.    The statements in ¶575 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), and (m)-(n).

577.    In the Q415 Financial Statements, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

578.    In the Q415 Financial Statements, the Company stated that ECC Investment Switzerland "coordinates investments in subsidiaries abroad[.]"

579.    The statements in ¶¶577-78 were materially false and misleading for the reasons set forth in ¶235(f).

580.    On March 29, 2016, Embraer filed a Form 20-F with the SEC for the fiscal year ended December 31, 2015 ("2015 20-F"), which Defendants Curado and Filippo signed.

Defendant Rodrigues, as Embraer's Executive VP-General Counsel, had ultimate authority to approve the disclosures made in the 2014 20-F.  Rodrigues was serving on Embraer's Board of Executive Officers at that time.  The Company reported the following financial metrics:

| Line Item | Year Ended 2015 | Year Ended 2014 | Year Ended 2013 | Year Ended 2012 | Year Ended 2011 |
|---|---|---|---|---|---|
| Revenue | $5,928.1[41] | $6,288.8 | $6,235.0 | $6,167.0 | $5,790.9 |
| (Cost of sales and services) | $(4,816.8) | $(5,038.3) | $(4,818.9) | $(4,676.6) | $(4,488.1) |
| (Administrative expense) | $(182.0) | $(207.5) | $(210.5) | $(279.2) | $(261.3) |
| (Selling expense) | $(361.6) | $(419.9) | $(454.4) | $(480.4) | $(481.6) |
| Other operating income (expense) | $(194.2) | $(32.6) | $(36.9) | $(42.8) | $(219.7) |
| Net Income | $80.8 | $347.7 | $346.0 | $348.6 | $120.4 |
| Commercial Aviation Business Unit Revenue | $3,348.7 | $3,163.3 | $3,307.0 | N/A | N/A |
| Commercial Aviation Business Unit Cost of Sales and Services | ($2,565.7) | $(2542.2) | $(2,532.6) | N/A | N/A |
| Commercial Aviation Business Unit Gross Profit | $783.0 | $621.1 | $774.4 | N/A | N/A |
| Commercial Aviation Business Unit Operating Income (Expense) | $(434.9) | $(321.2) | $(272.3) | N/A | N/A |
| Defense and Security Business Unit Revenue | $811.1 | $1456.4 | $1,196.9 | N/A | N/A |
| Defense and Security Business | $(785.4) | $(1,158.9) | $(951.2) | N/A | N/A |

---

[41] All figures are in millions.

| Unit Cost of Sales and Services | | | | |
|---|---|---|---|---|
| Defense and Security Business Unit Gross Profit | $25.7 | $297.5 | $245.7 | N/A | N/A |
| Defense and Security Business Unit Operating Income (Expense) | $(119.1) | $148.0 | $(154.1) | N/A | N/A |

581.  In the 2015 20-F, the Company reported that the Commercial Aviation business unit (which includes the Embraer 170 and 190 aircrafts) generated the following revenues in the Other geographic region (which includes Mozambique and Saudi Arabia): $193.5 million in 2013; $179.6 million in 2014; and $36.6 million in 2015.  The Company reported that the Defense and Security business unit (which includes the Super Tucano aircrafts) generated the following revenues in Latin America (which includes the Dominican Republic): $16.3 million in 2013; $47.3 million in 2014; and $21.7 million in 2015.  The Company reported that the Defense and Security business unit (which includes the AEW&C 145 aircrafts) generated the following revenues in Asia Pacific (which includes India):  $71 million in 2013; $78.5 million in 2014; and $33.2 million in 2015.

582.  The statements in ¶580-81 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(h), and (m)-(n).

583.   In the 2015 20-F, the Company reported having delivered the following numbers of aircrafts: in 2011, 24 Super Tucano aircrafts (in backlog), 2 145 aircrafts, 1 170 aircraft, and 68 190 aircrafts; in 2012, 14 Super Tucano aircrafts, 1 170 aircraft, and 62 190 aircrafts; in 2013, 6 Super Tucano aircrafts, 4 170 aircrafts, and 45 190 aircrafts; in 2014, 7 Super Tucano aircrafts, 1 170 aircraft, and 19 190 aircrafts; and in 2015, 19 Super Tucano aircrafts, 2 170 aircrafts, and 8 190 aircrafts.

584.    The statements in ¶583 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (h), and (m)-(n).

585.    In the 2015 20-F, the Company stated that "[w]e believe that we will be able to compete favorably on the basis of our aircraft performance, efficiency, low operating costs, product development experience, global customer base, market acceptance, cabin design and aircraft price."

586.    The statements in ¶585 were materially false and misleading for the reasons set forth in ¶235(m).

587.    In the 2015 20-F, the Company stated "Embraer has developed three cost-effective, reliable and flexible special-mission aircraft based on the ERJ 145 regional aircraft platform: the EMB 145 Airborne Early Warning and Control, or AEW&C, the EMB 145 Remote Sensing/Airborne Ground Surveillance, or RS/AGS EMB 145 Multi Intel, and the EMB 145 Maritime Patrol, or MP. A total of 18 aircraft of this category have been manufactured for the Brazilian, Mexican, Greek and Indian Air Forces."

588.    The statements in ¶587 were materially false and misleading for the reasons set forth in ¶235(a), (e), (h), and (m)-(n).

589.    In the 2015 20-F, the Company stated that for LAM, it had firm orders of 2 190 aircrafts and delivered both of them.

590.    The statements in ¶589 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

591.    In the 2015 20-F, the Company stated that its costs of sales and revenues consisted of the cost of the aircraft, spare parts, and services rendered, comprising of raw materials, labor, depreciation, amortization, product warranties, and multiple-elements arrangements.

592.   The statements in ¶591 were materially false and misleading for the reasons set forth in ¶235(m).

593.   In the 2015 20-F, the Company stated that Embraer RL provided "commercial and institutional representation for the Company."

594.   In the 2015 20-F, the Company stated that ECC Investment Switzerland "coordinates investments in subsidiaries abroad."

595.   The statements in ¶¶593-94 were materially false and misleading for the reasons set forth in ¶235(m).

596.   In the 2015 20-F, the Company stated the following in connection with receiving a subpoena from the SEC for an investigation of potential FCPA violations:  "Based upon the opinion of its outside counsel, we believe that there is no adequate basis at this time for estimating accruals or quantifying any contingency with respect to these matters."

597.   In the 2015 20-F, the Company reported Current Liabilities-Provisions of $95.4 million for the year ended 2014 and $95.7 million for the year ended 2015.  The Company reported Non-Current Liabilities-Provisions of $153.1 million for the year ended 2014 and $108.9 million for the year ended 2015.

598.   The statements in ¶¶596-97 were materially false and misleading for the reasons set forth in ¶235(a)-(e), (g)-(i), and (m)-(n).

599.   In the 2015 20-F, the Company disclosed that it "adopted a Code of Ethics and Conduct applicable to [its] directors, officers, and employees worldwide."  The statements in the Code of Ethics and Conduct were substantially similar to those described above in ¶194.

600.   The statements in ¶599 were materially false and misleading for the reasons set forth in ¶235(i).

In the 2015 20-F, the Company stated the following in connection with its Disclosure

Controls and Procedures:

> Our President and CEO, Frederico Pinheiro Fleury Curado, and our executive vice
> president and chief financial and investor relations officer, Jose Antonio de
> Almeida, after evaluating, together with management, the effectiveness of the
> design and operation of our disclosure controls and procedures (as defined in
> Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2015, the end of
> the period covered by this annual report, concluded that, as of such date, our
> disclosure control and procedures were effective to ensure information required to
> be disclosed by us in the reports that we file or submit under the Exchange Act is
> recorded, processed, summarized and reported within the time periods specified in
> the SEC's rules and forms, and were effective in ensuring that such information is
> accumulated and communicated to our management, including our CEO and chief
> financial officer, as appropriate to allow timely decisions regarding required
> disclosures.

601.     In the 2015 20-F, the Company stated the following in connection with its internal

control over financial reporting:  "

> Management assessed the effectiveness of our internal control over financial
> reporting as of December 31, 2015. In making this assessment, our management
> used the criteria set forth by the Committee of Sponsoring Organizations of the
> Treadway Commission (COSO) in Internal Control—Integrated Framework
> (2013). Based on this assessment, our management concluded that, as of December
> 31, 2015, our internal control over financial reporting was effective based on those
> criteria.  … Our risks and internal controls department periodically evaluates our
> internal controls for the main cycles, documenting the processes used in each cycle,
> identifying opportunities and suggesting improvements for the existing control
> mechanisms. There was no change in our internal controls over financial reporting
> that occurred during the period covered by this annual report that has materially
> affected, or is reasonably likely to materially affect, our internal controls over
> financial reporting.

602.     The statements in ¶¶600-01 were materially false and misleading for the reasons

set forth in ¶235(j)-(l).

603.     The 2015 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act

of 2002 ("SOX") by Defendants Curado and Filippo, stating that the financial information

contained in the 2015 20-F was accurate and disclosed any material changes to the Company's

internal control over financial reporting.  The SOX certifications also included language similar, in all material respects, to those statements disclosed in the 2011 20-F.

604.    The statements in ¶603 were materially false and misleading for the reasons set forth in ¶235.

605.    On April 14, 2016, Embraer filed a Form 6-K with the SEC regarding its first quarter 2016 aircraft deliveries, which Defendant Filippo signed.  The Company disclosed that as of that time, for LAM, it had firm orders of two 190 aircrafts and delivered two.

606.    The statements in ¶605 were materially false and misleading for the reasons set forth in ¶235(a), (d), (h), and (m)-(n).

**D.    The Truth Slowly Emerges**

607.    On March 3, 2016, Cowen and Company ("Cowen") issued a report entitled "Embraer[;] Messy 4Q; Weak 2016 Margin Guide[,]" stating, in pertinent part, "Investors are apt to be disappointed by weak 2016 margin guide & an expanded FCPA callout, which look like bigger issues than a messy Q4 with strong cash flow.  …  Indicated callout of negotiations with DOJ to resolve allegation of FCPA violations suggests greater risk of fines, which are not in guidance."

608.    On this news, Embraer's ADRs fell $3.53, or -11.86%, to close at $26.24 on March 3, 2016, on exceptional trading volume.

609.    On April 29, 2016, Embraer filed a Form 6-K with the SEC, which Defendant Filippo signed, releasing its results for the first quarter of 2016.  The Company disclosed that the (i) Commercial Aviation business segment represented 54.3% of consolidated revenues in the first quarter of 2016, which was down from the 62.7% in the first quarter of 2015, and (ii) Defense & Security business segment represented 14.5% of consolidated revenues in the first quarter of 2016, which was down from the 20.2% in the first quarter of 2015, due to a decline of 11.3% in this

segment's revenues in the first quarter of 2016.  These two business segments included the aircrafts

and contracts that were effectuated through the bribery schemes.  Also, the Company revealed the

following, in pertinent part, in connection with regulators' investigations into the bribery schemes:

> In light of additional information, the Company voluntarily expanded the scope of the internal investigation to include sales in other countries, reported on these matters to the SEC and the DOJ and otherwise cooperated with them.  … The Company has begun discussions with the DOJ for a possible resolution of the allegations of non-compliance with the FCPA.  A resolution of the U.S. government inquiries, and related inquiries, proceedings and developments in other countries would result in fines, which may be substantial, and possibly other substantial sanctions and adverse consequences.  … In light of the above, we embarked on a comprehensive effort to improve and expand our compliance program worldwide. This multi-year task involved reexamining every aspect of our compliance systems, and where appropriate, redesigning or adding to them. Some of the key enhancements include the creation of a Compliance Department, the appointment of a Chief Compliance Officer reporting directly to the Risk and Audit Committee of the Board of Directors, the development of a program to monitor engagement of and payments to third parties, improvements to compliance policies, procedure and controls, the enhancement of anonymous and other reporting channels, and the development of a comprehensive training and education program designed to maintain and reinforce a strong compliance culture at all levels of Embraer globally. The Company will continue to promote enhancements and update its compliance program.

610.   On this news, Embraer's ADRs fell $1.15, or -4.74%, to close at $23.10 on April

29, 2016, on exceptional trading volume.

611.   On June 9, 2016, after the market closed, Embraer announced that Defendant

Curado was stepping down from his position as CEO after 32 years with the Company and that

Paulo César de Souza e Silva would replace Curado as of July 2016.

612.   Also on June 9, 2016, Morgan Stanley issued a report entitled "Embraer[;] Good

Successor, But CEO Change Seems Rushed[,]" which stated, in pertinent part, the following:

> While Mr. Souza brings strong experience, we are somewhat concerned by the abruptness of this change.

\*\*\*

The only issue that concerns us about the news is how soon Fred is stepping down (i.e., ~20 days).  In the press release Embraer indicated that the transition will only be completed by the end of the year; it strikes us as a little odd that Paulo Cesar will assume the role before this transition period comes to an end.

613.    On June 10, 2016, Cowen published an equity research report on Embraer entitled "CEO Transition a Surprise[,]", which stated, in pertinent part, the following:

The circumstances of CEO Fred Curado's unexpected decision to step down next month are unclear.  His successor Paulo Silva looks very capable, but the potential of a link to ERJ's FCPA investigation is a risk given that fines for prior violation settlements have been sizable.

***

Embraer's announcement that CEO Fred Curado, ERJ's head for over nine years, plans to step down next month is unexpected.  The Company suggests that the move has been planned for some time, but it's unclear if the timing is in any way linked to the investigation of ERJ's possible FCPA violation(s) in connection with a sale of defense aircraft to the Dominican Republic.  The possibility of link is suggested by a WSJ report in March that a sales consultant told Brazilian prosecutors he "believed" ERJ's top execs, including Curado, knew of illicit payments related to the deal. …

While Silva looks like a capable CEO replacement, the FCPA investigation, which began in 2010, remains an overhang because of the potential for financial penalties.  The average fine for the top ten FCPA violation settlements is $380MM, and eight of the top ten fines were levied on foreign companies.

***
Risks To The Price Target

***

FCPA investigation results in a settlement fine[.]

614.    On this news, Embraer's ADRs fell $1.18, or 5.44%, to close at $20.51 on June 10, 2016, on exceptional trading volume.

615.    On July 29, 2016, Embraer filed a Form 6-K with the SEC, which Defendant Filippo signed, stating, in pertinent part, the following:

[N]egotiations with the U.S. Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) for the settlement of the allegations of non-compliance with the U.S. Foreign Corrupt Practices Act (FCPA) have significantly progressed, to the point that ***Embraer is recognizing a US$ 200 million loss contingency in the quarter ended June 30, 2016***, reflecting the likely outcome of this matter.  The amount of the contingency is an estimate and has not been finally determined.

In addition to the monetary consequences, a final settlement with the DOJ and SEC is likely to include: (1) a deferred prosecution agreement (DPA), under which the prosecution of criminal charges against Embraer will be deferred for the term of the DPA, and dismissed upon the expiration of the term of the DPA, and (2) an imposition of an independent monitor to assess the Company's compliance with the terms of any agreement that may be reached with the U.S. authorities.  These may not be the only non-monetary consequences contained in any final settlement.

The negotiations with the U.S. authorities are ongoing and thus subject to change.  There is no assurance that Embraer will ultimately reach a final settlement of these matters with the U.S. government agencies.  Related proceedings and developments in other countries are ongoing and could result in additional fines, which may be substantial, and possibly other substantial sanctions and adverse consequences.

(Emphasis added.)

616.    That same day, Embraer announced in a Form 6-K, which Defendant Filippo signed, its financial and operating results for the quarter ended June 30, 2016.  Embraer reported, in pertinent part, the $200 million loss contingency in connection with the FCPA violations and a net loss for the quarter totaling $99.4 million, or $0.55 per share.

617.    Also that same day, Morgan Stanley issued a research report entitled "Embraer[;] A Perfect Storm in 2Q16[,]" which stated, in pertinent part, the following:

ERJ recognized a $200mn contingency loss related to the DOJ/SEC investigation (discussed below), which made for a reported (and negative) EBIT of –$127mn.  As we can recall, this is ERJ's worst quarterly performance.  Adjusted EBITDA was $152mn, 24% below MSe.  Below the line, given this non-recurring contingency loss, the company reported a net loss of –$99mn, meaningfully below our positive +$95mn estimate.

***

**$200mn charge taken related to SEC/DOJ investigation; there could be additional penalties elsewhere.** In our view, the biggest development of the quarter was Embraer's recognition of a $200mn provision (equivalent to 5% of market capitalization) related to the non-compliance with the US Foreign Corrupt Practices Act. While we had recognized this investigation (which has been underway since 2010) as a major risk factor we had not factored in a potential loss to our valuation of the company in the past.

\*\*\*

ERJ mentioned in the release that investigations in other countries are still ongoing and could result in additional fines (not quantified by the company at this juncture).

(Emphasis in original)

618.    On this news, Embraer's ADRs fell $2.93, or 13.82%, to close at $18.27 on July 29, 2016, on exceptional trading volume.

619.    On Sunday, July 31, 2016, according to *Folha*, the Company revealed that it authorized bribes abroad. In testimony to prosecutors, Close said that the Company authorized bribe payments to a Dominican Republic official during aircraft-sale talks. The $3.5 million in bribes were during negotiations for eight Super Tucano aircrafts, and the testimony was given to prosecutors on April 4, 2016.

620.    On August 1, 2016, HSBC issued a report entitled "Embraer[;] Downgrade to Hold: the 'executive' downfall[,]" which stated, in pertinent part, the following:

Embraer reported weak 2Q earnings with adjusted EBIT at USD73m missing Bloomberg consensus estimates by 38%. Bottom line was a loss on account of the USD200m provision for the 2010 SEC/DOJ investigation.

\*\*\*

The company made a provision of USD200m for the ongoing DOJ/SEC investigation (with respect to US Foreign Corrupt Practices Act) as it nears a potential settlement that, as per the company, could also include a deferred prosecution agreement and an imposition of an independent monitor to assess the company's compliance with the terms of any agreement that may be reached with

the U.S. authorities.  Adjusted net income was USD44m, 47% below consensus estimate of USD83m.

\*\*\*

The net income estimate is cut by 61% to USD139m, which incorporates the lower operational margin as well as the USD200m provision on the ongoing SEC/DOJ investigation.

621.    On this news, Embraer's ADRs fell -$0.88, or -4.82%, to close at $17.39 on August 1, 2016, on exceptional trading volume.

622.    On August 17, 2016, according to Bloomberg and other press, the Company presented a voluntary dismissal program.  In a statement from the Embraer labor union Sindmetalsjc, the program would be in place from August 23 to September 14.  The company did not announce how many people were to be dismissed, and the Union discussed alternative solutions with Embraer.  The press reported that Embraer aimed to save $200 million a year with the voluntary dismissal program.  In an article in the journal *O Globo* entitled "Metallurgists promise to close Anchieta in action against layoffs[,]" this potential savings was linked to the Company's $200 million provision for liabilities connected to the bribery schemes.

623.    On this news, Embraer's ADRs fell -$0.46, or -2.44%, to close at $18.36 on August 17, 2016, exceptional trading volume.

624.    On August 18, 2016, the press continued reporting about Embraer's voluntary dismissal program, including the link to the Company's $200 million provision for liabilities connected to the bribery schemes.  For example, in an article on EXAME.com entitled "Embraer workers create plan against PDV[,]" an Embraer union was reported to oppose the termination plan because, in part, it aimed to place on the employees the burden of the potential liability stemming from the bribery schemes, specifically referencing the Company's $200 million provision for liabilities.

625.    On this news, Embraer's ADRs fell -$0.15, or -0.82%, to close at $18.21 on August 18, 2016, on exceptional trading volume.  The Company's ADRs fell $0.61, or 3.24%, over August 17th and 18th in response to the news about the voluntary dismissal program and link to the Company's $200 million provision for liabilities connected to the bribery schemes.

626.    On Saturday September 17, 2016, multiple news outlets reported about the Indian government's investigation into Embraer's involvement in the Indian bribery scheme.   For example, Press Trust of India published an article entitled "CBI registers PE in alleged kickbacks in Embraer deal[,]" stating, in pertinent part, as follows:

> CBI has registered a preliminary enquiry (PE) to probe allegations of commission being paid to middleman in the supply of three aircraft worth USD 208 million from Brazilian company Embraer to Defence Research and Development Organisation for airborne surveillance systems.
>
> …
>
> The allegations of commission being paid in the deal surfaced in a Brazilian paper which claimed that Embraer had taken the services of middlemen to get the deal of aircraft supply in Saudi Arabia and India. According to defence procurement rules of India, middlemen are strictly barred in such deals.
>
> …
>
> Since then, the investigation has widened to examine business dealings with eight more countries.   The allegations prompted Defence Ministry to hand over investigation to CBI.  DRDO has also sought an explanation from Embraer.

627.    On September 18, 2016, the Sunday Guardian Live in an article entitled "Files reveal links between Agusta, Embraer deals," stated, in pertinent part, as follows:

> The CBI has registered a preliminary enquiry (PE) against unknown Ministry of Defence officials to probe the Embraer aircraft deal scam, in less than 12 hours after this correspondent revealed on NewsX the minutes of four meetings held in December 2006 to finalise the aircraft for the AEW&C project.
>
> This correspondent has revealed that the Defence Research and Development Organisation (DRDO) was not on board with the Indian Air Force under then Air Force chief S.P. Tyagi over the selection of Embraer aircraft.

…

The CBI told this correspondent that "CBI has registered a PE (preliminary enquiry) against unknown [officials] of the Ministry of Defence (GOI) and others. This on a [reference] from the said Ministry on allegations related to M/s. Embraer employing an agent to facilitate various contracts.  These include the contract for AEW&C project [with] CABS/DRDO for procurement of 3 aircraft[.]"

This correspondent has accessed the key 10-page documents that form part of the "Embraer files" that are being investigated by the CBI and the Enforcement Directorate.  The documents contain the minutes of the four meetings held in December 2006 to finalise the aircraft for the AEW&C project.

In the first of the four meetings, held at Air Headquarter, New Delhi on 5 December 2006, the documents suggest, then Programme Director (AEW&C) Dr S. Christopher (who is currently the DRDO chief) had proposed two alternative options with different configuration and endurance for the aircraft as a platform for this project.  He also pointed out that better options will be available with the change of aircraft.  But the Air Force under S.P. Tyagi overruled Christopher's arguments and stated that the DRDO will work with Embraer, the world's third largest aircraft manufacturer that is now under the scanner of the US and Brazilian authorities for alleged kickbacks.

The Embraer files accessed by this correspondent reveal that four meetings had taken place on 5,6, 8 and 19 December 2006 among the Air Force officers, DRDO officials and the scientific adviser to the then Defence Minister, A.K. Antony.

"Dr. Christopher brought out that better options will be available with change of aircraft.  The Chairman (the then Deputy Chief of Air Staff) stated that we need to work with EMB-145 and develop a prototype with the configuration that CABS will formulate and send to IAF for consideration", stated the minutes that are available with this correspondent.

The minutes further state: "The Programme Director, AEW&C stated that CABS has proposed two options with different configuration and endurance.  DCAS asked him to submit a clear proposal of what can be achieved with a 24T aircraft."

The Defence Ministry is also expected to seek information from Brazil and the US through Indian defence attachés deployed in Indian embassies in the two countries.

***

Significantly, the Embraer deal reminds one of the AgustaWestland VVIP helicopter scam due to the many similarities.  Both Embraer and Augusta deals

were inked when S.P. Tyagi was the Air Force chief and A.K. Antony was the Defence Minister.

Both deals were cleared between 2008 and 2010 despite alternative options being available. In both deals, UK based middlemen and aircraft company officials are allegedly involved.

628.   Following this news, Embraer's ADRs fell -$0.47, or -2.51%, to close at $18.25 on September 19, 2016, on exceptional trading volume.

629.   On September 26, 2016, before the market opened, Embraer accepted 1,463 workers in their voluntary redundancy plan, which was 99.5% of workers that registered, according to an emailed statement.  The plan was one of the measures that the Company adopted to cut recurring costs.  In an article in the journal *O Globo* entitled "Embraer accepts 1,463 accessions to the Voluntary Dismissal Program[,]" a union was reported to link Embraer's aim to cut $200 million in costs per year to help recoup the Company's $200 million provision for liabilities connected to the bribery schemes.

630.   On this news, Embraer's ADRs fell -$0.62, or -3.34%, to close at $17.95 on September 26, 2016, on exceptional value.

631.   On September 29, 2016, the Times of India published an article entitled "CBI finds Embraer deal fixer, may unmask bribe recipients[,]" stating, in pertinent part, as follows:

CBI claimed on Wednesday that it has managed to track down a middleman, a foreign national, who was allegedly paid $5.5 million as commission by Brazilian company Embraer to bag a Rs 1,350 crore ($208 million) jet deal with India in 2008.  Sources said investigation has established that the payment was linked to the sale of jets to India.  Although sources refused to identify the "middleman" or spell out his nationality citing confidentiality clause undergirding cooperation among investigating agencies, they said he is a controversial figure and has been known to be conduits for arms deals.

"We will ask Embraer why did they pay such a big amount to the gentleman in connection with the deal with Defence Research and Development Organisation (DRDO) for airborne surveillance systems," said a CBI officer, adding that the breakthrough could put the agency on the trail of other beneficiaries.  CBI sources

said they will [approach] law agencies of some countries, including Brazil and UK, to get details on him and other aspects like the mode of payment. "That is how this business functions. The defence contractor pays the money to the middleman who, after retaining his own share, distributes the money to those who may help him swing the deal," said a source.

632.   On this news, Embraer's ADRs fell $0.79, or -4.34%, to close at $17.40 on September 29, 2016, on exceptional trading volume.

633.   On November 11, 2016, the Times of India published an article entitled "ED starts Embraer deal probe[,]" stating, in pertinent part, as follows:

The Enforcement Directorate (ED) has started a probe into the Embraer aircraft deal which was signed during UPA rule in 2008. In the three-aircraft deal, foreign investigating agencies have alleged that payoffs were received by Indian agents for pushing the deal with the government here. The CBI had last month registered an FIR and named Vipin Khanna as the agent who allegedly received payoffs in the $208 million deal. In the Embraer deal, the agencies are trailing transactions of more than $5 million suspected to be alleged payoffs in the purchase of three aircraft by the Defence Research and Development Organisation (DRDO) for the air-borne radar system. Khanna and his son had come under investigation for the first time after the Volcker oil-for-food scam broke out in 2005 for their links with former foreign minister Natwar Singh.

634.   On this news, Embraer's ADRs fell $1.18, or -5.36%, to close at $20.82 on November 11, 2016, on exceptional trading volume.

635.   On November 29, 2016, The Press Trust of India published an article entitled "Embraer has admitted entering into agreement with an 'Agency[.]'" stating, in pertinent part, as follows:

The government today said that Brazilian firm Embraer has admitted to it [that] they have entered into an agreement with an "Agency" towards a controversial DRDO contract and that a sum of USD 5.76 million was paid to the agency.

Embraer deal was to purchase three modified aircraft for installation of DRDO developed mission system to develop indigenous Airborne Early Warning & Control (AEW&C) System.

\*\*\*

"Therefore, DRDO asked for clarification from Embraer based on the media reports. Embraer, in their reply, admitted that they have entered into an Agreement with an Agency towards the Contract and that a sum of USD 5.76 million was paid to the Agency. The same has been submitted to CBI for investigation," Minister of State for Defence Subhash Bhamre said in a written reply to Rajya Sabha.

CBI has registered a case against NRI arms dealer Vipin Khanna and two companies based abroad in a case of alleged kickbacks in connection with the deal with Embraer signed in 2008.

Khanna, whose name had figured earlier also in defence deals probed by the agency, has been booked along with two companies—Brazil-based Embraer and Singapore based Interdev Pte Ltd—in connection with the deals [totaling] USD 208 million.

636. On this news, Embraer's ADRs fell $0.35, or -1.78%, to close at $19.36 on November 29, 2016, on exceptional trading volume.

### E.     Additional scienter allegations

637.    Defendants' scienter is further supported through (i) criminal actions against several of the Company's senior executives, including, without limitation, former Executive Board members and Defendants Aguiar and Rimoli, (ii) a deluge of Embraer admissions of guilt, and (iii) detailed facts reflecting Defendants Curado, Aguiar, Rimoli, and Rodrigues' knowledge of and involvement in the bribery schemes.

638.    Embraer's current President and CEO, Paulo Cesar de Souza e Silva ("Souza"), admitted summarily the Company's culpability in the bribery schemes. During an October 31, 2016 call about Embraer's third quarter 2016 results, Souza conceded the Company's culpability: "So, let me elaborate a little bit on this because, of course, this is a high profile case for us. I think this is over now. We have to turn this page so the company unfortunately made that mistake years ago. The company is responsible for that."

639.    Souza had excellent reason to concede Embraer's culpability. The Company's bench of executives who were directly involved in the bribery scheme or otherwise embroiled in the investigation runs extraordinarily long and deep, as reflected by the fact that several senior

Embraer executives, including several Executive Board members, were named as defendants in

Brazilian criminal complaints:

| Individuals | Positions Held | Description |
|---|---|---|
| Defendant Aguiar | Executive Board Member; CFO; Executive VP of Defense Market Business Unit | Named as a defendant in Brazilian Criminal Actions |
| Defendant Rimoli | Executive Board Member; General Counsel; Executive VP of Commercial Services Business Unit; VP of Commercial Airline Business Unit | Named as a defendant in Brazilian Criminal Actions |
| Ricardo Marcelo Bester | Director of Marketing and Sales of Government Market Business Unit in Europe, Middle East, and Africa Region | Named as a defendant in Brazilian Criminal Actions |
| Eduardo Munhos de Campos | VP of the Airline Market Business Unit in Latin America Region | Named as a defendant in Brazilian Criminal Actions |
| Albert Phillip Close | Senior Manager for Proposals and Contracts in Defense Market Business Unit | Named as a defendant in Brazilian Criminal Actions; Testified and signed deal in Dominican Republic investigation |
| Eduardo Augusto Fernandes Fagundes | Manager and Contracts Negotiator in Defense Market Business Unit | Named as a defendant in Brazilian Criminal Actions |
| Luiz Alberto Lage da Fonseca | Senior Manager of Special Programs Contracts and Contracts Negotiator in Defense and Government Market Business Unit | Named as a defendant in Brazilian Criminal Actions |
| Luiz Eduardo Zorzenon Fumagalli | Director of International Marketing and Sales in Defense Market Business Unit in Latin America and Caribbean Regions | Named as a defendant in Brazilian Criminal Actions |
| Orlando Jose Ferreira Neto | Executive Board Member; Executive VP of Defense and Government Market Business Unit; CEO & Managing | Named as a defendant in Brazilian Criminal Actions |

|  | Director of EAP (Embraer Subsidiary) |  |
|---|---|---|
| Acir Luiz de Almeida Padilha Junior | VP of Marketing and Sales in Americas Region | Named as a defendant in Brazilian Criminal Actions |

640.    The admissions that Embraer has already made to U.S. and Brazilian regulators

supported findings to the effect of the following, without limitation:

- According to the DPA, Embraer's culpability hinged partially on "the organization [having] 5,000 or more employees and an individual within **high-level personnel of the organization participat[ing] in, condon[ing], or was willfully ignorant of the offense[.]**"

- According to the DPA, the nature and seriousness of Embraer's offenses was "pervasive[] throughout each of the Company's three separate sales divisions and [had] involvement of high-level executives in each set of criminal conduct[.]"

- The DOJ noted that the seriousness of Embraer's offense level included "Multiple Bribes" and "High Level Official" involvement.

- As of October 24, 2016, according to the DPA, Embraer had not disciplined a senior executive with oversight responsibility over the employees engaged in the illegal activity, even though the senior executive was at least aware of the bribery discussions in 2004, as reflected in emails.

- Embraer admitted that "[N]umerous high-level EMBRAER executives knew that the various agency agreements referenced above falsely represented that payments were being made for legitimate agency services, and that the true purpose of the payments made to the agents was to funnel bribes to foreign officials. **Many of the high-level executives who knew about the false nature of the agreements and the improper purpose of the payments had the authority and responsibility to ensure that EMBRAER devised and maintained an adequate system of internal accounting controls, knew that EMBRAER'S then-existing internal accounting controls failed to prevent EMBRAER from entering into false agency agreements and making improper payments, and knowingly and willfully failed to implement adequate internal accounting controls to address the known weaknesses, in part to permit EMBRAER to enter into false agency agreements and funnel bribes to foreign officials.**"

- The SEC alleged that these "bribes were authorized by senior executives at Embraer and its subsidiaries while knowing or recklessly ignoring red flags which indicated a high probability that such payments were intended for, or would be passed to, foreign officials." Moreover, "Embraer's legal department was responsible for approving the consultants its senior legal executive engaged on behalf of ERL.  As a result, senior Embraer executives in Brazil, including a senior legal executive at the time, at least two other senior Embraer executives, and several Embraer managers, circumvented the Company's internal accounting controls by, among other things, approving the engagement of third parties

through sham contracts to act as conduits for bribes to foreign officials, and concealing bribe payments as legitimate expenses under contracts obtained in countries that bore no relation to any legitimate services rendered and that were intended largely to pay bribes to foreign government officials."

641.    The Company's admissions concern each bribery scheme in the Dominican Republic, Saudi Arabia, Mozambique, and India.

642.    Embraer admitted to the DOJ that to effectuate the Dominican Republic bribery scheme, Embraer made payments to a shell company identified by a Dominican official, even though a foreign official had told Embraer to which company to make agency payments, Embraer had conducted no due diligence on the shell company, did not have a signed contract with the shell company, and knew that the shell company had not performed any legitimate services in exchange for the payment.

643.    Embraer admitted to the DOJ that in connection with the Dominican Republic bribery scheme, Embraer made payments to an agent for services purportedly rendered in connection with an aircraft sale to the Jordanian Air Force, even though the Company never sold any aircraft to the Jordanian Air Force, the Company knew that the agent had rendered no services in connection with any attempted sale to the Jordanian Air Force, and an internal Company memorandum indicated that the payments were related to unlawful commissions owed for aircrafts sold to the DRAF, not potential sales to the Jordanian Air Force.

644.    Embraer admitted to the DOJ that in connection with the Saudi Arabian bribery scheme, Embraer made unlawful payments to an agent, even though the Company conducted minimal due diligence on the agent, did so almost exclusively on the basis of information that an Embraer executive personally provided to the Company's contracts and legal departments, and the Company did not require any proof of services from the agent before payment.

645.    Embraer admitted to the DOJ that in connection with the Mozambique bribery scheme, the only due diligence that the Company conducted on an agent's shell company was limited to collecting the shell's registration documents, corporate by-laws, and board minutes directly from the agent.  The Company did not require any proof of services from the agent before making payments.

646.    Orlando, a former Embraer Executive Board member, offered the CVM a settlement of R$300,000 (approximately $89,140) in connection with his involvement in the Dominican Republic bribes.  The CVM rejected his settlement offer partially because of findings that Orlando helped effectuate the bribes, discussed them with other Embraer executives, furnished instructions on how to hide the payments, and approved the purported agency contract with Globaltix.

### 1.    Defendant Curado's Knowledge

647.    Defendant Curado was Embraer's CEO and President during the Class Period.  He signed Embraer's disclosures during the Class Period and had ultimate authority over the Company's disclosures.

648.    In a deposition around March 23, 2015 before Brazilian regulators, Sonnenfeld testified that Orlando approached Sonnenfeld for help with effectuating the payments to Piccini in connection with the Super Tucano sales in the Dominican Republic.  According to Sonnenfeld's testimony, Orlando stated, "they left some bad things there before my time for me to resolve[.]" Sonnenfeld testified that Orlando said that Defendants Curado, Aguiar, and Rimoli knew about the payments to Piccini.

649.    In a deposition before Brazilian regulators around April 17, 2015, Sonnenfeld testified that he maintained close relationships with several Embraer executives during his over-30-year working relationship with Embraer.  These executives included Defendant Curado.

650.    During the same deposition, Sonnenfeld provided compelling testimony demonstrating the probability that Defendant Curado evaluated the decision to pay bribes in connection with the Dominican Republic sales:

a)  First, after a dinner with Orlando and Padilha, Orlando told Sonnenfeld about the Dominican Republic situation and said that Defendant Curado knew about it and that Munhos would be in contact with him;

b)  Second, among those that knew about the Dominican Republic bribes, Defendant Curado was the only one who shared a deep history and relationship of trust with Sonnenfeld.  They regularly dined together at Embraer's offices and at air shows where Embraer courted business;

c)  Third, Defendant Rimoli signed the contract with Globaltix around March 2010 as the Embraer head and VP of the Legal Department, despite the contract having been extremely atypical, including, without limitation, an advance payment of a fixed commission.  Under the conditions that Defendant Rimoli signed the contract, it was clear to Sonnenfeld that Defendant Rimoli needed Defendant Curado's backing.

d)  Fourth, Defendant Aguiar signed the contract with Globaltix around March 2010 when he was Embraer's CFO, despite the contract having been extremely atypical, including, without limitation, an advance payment of a fixed commission, and he signed the purchase-and-sale contract with the DRAF when he was the Company's VP of the Defense and Government business unit.  It was clear to Sonnenfeld that under these conditions, Defendant Aguiar would not have signed these contracts without Defendant Curado's backing.

651.    Sonnenfeld's testimony about Defendant Curado's knowledge of the Dominican Republic bribes is corroborated by Embraer emails revealed to the Brazilian regulators.  For example, around August 27, 2008, Sonnenfeld emailed Defendant Curado about "FACh" to congratulate him on a historic victory in an "(almost) neighboring country[,]" reiterating that Sonnenfeld and Defendants Curado and Aguiar's meeting gave Sonnenfeld an additional boost, amongst other things.  Defendant Curado replied that same day to the apparently same email chain, congratulating Sonnenfeld, stating that it was a joint victory and a "happy ending[.]"

652.    In another deposition before Brazilian regulators around April 20, 2015, Sonnenfeld testified that around January 2008, Sonnenfeld worked with Defendants Curado and Aguiar on a campaign representing Embraer in Chile.  Sonnenfeld also asked to represent Embraer in Ecuador at that time.  Defendant Curado responded that Sonnenfeld should focus on Chile and not pursue a campaign in Ecuador.  Sonnenfeld believed that Embraer's business configuration in Ecuador denoted corruption.  Also, Sonnenfeld believed that there was a perception that Embraer's sales of E-170 and E-175 planes to the Argentinian company Air Austral were tainted with bribery.

653.    Indeed, around March 29, 2010, an allegation of irregularities in these transactions was made in the Argentinian paper La Nacion and refuted by Embraer in a press release issued around that time.  Also in early 2009, Brazil's *Veja* magazine in an article, entitled "Cobranca Suspeita" ("Suspicious Payment"), reported about accusations of improper payments associated with attempted Super Tucano sales to the Colombian government.  On February 5, 2009, Embraer filed a Form 6-K with SEC, which Defendant Aguiar signed, denying these accusations.

654.    Sonnenfeld's deposition testimony is corroborated by Embraer emails revealed from the regulatory investigations.  For example, in a June 4, 2007 email from "Satoshi" to Defendant Curado, copying Defendant Aguiar, amongst others, about meeting Manuel Vasquez

("Vasquez") of Argentina, Satoshi stated that an initial conversation with Vasquez was strange in that Vasquez explained that he was not from the government but had access to powerful Argentinian politicians, including the Secretary of Transport and the Minister of Infrastructure. For Satoshi, there were big questions about Vasquez.  Around June 6, 2007, Defendant Curado replied to the same email string stating that his suspicions were confirmed, that they needed to find out more before proceeding, and that up until that point, 100% of the time that a matter came to Embraer in this form, nothing came of it.

655.    In a deposition before Brazilian regulators around May 15, 2015, Sapha, who worked for Embraer for 11 years until 1990 and then began working for Sonnenfeld at his company Logistica, testified about hearing from Sonnenfeld that Sonnenfeld met with Defendant Curado. Also, Sapha heard rumors of bribe payments by Embraer in some countries, specifically recalling Colombia and Peru.  From what Sapha knew about Embraer, bribe payments could not have occurred without the President [or CEO] authorizing them, since they would involve advising from the Legal Department, which was directly linked to the President.

F.    **Defendants Aguiar's Knowledge**

656.    Between 2011 and February 2014, Defendant Aguiar was a member of Embraer's Executive Board as the Executive VP of the Defense and Security business unit.  Before then, he was Embraer's CFO.   During the Class Period, he had ultimate authority over Embraer's disclosures.  *He was named as a defendant in the Brazilian*

657.    In connection with the Dominican Republic bribery scheme, an email around September 1, 2008 reflects that Campos told Defendant Aguiar that Piccini was asking for a bribe.

658.    In connection with the Dominican Republic bribery scheme, Defendant Aguiar was aware of the potential use of Sonnenfeld to help effectuate the bribes to Piccini.

659.    As discussed above in ¶648, in a deposition around March 23, 2015 before Brazilian regulators, Sonnenfeld testified that Orlando said that Defendant Aguiar was aware of the Dominican Republic bribery scheme.

660.    As discussed above in ¶650(d), Defendant Aguiar signed the extremely atypical agreements to help effectuate the bribery schemes.

661.    In a deposition before Brazilian regulators around April 17, 2015, Sonnenfeld testified that he met with Defendant Aguiar in 2012 to discuss the burgeoning Embraer bribery investigation.  Sonnenfeld stated, "I did a favor for you, and you got me in trouble[.]"  Sonnenfeld testified that Defendant Aguiar stated, "Are you seeing now why it's not good to write many emails?"

662.    As discussed above in ¶653, in another deposition before Brazilian regulators around April 20, 2015, Sonnenfeld testified about Embraer's operations in Chile and Argentina. These allegations demonstrate Defendant Aguiar's knowledge about potential bribes in Chile and Argentina.  Brazil's *Veja* magazine reported accusations of improper payments associated with attempted Super Tucano sales to the Colombian government.  On February 5, 2009, Embraer filed a Form 6-K with SEC, which Defendant Aguiar signed, denying these accusations.

663.    The June 4, 2007 email discussed above in ¶654 corroborates Sonnenfeld's testimony about Defendant Aguiar's knowledge about Embraer bribery schemes.

664.    Sonnenfeld's deposition testimony was also corroborated by an Embraer email from Campos to Defendant Aguiar around September 1, 2008, discussing Ecuador:

> I am under attack since they said there is no contract for the Super Tucano due to a legal report.  I don't see risk in detonating the contract but I don't think we should make a good-will gesture together with the group.  My suggestion is to raise the Legacy commission from 1% to 2% (it would be $600k).  We would make an international consulting contract to be paid in December after Legacy's submission without mentioning the plane and the country.  We would have them tied up to give

us time to close the Super Tucano [contract] without surprises and to do the Legacy submission without fear. ***This way, I avoid infringing the anti-corruption laws of the country and I keep them supporting us.***

665.    In connection with the Mozambique bribery scheme, Defendants Aguiar and Rimoli executed a contract on Embraer RL's behalf for purported commercial representation with the company Xihivele – Consultoria e Servicos Ltda., which had been recently created by Zimba in Sao Tome e Principe.  This contract authorized Zimba's company to promote sales of the E-190 aircraft "only and specifically" for LAM, although the sale of those planes had been contracted for seven months before the signing of this purported commercial-representative contract.  Zimba's company did not even exist when the purchase-and-sale contract for the aircrafts was signed with LAM and did not act in any capacity in the ambit of that contract.  The contract with Zimba's company falsely affirmed that the work for promotion of sales had commenced in March 2008.

666.    In connection with the India bribery scheme, Khanna, an alleged arms dealer, contacted Defendant Aguiar to demand bribe payments associated with the Indian Government's purchase of AEW&C 145 aircrafts—almost three year after the signing of the agreement with the Indian Government.

### G.    Defendant Rimoli's Knowledge

667.    Defendant Rimoli was Embraer's General Counsel between 2005 and 2012 and Executive VP of Corporate Services between 2012 through 2013.  Between 2005 and 2012, Defendant Rimoli was also the Secretary of Embraer's Board.  Also, he has been an officer or member of the board of several of Embraer's subsidiaries.  He was a member of Embraer's Executive Board during the Class Period.  During the Class Period, he had ultimate authority over Embraer's financial disclosures. ***He was named as a defendant in the Brazilian Criminal Actions***

668. As of 2015, Defendant Rimoli has been the head of the compliance department of Construtora Camargo Correa, a company that is embroiled in the massive collusion and bribery scheme involving Petroleo Brasileiro S.A. – Petrobras.

669. In connection with the Dominican Republic bribery scheme, Defendant Rimoli advised senior Embraer executives and managers on how to effectuate the bribes to Piccini to hide their true purpose, including recommending the use of Sonnenfeld. An Embraer email around October 16, 2009 corroborates this point.

670. As discussed above in ¶648, in a deposition around March 23, 2015 before Brazilian regulators, Sonnenfeld testified that Orlando said that Defendant Rimoli was aware of the Dominican Republic bribery scheme.

671. As discussed above in ¶650(c), Defendant Rimoli signed the contract with Globaltix, which was as an extremely atypical contract.

672. As discussed above in ¶665, in connection with the Mozambique bribery scheme, Defendants Aguiar and Rimoli executed a contract on Embraer RL's behalf for purported commercial representation with the company Xihivele – Consultoria e Servicos Ltda.

**H.**     **Defendant Rodriguez's Knowledge**

673. Defendant Rodrigues was Embraer's Senior VP-General Counsel & Compliance in 2012 and since April 2013, she has been Embraer's Executive VP-General Counsel. She was a member of Embraer's Executive Board during the Class Period. During the Class Period, she had ultimate authority over Embraer's financial disclosures.

674. In connection with India bribery scheme, Defendant Rodrigues actively participated in hiding the fraud. To hide the fraudulent commercial-representation contract with Khanna—an alleged arms dealer—to help effectuate the bribes, Defendant Rodrigues hid the

contract in a lockbox in London.  This lockbox could have been opened only in the presence of an

Embraer authorized employee and Khanna—or someone linked to him.

## V.   NO SAFE HARBOR

675.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false and misleading statements pleaded in

the Amended Complaint.  Many of the specific statements pleaded herein were not identified as

"forward-looking statements" when made.  To the extent that there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking

statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time that each of those forward-looking statements were made, the

particular speaker knew that the particular forward-looking statement was false, and/or the

forward-looking statement was authorized and/or approved by an Embraer executive officer who

knew that those statements were false when made.

## VI.   LOSS CAUSATION/ECONOMIC LOSS

676.    The market for Embraer shares was open, well-developed, and efficient at all

relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of

conduct and a scheme to deceive the market, which artificially inflated Embraer shares and

operated as a fraud or deceit on Class Period purchasers of the Company's shares by

misrepresenting the material facts detailed herein.  As detailed above, at the end of the Class

Period, when Defendants' prior misrepresentations and/or omissions became known to the public,

the price of Embraer's shares fell precipitously, as the prior artificial inflation came out.  As a

result of their purchases of Embraer shares during the Class Period, Lead Plaintiff and the other Class members suffered economic loss—damages—under the federal securities laws.

677.   During the Class Period, Defendants presented a misleading picture of Embraer's financial condition, revenues, growth, performance, and business prospects.  Defendants' false and misleading statements and omissions had the intended effect and caused Embraer's shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

678.   In response to the curative revelations, the price of Embraer shares dropped dramatically on high volume, as detailed herein.  These drops, among others, removed inflation from the price of Embraer's shares, causing real economic loss to investors who had purchased the Company's shares during the Class Period.

679.   The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Embraer shares negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

680.   The economic loss—damages—suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Embraer's share price and the subsequent significant decline in the value of the Company's shares when Defendants' prior misrepresentations and omissions were revealed.

## VII.   RELIANCE PRESUMPTION

681.   At all relevant times, the market for Embraer shares was efficient for the following reasons, among others: (a) for most of the Class Period, the Company met the requirements for listing, was listed, and actively traded on the NYSE under ticker symbol "ERJ," a highly efficient

and automated market; (b) during the Class Period, numerous shares of the Company's ADRs were traded on a daily basis, demonstrating an active and broad market for the Company's ADRs and permitting a strong presumption of an efficient market; (c) as a regulated issuer, the Company filed periodic public reports with the SEC; (d) the Company regularly communicated with public investors through established market-communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (e) the Company was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and (f) unexpected material news about the Company was rapidly reflected and incorporated into the Company's stock price during the Class Period.

682. As a result of the foregoing, the market for Embraer shares promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the ADRs. Under these circumstances, all purchasers of Embraer shares during the Class Period suffered similar injury through their purchases of Embraer shares at artificially inflated prices, and a presumption of reliance applies.

## VIII.   CLASS ACTION ALLEGATIONS

683. Lead Plaintiff brings this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons and entities who purchased or otherwise acquired Embraer securities, including ADRs, during the Class Period and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

684.     The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Embraer securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other Class members may be identified from records maintained by Embraer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

685.     Lead Plaintiff's claims are typical of the claims of the other Class members as they are all similarly affected by Defendants' wrongful conduct in violation of securities laws complained of herein.

686.     Lead Plaintiff will fairly and adequately protect the other Class members' interests and has retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

687.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, financial condition, operations, internal controls, prospects, and management of Embraer;

- whether the Individual Defendants caused Embraer to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Embraer securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether Class members have sustained damages and, if so, what is the proper measure of damages.

688.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

689.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Embraer securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and the other Class members purchased Embraer securities between the time that Defendants failed to disclose or misrepresented material facts and the time that the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

690.    Based upon the foregoing, Lead Plaintiff and the other Class members are entitled to a presumption of reliance upon the integrity of the market.

691.    Also, Lead Plaintiff and the other Class members are entitled to the presumption of reliance established by the U.S. Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### IX.     CLAIMS FOR RELIEF

### COUNT I

### (Against all Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

692.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

693.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

694.     During the Class Period, Defendants did the following: engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to and, throughout the Class Period, did the following:  (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Embraer securities; and (iii) cause Lead Plaintiff and the other Class members to purchase Embraer securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants—and each of them—took the actions set forth herein.

695.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including, without limitation, statements made to securities analysts and the media that were designed to influence the market for Embraer securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Embraer's results.

696.    By virtue of their positions at Embraer, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other Class members or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Individual Defendants.  Said acts and omissions of the Individual Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

697.    Information showing that the Individual Defendants acted knowingly or with reckless disregard for the truth is particularly within the Individual Defendants' knowledge and control.  As the senior managers, executives, and/or directors of Embraer, the Individual Defendants had knowledge of the details of Embraer's internal affairs.

698.    The Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Embraer securities from their personal portfolios.

699.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Embraer.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Embraer's businesses, operations, future financial condition, and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Embraer's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Embraer's business and financial condition that were concealed by the Individual Defendants, Plaintiffs and the other Class members purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Individual Defendants, and they were damaged upon the revelation of the truth.

700.     During the Class Period, Embraer securities were traded on an active and efficient market.  Lead Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Embraer securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by the Lead Plaintiff and the other Class members, the true value of Embraer securities was substantially lower than the prices paid by Lead Plaintiff and the other Class members.  The market price of Embraer securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and the other Class members.

701.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

702.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions, and sales of the Embraer's securities during the Class Period, upon the disclosure that the Company had been disseminating materially false and misleading disclosures to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

703.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

704.    This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

705.    During the Class Period, the Individual Defendants participated in the operation and management of Embraer and conducted and participated directly and indirectly in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about Embraer's misstatements of income and expenses and false financial statements.

706.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Embraer's

financial condition and results of operations and to promptly correct any public statements issued by the Company that had become materially false or misleading.

707.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Embraer disseminated in the marketplace during the Class Period concerning the Company's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Embraer to engage in the wrongful acts complained of herein.   The Individual Defendants therefore were "controlling persons" of Embraer within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of Embraer securities.

708.    Each of the Individual Defendants acted as a controlling person of Embraer.   By reason of their senior management positions and/or being directors of Embraer, each of the Individual Defendants had the power to direct the actions of and exercised the same to cause Embraer to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of Embraer and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiff and the other Class members complain.

709.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Embraer.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands Judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, certifying Lead Plaintiff as the Class representative and its choice of choice of counsel, lead counsel, as Class counsel;

B.     Requiring defendants to pay damages sustained by Lead Plaintiff and the other Class members by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiff and the other Class members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.     Awarding such other and further relief as this Court may deem Just and proper.

## XI.   DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands trial by Jury of all issues that may be so tried.

Dated:  December 13, 2016

**POMERANTZ LLP**

By: _/s/Jeremy A. Lieberman_
Jeremy A. Lieberman
Tamar A. Weinrib
Justin S. Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: 312-377-1181

***Lead Counsel for the Class***