UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

EMPLOYEES RETIREMENT SYSTEM OF THE :
CITY OF PROVIDENCE, et al., Individually and :
on Behalf of All Others Similarly Situated, :

                                :

                      Plaintiffs, :

            - against - :

EMBRAER S.A., et al., :

                      Defendants. :

------------------------------------------------------------x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: **3/30/18**

16 Civ. 6277 (RMB)

**DECISION & ORDER**

I.    **Background**

On December 13, 2016, the Employees' Retirement System of the City of Providence, Rhode Island ("Plaintiff") filed an amended class action complaint pursuant to the federal securities laws against Embraer S.A. ("Embraer" or "Company"); Frederico Pinheiro Fleury Curado, Embraer's former chief executive officer and president (who resigned in July of 2016); and José Antonio de Almeida Filippo, Embraer's chief financial officer (collectively, "Defendants").[1] See Amended Class Action Complaint, dated Dec. 13, 2016 (hereafter "Amended Complaint").[2] Plaintiff sues individually and "on behalf of a class [] of all persons and entities" who purchased or otherwise acquired Embraer American Depository Receipts

---

[1] On March 31, 2017, Plaintiff voluntarily dismissed the action, without prejudice, as to Paulo Penido Pinto Marques, Luiz Carlos Siqueira Aguiar, Terena Penteado Rodrigues, and Flavio Rimoli. See Notice of Voluntary Dismissal, dated Mar. 31, 2017.

[2] On October 20, 2016, the Court appointed the Employees' Retirement System of the City of Providence as lead plaintiff (over several lead plaintiff applicants) because "it has by far the largest financial loss." Order, dated Oct. 20, 2016.

1

("ADRs") between January 11, 2012 and November 28, 2016 ("Class Period").[3] Id. ¶ 1. Plaintiff alleges, among other things, that during the Class Period Embraer made false or misleading statements about and/or failed to disclose violations of the U.S. Foreign Corrupt Practices Act ("FCPA"). See, e.g., id. ¶ 235 ("Embraer, in conducting and hiding the bribery schemes, was violating the FCPA and other anti-bribery, accurate-accounting, and internal-control laws."). **All of the referenced FCPA violations occurred before the Class Period.** See, e.g., id. ¶¶ 81-164. Plaintiff asserts claims against Defendants under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, and under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). See Amended Complaint ¶¶ 692-709.

Embraer is a Brazilian company that "manufactures commercial, executive, and defense aircrafts and sells them to governmental and private customers throughout the world." Id. ¶ 72. The individual Defendants are current or former senior officers of Embraer. Id. ¶ 707.

At the core of the Amended Complaint are allegations that "Embraer has engaged in and covered up a brazen and sprawling bribery scheme" with, among others, "Carlos Piccini Nunez [], the General Manager of Programs and Special Projects to the Secretary of the Dominican Republic's Airforce [sic];" "Mazen Snobar, an employee of the public Saudi Arabian company Saudi Aramco;" "at least one executive at Mozambique's state-owned and controlled airline, Linhas Aereas de Mocambique, S.A.;" "Mozambican official Mateus Lisboa Gentil Zimba;" "at least one Indian official with the Indian Air Force;" and "Vipin Khanna [] (an alleged arms dealer)." Id. ¶¶ 3-4. Plaintiff also contends that "[a] deluge of Embraer admissions to regulators

---

[3] "An American Depository Share [('ADS')] is a security that represents an ownership interest in a specified number of a company's ordinary shares. An American Depository Receipt [] is a physical certificate that evidences ADSs (in much that same way that a stock certificate evidences shares of stock)." In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 521 n.2 (S.D.N.Y. 2011), aff'd sub nom. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223 (2d Cir. 2016).

demonstrates the Company's culpability." Id. ¶ 6. "The Company admitted that between 2007

and 2011 [prior to the Class Period], several of its high-level executives helped effectuate

approximately $11.5 million in bribes to secure contracts with government officials" in the

Dominican Republic, Saudi Arabia, Mozambique, and India that "in total were worth $463.1

million in revenue and $83 million in profits." Id. ¶ 3 (footnote omitted). And, Plaintiff contends

that numerous public statements Defendants made during the Class Period (January 11, 2012 to

November 28, 2016) were false or misleading:

> Throughout the Class Period, . . . Embraer disclosed materially false and misleading statements regarding the following, without limitation: revenue, income, and cost metrics in both Embraer's consolidated and business-segment financial reporting; the aircraft agreements with and deliveries to the Dominican Republic, Saudi Arabia, Mozambique, and India; the nature of Embraer's subsidiaries, a substantial function of which were to execute the extremely atypical and fraudulent commercial-representation contracts used to effectuate the schemes and to dole out the bribes; provisions for foreseeable and quantifiable liabilities; adherence to the Company's code of ethics and business practices; internal controls; and knowledge about the very bribery schemes at the heart of this Action.

Id. ¶ 13.

On November 3, 2011, and thereafter, Embraer announced that it was under investigation

by the Department of Justice and the Securities and Exchange Commission "relating to possible

violations of the U.S. Foreign Corrupt Practices Act." Embraer S.A., Form 6-K (filed November

3, 2011). Embraer advised that it had "retained outside counsel to conduct an internal

investigation into transactions in three specific countries." Id. On March 26, 2013, Embraer also

disclosed that it had "voluntarily expanded the scope of the internal investigation to include two

additional countries," but did not specify the countries by name. Embraer S.A., Form 20-F (filed

March 26, 2013).

Following the initial public disclosure of the investigations by the Department of Justice

and the Securities and Exchange Commission in November 2011, Embraer stated in public

filings, among other things, that "[it] may be required to pay substantial fines and/or incur other sanctions." See, e.g., Embraer S.A., Form 20-F (filed April 13, 2012); Embraer S.A., Form 6-K (filed Oct. 24, 2012); Embraer S.A., Form 20-F (filed Mar. 26, 2013); Embraer S.A., Form 6-K (filed July 26, 2013); Embraer S.A., Form 20-F (filed Mar. 21, 2014). In these public filings, Embraer also stated that "[o]ur management, based upon the opinion of our outside counsel, believes that . . . there is no basis for estimating reserves or quantifying any possible contingency." See, e.g., Embraer S.A., Form 20-F (filed April 13, 2012).

On July 29, 2016, Embraer announced that "negotiations with the U.S. Department of Justice [] and the Securities and Exchange Commission [] for the settlement of the allegations of non-compliance with the U.S. Foreign Corrupt Practices Act [] have significantly progressed, to the point that Embraer is recognizing a US[] [$]200 million loss contingency . . . reflecting the likely outcome of this matter." Embraer S.A., Form 6-K (filed July 29, 2016). And, on October 24, 2016, i.e. shortly before the end of the Class Period, Embraer announced that it had entered into a deferred prosecution agreement (hereafter, "DPA") with the Department of Justice and a Consent to Entry of Final Judgment with the Securities and Exchange Commission ("Consent Agreement") "for the settlement of the allegations of criminal and civil violations." Embraer S.A., Form 6-K (filed October 24, 2016).

Under the DPA, Embraer agreed, among other things, to pay a $107.3 million fine for criminal "conspiracy to violate the anti-bribery and books and records provisions of the FCPA and . . . [for] violating the internal controls provisions of the FCPA." Id. The DPA also provided, among other things, that Embraer agreed to disgorge profits of $83,816,476 from the bribery scheme. DPA, No. 16-cr-60294, ¶¶ 7, 66 (S.D. Fla. October 24, 2016). The DPA stated that Embraer "had an inadequate compliance program at the time of the criminal conduct," but "now

4

has designed and is implementing a more adequate compliance program and system of internal accounting controls." Id. ¶ 4. The DPA also stated that Embraer "has disciplined a number of Company employees and executives engaged in the misconduct" and "did not discipline a senior executive who was (at the very least) aware of bribery discussions in emails in 2004 and had oversight responsibility for the employees in those discussions." Id. And, the DPA provided that Embraer "had fully cooperated with the [Department of Justice]'s investigation" which began in 2010 and ended in 2016. Id. at 4; see Amended Complaint ¶ 165.

The DPA contained a statement of facts ("Statement of Facts") to which Embraer agreed and stipulated. DPA, No. 16-cr-60294, at A-1. The Statement of Facts included the following, among other things: that one of Embraer's wholly owned subsidiaries, Embraer Representations LLC, "held and maintained a bank account in New York from which Embraer made improper payments" on or about May 24, 2010 and June 25, 2010. Id. at A-2, A-8 (emphasis omitted); that on or about November 21, 2009 "Embraer created a false agency agreement. . . . through its wholly owned subsidiary, ECC Investment Switzerland AG" in order "to conceal [a] payment" to an individual involved in the bribery scheme. Id. at A-16; that from 2008 to 2011, Embraer paid a local Dominican Republic official approximately $3.52 million, paid a local Saudi Arabian official more than $1.5 million, and paid an agent in India $5.76 million. Id. at A-15; and that "[d]uring the relevant period, Embraer knowingly and willfully failed to devise and maintain an adequate system of internal accounting controls." Id. at A-17.

Under the Consent Agreement, Embraer was required, among other things, "to pay disgorgement [of profits] in the amount of $83,816,476 . . . plus prejudgment interest thereon in the amount of $14,431,815, for a total payment of $98,248,291 to the Securities and Exchange Commission." Consent of Defendant Embraer, S.A., 16-cv-62501, ¶ 4 (S.D. Fla. October 24,

2016). Embraer was also required, among other things, "to retain an independent compliance monitor with demonstrated expertise in helping companies comply with the Foreign Corrupt Practices Act" for a period of three years. Consent of Defendant Embraer, S.A., 16-cv-62501, ¶ 4 (S.D. Fla. October 24, 2016).

On June 28, 2017, Defendants filed a motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure arguing, among other things, that "Plaintiff's allegations suffer from a temporal disconnect: Plaintiff alleges that Embraer's statements *during the class period* were false because Embraer violated the FCPA *before the Class Period*." Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss, dated June 29, 2017 ("Defs. Mem."), at 2. In particular, they argue that: **(1)** Embraer's statements or omissions concerning the Department of Justice and the Securities and Exchange Commission investigation are not actionable because companies "do not have a duty to disclose uncharged, unadjudicated wrongdoing." Id. at 9 (internal quotation marks omitted); **(2)** Plaintiff makes "no allegation that any wrongdoing occurred at the time of the statements" about Embraer's subsidiaries. Id. at 22. "There are no particularized facts alleged, and no basis to infer, that just because [Embraer's] subsidiaries were identified as having played a role in pre-Class Period FCPA violations, they did not also perform, during the Class Period, the legitimate functions that Embraer disclosed." Id.; **(3)** Embraer's statements or omissions concerning its financial statements are not actionable because "the challenged [financial] statements are accurate reports of Embraer's revenues, profits, and aircraft deliveries, which are not actionable." Id. at 2; **(4)** Embraer's statements or omissions concerning its code of ethics and anti-corruption policy are not actionable because "the statements are precisely the kind of vague, generalized aspirational statements courts have held to be immaterial as a matter of law." Id. at 18; **(5)** Embraer's opinion that Embraer could

6

not reliably estimate the liability it would incur for the alleged FCPA violations is not actionable because "Embraer's management, assisted by its outside advisors, . . . actually and honestly believe[d]" this opinion. Id. at 16. "This is just the type of Monday morning quarterbacking rejected in [Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318 (2015)]." Id.; **(6)** Embraer's statements or omissions concerning the effectiveness of its internal controls are not actionable because "Plaintiff relies on hindsight speculating that, because the FCPA violations occurred *before* the Class Period, Embraer's controls must have been inadequate *during* the Class Period, even though it cannot allege any failure of the controls during the Class Period. . . . Embraer's internal controls were, in fact, enhanced during the Class Period, a fact acknowledged by the DOJ in the DPA." Id. at 21; and **(7)** Plaintiff's failure to plead any primary violation of the Exchange Act or the requisite control by the individual Defendants requires dismissal of its Section 20(a) claims. Id. at 4.

On August 9, 2017, Plaintiff filed its opposition to Defendants' motion to dismiss contending, among other things, that: **(1)** "having raised the subject of the [government] investigation, Defendants were duty bound to alert investors to the certainty of the fraud and that it took place in four countries, not three." Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, dated August 9, 2017 ("Pl. Opp'n"), at 19; **(2)** "Defendants do not—and cannot—cite any authority supporting their proposition that Plaintiff[] must allege with precision that [Embraer's subsidiaries] did not have any legitimate functions during the Class Period and the exact timing of when the subsidiaries were used to effectuate the bribes." Id. at 32; **(3)** "Embraer's Class Period financial statements were not accurate . . . . While the revenues reported may have been the revenues collected, Defendants' failure to identify that a portion were derived from an illicit scheme is misleading." Id. at 23; **(4)** Embraer's statements or omissions concerning its code of

7

ethics and anti-corruption policy are actionable because "[k]nowing that Embraer faced an investigation, investors placed greater importance on statements concerning its adherence to a Code of Ethics and compliance with antibribery laws." Id. at 30; **(5)** "[a] reliable estimate [of Embraer's liability for the bribery scheme] was available based on the ill-earned $83 million in profits from the bribe-tainted aircraft agreements." Id. at 26. "Knowing that the scheme had taken place and had resulted in $83 million in quantifiable profit, Defendants had no valid basis for accepting any legal advice that directed them not to estimate reserves or quantify any potential contingency." Id. at 41; **(6)** "[w]hile professing that its internal controls were effective, Defendants knew of the bribery scheme, and that several executives that implemented the scheme remained at the Company during the Class Period. These allegations are sufficient to infer that the Company disbelieved the alleged statements at the time they were made." Id. at 31; and **(7)** "Defendants simply argue that a primary violation has not been pled, thus absolving them from Section 20(a) liability. They do not challenge, and thus concede, that the Section 20(a) claim is satisfied in all other respects." Id. at 41.

On August 24, 2017, Defendants filed a reply. Defs.' Rep. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, dated Aug. 31, 2017 ("Defs. Rep.").

**For the reasons set forth below, Defendants' motion to dismiss [#81] is granted.[4]**

## II.    Legal Standard

"The Class Period is the period during which the fraudulent misrepresentations impacted securities prices, thereby resulting in the alleged damages. Counsel chooses the Class Period during the early stages of the litigation." Linda Allen, Meeting _Daubert_ Standards in Calculating

---

[4] Any arguments raised by the parties but not specifically addressed herein have been considered by the Court and rejected.

Damages for Shareholder Class Action Litigation, 62 Bus. Law. 955, 969 (2007). "[P]re-class period allegations of misconduct are insufficient where 'there is scant else from which to infer that this was the company's practice at any pertinent time'[]." Cats v. Prot. One, Inc., 2001 WL 34070630, at *15 (C.D. Cal. June 4, 2001) (quoting Greebel v. FTP Software Inc., 194 F.3d 185, 202 (1st Cir. 1999)).

"It is well established that 'companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.'" In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 650 (S.D.N.Y. 2017) (quoting City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014)).

Because "a code of ethics is inherently aspirational, it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all." In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731, 755-56 (S.D.N.Y. 2017) (internal quotations and citations omitted). "An undisclosed breach" of a company's "anti-bribery prohibitions" is, "without more, not actionable under the securities laws." Id. at 756.

"[T]he securities laws do 'not allow investors to second-guess inherently subjective and uncertain assessments;' they are not, in other words, 'an invitation to Monday morning quarterback [a company]'s opinions.'" In re Weight Watchers Int'l, Inc. Sec. Litig., 2016 WL 2757760, at *5 (S.D.N.Y. May 11, 2016) (quoting Omnicare, 135 S. Ct. at 1327).

Where plaintiffs "failed to allege specific facts concerning [] purportedly deficient internal controls, including how they were deficient, when and why," "the plaintiffs' allegations concerning internal and disclosure controls [a]re insufficient." Janbay v. Canadian Solar, Inc., 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012).

"Where a plaintiff fails to allege any primary violation, he cannot establish control person liability under Section 20(a)." Wilbush v. Ambac Fin. Grp., Inc., 271 F. Supp. 3d 473, 486 (S.D.N.Y. 2017).

III.    **Analysis**

(1)    **Statements or Omissions Concerning Investigations**

Defendants persuasively argue that "[t]he Amended Complaint is premised on the faulty notion that Embraer was required to disclose details of the FCPA violations and admit that it had engaged in wrongdoing—before it had even been charged and before the investigations were even complete. However, the Second Circuit has held that disclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." Defs. Mem. at 8-9 (citation, brackets, and internal quotation marks omitted). Plaintiff counters that "having raised the subject of the investigation, Defendants were duty bound to alert investors to the certainty of the fraud and that it took place in four countries, not three." Pl. Opp'n at 19.

The controlling principle is that "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." UBS, 752 F.3d at 184 (brackets, footnote and internal quotation marks omitted). For example, in the UBS case, the plaintiffs "allege[d] that UBS made materially misleading statements regarding an alleged scheme in which UBS Swiss bankers traveled in and out of the United States to illegally advise American clients on the purchase of investments." Id. at 178. Following the indictment of UBS employees in connection with the scheme, UBS made two public disclosures which revealed that the Department of Justice and the Securities and Exchange Commission were investigating. Id. The plaintiffs in UBS argued that, in addition to disclosing the existence of an investigation, "defendants were required to disclose that UBS was, in fact, engaged in an ongoing . . . scheme."

10

Id. at 184. The district court dismissed the case at the motion to dismiss stage. Id. at 178. The

United States Court of Appeals for the Second Circuit affirmed, reasoning that "[b]y disclosing

its involvement in multiple legal proceedings and government investigations and indicating that

its involvement could expose UBS to substantial monetary damages and legal defense costs, as

well as injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions,

UBS complied with its disclosure obligations under our case law." Id. at 184.

Similarly, in the Banco Bradesco case, the plaintiffs contended that the defendant

company "should have disclosed that it was engaged in an unlawful bribery scheme." 277 F.

Supp. 3d at 653. The district court rejected the plaintiffs' argument, reasoning that "companies

do not have a duty to disclose uncharged, unadjudicated wrongdoing," and found that the

defendant company's disclosures during the class period "did address the risks that could result

from unlawful conduct." Id. at 650-51. The defendant company in Banco Bradesco disclosed that

"'our subsidiary Banco Bradesco BBI S.A. is a party to certain legal and administrative

proceedings filed against Petrobras and other defendants' and that 'we or our subsidiaries may

become a party to other legal and/or administrative proceedings against Petrobras or other

companies which have not yet been filed.'" Id. at 651. The defendant company also stated that

"'a negative outcome of these ongoing legal proceedings or any new legal proceedings may harm

our reputation and may adversely affect our financial condition and our results of operations.'"

Id. (brackets, citations and ellipsis omitted). The district court found these disclosures were

sufficient to satisfy any duty the company may have had to disclose. Id. at 653-54.

The Court finds that Embraer complied with its disclosure obligations. As did the

defendants in UBS and Banco Bradesco, Embraer disclosed that it was under investigation by the

Department of Justice and the Securities and Exchange Commission for alleged violations of the

FCPA on November 3, 2011 (i.e. before the Class Period began). See Embraer S.A., Form 6-K

(filed November 3, 2011). Embraer stated, on November 3, 2011:

> In response to a subpoena issued in an investigation by the U.S. Securities and Exchange Commission ("SEC") relating to possible violations of the U.S. Foreign Corrupt Practices Act, the Company retained outside counsel to conduct an internal investigation into transactions in three specific countries. That internal investigation is ongoing, and the Company is fully cooperating with the SEC and the U.S. Department of Justice ("DOJ"). The Company's outside counsel has been in regular contact with the SEC and the DOJ and has provided both agencies with documents and other information. The Company's outside counsel recently met with both agencies to brief them on the status of its investigation. The Company and its outside counsel expect to continue to have discussions with the SEC and the DOJ. The Company is unable to predict duration, scope or results of the investigation.

Id.

And, Embraer publicly warned, among other times, on April 13, 2012 (i.e. during the

Class Period) that it might have to pay substantial fines and/or incur other sanctions, stating:

> **SEC/DOJ Investigation.** We received a subpoena from the SEC, which inquired about certain operations concerning sales of aircraft abroad. In response to this SEC-issued subpoena and associated inquiries into the possibility of non-compliance with the U.S. Foreign Corrupt Practices Act, or FCPA, we retained outside counsel to conduct an internal investigation on transactions carried out in three specific countries.
>
> The investigation remains ongoing and we, through our outside counsel, continue to cooperate fully with the SEC and U.S. Department of Justice, which are the authorities responsible for reviewing the matter. Our management, with the support of our outside counsel, has concluded that, as of December 31, 2011, it is still not possible to estimate the duration, scope or results of the investigation. **In the event that an illegal activity is identified or the parties enter into an agreement to settle the matter, we may be required to pay substantial fines and/or to incur other sanctions, as provided in the FCPA.** Our management, based upon the opinion of our outside counsel, believes that, as of December 31, 2011, there is no basis for estimating reserves or quantifying any possible contingency.

Embraer S.A., Form 20-F (filed Apr. 13, 2012) (emphasis added). Throughout the Class Period,

Embraer continued to warn the public, for example, that "[i]n the event that the SEC and/or DOJ

12

investigations result in enforcement action, we may be required to pay substantial fines and/or to incur other sanctions, as provided in the FCPA." See, e.g., Form 6-K (filed Oct. 24, 2012). The Court finds that these disclosures satisfied Defendants' disclosure obligations. See UBS, 752 F.3d at 184; Banco Bradesco, 277 F. Supp. 3d at 651.[5]

### (2)    Statements or Omissions Concerning Subsidiaries

Defendants argue that Embraer's statements or omissions during the Class Period concerning its subsidiaries (e.g., that "Embraer RL provided 'commercial and institutional representation' and that ECC investment is 'an in-house insurance company'") are not actionable because "[t]here are no particularized facts alleged, and no basis to infer, that just because these subsidiaries were identified as having played a role in pre-Class Period FCPA violations, they did not also perform, during the Class Period, the legitimate functions that Embraer disclosed." Defs. Mem. at 21-22 (quoting Amended Complaint ¶¶ 245-46). Plaintiff counters that "Defendants do not—and cannot—cite any authority supporting their proposition that Plaintiff[] must allege with precision that [Embraer's subsidiaries] did not have any legitimate functions during the Class Period and the exact timing of when the subsidiaries were used to effectuate the bribes." Pl. Opp'n at 32.

Most of the statements concerning subsidiaries which Plaintiff alleges were false or misleading describe the business activities that the subsidiaries engaged in. See, e.g., Amended Complaint ¶ 245 ("Embraer RL provided 'commercial and institutional representation for the

---

[5] Plaintiff also asserts that "even when Defendants issued their bare bones statements about the regulatory investigations and the internal investigation they had no choice but to undertake, they identified the scope as 'transactions carried out in *three* specific countries' though they knew that the scheme had been carried out in at least *four* countries." Pl. Opp'n at 21. An operative disclosure, in the Court's view, was that "[t]he Company is unable to predict the duration, scope or results of the investigation." Embraer S.A., Form 6-K (filed November 3, 2011).

13

Company.'"). Other statements concerning the subsidiaries which Plaintiff alleges were false or misleading indicate that one of the subsidiaries, ECC Investment Switzerland AG, owns other subsidiaries. See, e.g., id. ¶ 397 ("ECC Investment 'Switzerland, holds 100% of the capital of . . . ECC Insurance & Financial Co. Ltd . . . this company is an in-house insurance company providing cover[age] for the financial guarantees offered to customers and/or financing agents involved in structuring the sales of Embraer aircraft.'"). Plaintiff does not dispute that Embraer's subsidiaries performed genuine business functions during the Class Period. And, Plaintiff does not dispute that ECC Investment Switzerland AG owns other subsidiaries.

Plaintiff argues unpersuasively that the statements concerning the subsidiaries are actionable because Embraer did not disclose that before the Class Period "Embraer'[s] subsidiaries . . . were [allegedly] used as tools to execute fraudulent commercial-representation contracts with and dole out bribes to parties necessary to effectuate the bribery schemes in the Dominican Republic, Saudi Arabia, Mozambique, and India." Amended Complaint ¶ 235. As noted at pages 10-12 supra, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." UBS, 752 F.3d at 184. And, as noted at pages 12-13 supra, Defendants disclosure obligations were satisfied. See In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("Because the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct, the allegation that [the company] misstated its earnings merely by failing to disclose the misconduct at its [] subsidiary is not actionable."); see also UBS, 752 F.3d at 184; Banco Bradesco, 277 F. Supp. 3d at 651.

### (3)    Statements or Omissions Concerning Financial Statements

Defendants argue that "Plaintiff's claim rests on the incorrect premise that Embraer was obligated to disclose that some unstated portion of its sales or income was derived from contracts

related to the FCPA violations. But Embraer had no such duty." Defs. Mem. at 11 (citation omitted). Plaintiff counters unpersuasively that "[d]ivulging financial results with nary a mention of the part an illicit bribery scheme played in achieving those financials—to the tune of $83 million on profit—is actionable." Pl. Opp'n at 23. According to Plaintiff, **"while the revenues reported may have been the revenues collected**, Defendants' failure to identify that a portion were derived from an illicit scheme is misleading." Id. (emphasis added).

In Sanofi, the plaintiffs alleged that a pharmaceutical company had "engaged in an illegal marketing scheme to artificially boost the sales of its diabetes product line and hid those illegal practices from investors while touting the product line's incredible sales growth." 155 F. Supp. 3d at 391, 395 ("All of Sanofi's 6Ks, with the accompanying press releases and conference calls, as well as both of its 20-Fs failed to indicate that: (1) sales growth for its diabetes product line was boosted by an illegal marketing and kickback scheme; [and] (2) [the company]'s selling and general expenses disclosures included unlawful payments that were part of the illegal marketing and kickback scheme."). In granting the defendant's motion to dismiss, the district court rejected the plaintiffs' argument, reasoning that

> There is no allegation that Sanofi failed to accurately report any of its financial figures. Courts in this district have held that the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability. Absent an allegation that Sanofi reported income that it did not actually receive or sales growth that did not actually occur, this Court agrees that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.

Id. at 404 (citations and internal quotation marks omitted).

Similarly, in the instant case, Plaintiff does not plead that Embraer's financial statements were inaccurate. And, "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." Id. Because, as in Sanofi, Plaintiff does not

15

dispute that the Embraer financial statements were (literally) accurate, the statements or omissions concerning Embraer's financial statements are not actionable. Id.; see also Marsh, 501 F. Supp. 2d at 469.

### (4)    Statements or Omissions Concerning Embraer's Code of Ethics and Anti-Corruption Policy

Defendants argue persuasively that statements concerning Embraer's code of ethics and its anti-corruption policy are not actionable because "the statements are precisely the kind of vague, generalized aspirational statements courts have held to be immaterial as a matter of law." Defs. Mem. at 17-18 (citation omitted). Plaintiff counters that the statements concerning Embraer's code of ethics and its anti-corruption policy are actionable because "[k]nowing that Embraer faced an investigation, investors placed greater importance on statements concerning its adherence to a Code of Ethics and compliance with anti-bribery laws." Pl. Opp'n at 30.

A recent case from this district supports Defendants' position. See Braskem, 246 F. Supp. 3d at 754-56. In Braskem, a Brazilian petrochemical company had adopted a code of ethics and had stated that "[n]o waivers of the provisions of the code of ethics are permitted." Id. at 755. The defendant company had also adopted rules "forbidding bribery." Id. at 756.

The plaintiffs, in Braskem, alleged that in contravention of its code of ethics and its rules forbidding bribery, the defendant company engaged in a "long-running bribery scheme." Id. at 740-41. But in granting the defendant company's motion to dismiss in part, the district court explained that the failure to abide by a code of ethics and rules prohibiting bribery was not actionable under the securities laws:

> To the extent that plaintiffs rely on Braskem's code of conduct, it is a particularly inapt candidate to serve as the basis for § 10(b) liability. As the Second Circuit has noted, statements within such codes tend to be "explicitly aspirational, with qualifiers such as 'should.'" Such is the case here, even based on the code excerpts extracted by plaintiffs in the [complaint].

16

> [The defendant company]'s statement in the Form 20-F filed on June 10, 2011, to the effect that "no waivers of the provisions of the code of ethics are permitted," does not alter this analysis. **Because "a code of ethics is inherently aspirational, it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all."**
>
> Plaintiffs [also] rely on the company's anti-bribery prohibitions. **An undisclosed breach of this standard of conduct is, however, without more, not actionable under the securities laws.** There is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct. The [complaint] does not allege any historical representation by the company to the effect that its officers had uniformly abided by these rules.

Id. at 755-56 (citations omitted and emphasis added).

The instant case is similar to Braskem, and the same result is warranted here. In the Amended Complaint, Plaintiff alleges that "Embraer's Code of Ethics and details about its anti-corruption policy are maintained on the Company's website and strictly prohibit extortion, bribery, and money laundering." Amended Complaint ¶ 192. Embraer's code of ethics contains aspirational statements such as, "[t]he Company must work against corruption in all its forms, including extortion and bribery;" and "Embraer seeks to adhere to all laws and accounting standards applicable to its ledgers, accounting records and financial statements, undertaking to record all financial transactions with accuracy and reliability." Id. ¶ 194. And, Embraer's anti-corruption policy requires compliance with Embraer's code of ethics and with all relevant laws and regulations against bribery and corruption. Id. ¶ 195. Because Embraer's code of ethics is inherently aspirational, it cannot be that every time a violation of that code occurs, Embraer will be liable under federal laws. See Braskem, 246 F. Supp. 3d at 755-56. And, an undisclosed

breach of Embraer's anti-bribery prohibitions is, without more, similarly not actionable under the securities laws. Id. at 756.[6]

### (5)     Estimate of Potential Liability

Defendants argue that the decision to record a liability is a matter of opinion and belief, Defs. Mem. at 14, and that "Plaintiff cannot (and does not) allege that . . . Embraer's management, assisted by its outside advisors, did not actually and honestly believe that it lacked a reasonable basis for estimating reserves for the investigation." Id. at 16. Plaintiff counters unpersuasively that "[a] reliable estimate [of Embraer's liability for the bribery scheme] was available based on the ill-earned $83 million in profits from the bribe-tainted aircraft agreements." Pl. Opp'n at 26. "Knowing that the scheme had taken place and had resulted in $83 million in quantifiable profit, Defendants had no valid basis . . . not to estimate reserves or quantify any potential contingency." Id. at 41.

The instant motion is governed by the principle that "[t]he securities laws do 'not allow investors to second-guess inherently subjective and uncertain assessments;' they are not, in other words, 'an invitation to Monday morning quarterback [a company]'s opinions.'" Weight Watchers, 2016 WL 2757760, at *7 (quoting Omnicare, 135 S. Ct. at 1327).

---

[6] It should be noted that some courts have held that where a company uses its adherence to its code of ethics "to reassure the investing public about the [c]ompany's integrity," such statements may be actionable. In re Eletrobras Sec. Litig., 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (brackets, citations and internal quotations omitted). For example, in Electrobras, an electric utilities company "emphasized its adherence to its Code of Ethics and corporate governance rules in response to specific press reports indicating that [a] money laundering investigation— initially focused on energy company Petrobras—had widened to include [the electric utilities company's] projects." Id. The court denied the defendant's motion to dismiss reasoning that "[w]hen (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the [c]ompany's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company." Id. The Electrobras case is currently stayed while the parties engage in mediation. See Order, 15-cv-5754 (S.D.N.Y. Feb. 28, 2018).

The Court finds that Embraer's statement of opinion – which in turn was based upon the written opinion and/or advice of attorneys Baker & McKenzie LLP – is not actionable because "an investor cannot state a claim by alleging only that an opinion was wrong." Omnicare, 135 S. Ct. at 1332; see DPA, No. 16-cr-60294, at A-0. Embraer stated publicly on April 13, 2012, that "management, based upon the opinion of our outside counsel, believes that . . . there is no basis for estimating reserves or quantifying any possible contingency." Embraer S.A., Form 20-F (filed April 13, 2012). Plaintiff does not plead that this statement was (insincerely) not truthful or that management (and its outside counsel) did not believe what they were stating publicly. It is of little moment that Plaintiff disagrees with the opinion, see Pl. Opp'n at 27, and alleges that "a reliable estimate—at least the $83 million in tainted profits—was available." Id. As noted, "[t]he securities laws do 'not allow investors to second-guess inherently subjective and uncertain assessments.'" Weight Watchers, 2016 WL 2757760, at *5; Omnicare 135 S. Ct. at 1327 (where the court found that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove that belief wrong.").

**(6)   Statements Concerning Internal Controls**

Defendants contend that Plaintiff's internal controls claim is deficient principally because there are no particularized allegations regarding Defendants' failure to maintain adequate controls ("with contemporaneous support to show that the control procedures were not followed"). Defs. Mem. at 20 (brackets and internal quotations omitted). Defendants also argue that there is a "temporal disconnect" between bribery events which occurred well before the Class Period and alleged faulty internal controls between January 11, 2012 and November 28, 2016. Id. at 2. Plaintiff counters that "the DPA admits that, as of October 24, 2016, Embraer had not disciplined a senior executive with oversight responsibility over the employees engaged in

19

the illegal activity, even though that executive was at least aware of the bribery discussions in 2004. Moreover senior executives that participated in the scheme remained at Embraer during the Class Period." According to Plaintiff, allowing senior executives of Embraer to remain employed at the Company with oversight responsibility despite their knowledge of a bribery scheme "demonstrates a clear breakdown of the Company's internal controls *during the Class Period.*" Pl. Opp'n at 31-32.

The allegations (pleadings) in support of Plaintiff's claim of a failure of Embraer's internal controls are not sufficiently "particularized" to survive Defendant's motion to dismiss. See Janbay, 2012 WL 1080306, at *9. Where plaintiffs allege that internal controls are deficient, courts have consistently required plaintiffs to "allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why." Id. at *2, *9 ("The Complaint does not allege any facts explaining why or how [the company]'s internal controls were materially deficient at the time [the company] made any of the challenged statements.").

In a relatively recent case, In re PetroChina Co. Ltd. Sec. Litig., 120 F. Supp. 3d 340 (S.D.N.Y. 2015), the absence of particularized allegations doomed the plaintiffs' claim. In that case, the plaintiffs alleged that the defendant company "falsely claimed to have adequate internal controls," id. at 347-48, and that the defendant company had misled investors because senior officers of the company were aware of corporate bribery "and of significant or material internal control weaknesses." Id. at 352. In dismissing the case, the court stated:

> The [complaint] does not claim that [the company] failed to evaluate its internal controls or disclose any weaknesses to its auditors. It does not assert that the [company's] officers neglected to inform [the company]'s auditor of any relevant fraud. And it does not establish that [the company]'s internal controls in relation to financial reporting were insufficient; much less does the [complaint] make any allegation as to how or why [the company]'s internal controls were inadequate.

20

Id. at 359-60 (citations and internal quotations omitted). These same weaknesses identified in

PetroChina also attach to Plaintiff's internal control claim in this case.

Plaintiff cites to In re Petrobras Sec. Litig., a case where the court apparently did not

require the plaintiffs to present more detailed information about the defendant's internal controls.

See 116 F. Supp. 3d 368, 377, 380-81 (S.D.N.Y. 2015). In granting a motion to dismiss in part

and denying the motion in part, the court found the plaintiffs' allegations were sufficient

observing that: "[P]laintiffs allege that at the time the Company's management was professing its

opinion that the company's internal controls were effective, that same management was well

aware of the extensive corruption in the Company's procurement activities. These allegations are

sufficient to infer that the Company disbelieved the alleged statements at the time they were

made." Id.

The instant case is similar to PetroChina, and unlike Petrobras, for the following reasons:

Plaintiff, in the instant case, relies exclusively upon general assertions about Embraer's internal

controls – and tortuously (and unpersuasively) tries to relate them to the fact that some current

Embraer employees knew about or participated in (publicly disclosed) pre-Class Period bribery

at various points between 2004 to 2011. See, e.g., Amended Complaint ¶ 235 ("Statements by

Defendants regarding the adequacy of internal controls failed to disclose that the Company's

internal controls were insufficient to insure that the Company did not violate the FCPA and other

anti-bribery laws."). These allegations fall short of satisfying the exacting (specificity) pleading

requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. See Janbay, 2012 WL 1080306, at *9. As

in PetroChina, the Plaintiff here has failed to "allege specific facts concerning the purportedly

deficient internal controls, including how they were deficient, when and why." 120 F. Supp. 3d

21

at 359 (quoting Janbay, 2012 WL 1080306, at *9). Plaintiff does not allege facts regarding the structure of Embraer's internal controls, or how they failed during the Class Period. See id. The Plaintiff does not claim, e.g., that Embraer "failed to evaluate its internal controls or disclose any weaknesses to its auditors," and does not assert that Embraer's "officers neglected to inform [the company]'s auditor of any relevant fraud." Id. It goes without saying that it is no secret that the employees whom Plaintiff is referring to work at Embraer; and that the Company's internal controls have nothing to do with uncovering or publicizing this fact.

Petrobras is not supportive of Plaintiff's cause. The plaintiffs in Petrobras alleged that "at the time the Company's management was professing its opinion that the company's internal controls were effective, that same management was well aware of the extensive corruption in the Company's procurement activities." 116 F. Supp. 3d at 380-81. And, both the statements and the alleged corruption occurred during the class period. Id. In the instant case, Plaintiff has not pled that the bribery scheme occurred during the Class Period. In fact, it occurred five years prior to the Class Period. See page 2 supra. That is, Plaintiff here alleges pre-Class Period claims and findings of misconduct (bribery) and seeks, thereby, implausibly to draw bribery into the Class Period via the internal controls claim. These allegations are temporally and logically insufficient. "'[T]here is scant else from which to infer that this was the company's practice at any pertinent [class period] time.'" See Cats, 2001 WL 34070630, at *15 (quoting Greebel, 194 F.3d at 202) ("[A]lleged accounting manipulation occurring prior to the Class Period cannot meet the heightened pleading standards of the PSLRA in the absence of specific facts showing that the practice continued during the Class Period.").

Plaintiff relies upon the allegations that "Embraer had not disciplined a senior executive with oversight responsibility over the employees engaged in the illegal activity, even though that

22

executive was at least aware of the bribery discussions in 2004" and that "senior executives that participated in the scheme remained at Embraer during the Class Period." Pl. Opp'n at 31-32. These claims are derived from the DPA and are quoted at page 20 supra; see also pages 4-5 supra. They have nothing to do with Class Period internal controls or demonstrating that Embraer's internal controls were deficient. See PetroChina 120 F. Supp. 3d at 359; Cats, 2001 WL 34070630, at *15 ("[P]re-class period allegations of misconduct are insufficient where 'there is scant else from which to infer that this was the company's practice at any pertinent time.'" (quoting Greebel, 194 F.3d at 202)).

Moreover, internal controls logically relate to financial reporting which the Court finds (at pages 15-16 supra) was not false or misleading. See PetroChina, 120 F. Supp. 3d at 359 ("Even if [a company's] officials were engaging in bribery, the [complaint] does not make any allegations that would imply that the Company had flawed internal controls over *financial reporting*.").

### (7)    § 20(a) Claims

Plaintiff's control person claims against the individual Defendants under § 20(a) of the Exchange Act, are necessarily predicated upon a primary violation of securities law by the individual Defendants. See Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004). Because, for the reasons set forth above, see pages 10-23 supra, Plaintiff's primary claims under § 10(b) and Rule 10b-5 are unpersuasive, the control person or secondary claims must also be dismissed. See id. at 178 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary claims must also be dismissed."); see also Wilbush, 2017 WL 4125364, at *18 ("Because the Court holds that

23

Plaintiff has not alleged a primary violation of the Securities Exchange Act or Rule 10b-5, he cannot establish control person liability." (citation and internal quotation marks omitted)).

## IV.    Conclusion & Order

For the reasons stated above, Defendants' motion to dismiss [#81] is granted with prejudice.[7] The Clerk of Court is respectfully directed to close this case.


Dated: March 30, 2018
       New York, New York

RMB
_____
**RICHARD M. BERMAN**
**U.S.D.J.**

---

[7] At a status conference on November 2, 2016, Plaintiff's counsel asked the Court to extend its deadline to file an amended complaint to December 13, 2016 in order **"to make this a very strong amended complaint, one that we only need to amend once."** Tr. of Proceedings, dated Nov. 2, 2016 at 3 (emphasis added).